No. 23-10159

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

ALEXANDER R. DEANDA, on Behalf of Himself and Others Similarly Situated,

Plaintiff-Appellee,

v.

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; JESSICA SWAFFORD MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; UNITED STATES OF AMERICA,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas

## BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*
ABBY C. WRIGHT
COURTNEY L. DIXON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7246*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-8189*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as appellants are government entities and government officials sued in their official capacities.

5th Cir. R. 28.2.1

## STATEMENT REGARDING ORAL ARGUMENT

The government respectfully requests oral argument. The district court held that a federal statute, Title X of the Public Health Service Act, does not preempt state parental-consent laws with respect to the provision of federal family-planning services under the Title X program. The district court further held that, as administered, the Title X program violates plaintiff's substantive due-process rights, and the court vacated a portion of a federal regulation on that basis. The government believes oral argument would provide substantial assistance to the Court.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................1

STATEMENT OF JURISDICTION .................................................................2

STATEMENT OF THE ISSUES.......................................................................2

STATEMENT OF THE CASE ..........................................................................3

I.    The Title X Program ..............................................................................3

II.   Procedural History.................................................................................8

SUMMARY OF ARGUMENT.......................................................................13

STANDARD OF REVIEW .............................................................................18

ARGUMENT ...................................................................................................18

I.    Plaintiff Lacks Article III Standing ...................................................18

II.   State Laws Requiring Parental Consent and Notification Do Not
      Apply to Title X Federal Family-Planning Services ........................25

      A.    The Title X Statute and HHS's Regulations Preempt Parental
            Consent and Notification Requirements for Title X Federal
            Family-Planning Services .........................................................25

      B.    The District Court Erred in Concluding That a Parental-Consent
            Requirement Can Be Imposed on the Title X Program Under
            Texas Law ..................................................................................32

III.    The District Court Erred in Recognizing an Abstract and Unqualified Constitutional Right of Parents to Insist that Contraception Not Be Provided to Minors ................................................................................................ 36

IV.    Even Assuming It Were Correct on the Merits, the District Court Abused Its Discretion in Vacating HHS's Regulation ................................... 48

CONCLUSION ................................................................................................ 52

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Alfonso v. Fernandez,*
   195 A.D.2d 46 (N.Y. App. Div.  1993) ................................................... 42, 43

*Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health,*
   503 F.3d 256 (3d Cir. 2007) ...................................... 11, 16, 37, 39, 40, 41, 42

*Arizona v. United States,*
   567 U.S. 387 (2012) ........................................................................... 33, 34

*Central & S.W. Servs., Inc. v. U.S. EPA,*
   220 F.3d 683 (5th Cir. 2000) ....................................................................... 51

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ............................................................................. 13, 18

*County of St. Charles v. Missouri Family Health Council,*
   107 F.3d 682 (8th Cir. 1997) ......................................................... 6, 15, 29

*Crosby v. National Foreign Trade Council,*
   530 U.S. 363 (2000) ............................................................................. 25-26

*Curtis v. School Comm. of Falmouth,*
   652 N.E.2d 580 (Mass. 1995) ...................................................................... 43

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor,*
   45 F.4th 846 (5th Cir. 2022) ....................................................................... 51

*Davidson v. Fairchild Controls Corp.,*
   882 F.3d 180 (5th Cir. 2018) ....................................................................... 18

*Doe v. Irwin,*
   615 F.2d 1162 (6th Cir. 1980) ................................. 11, 16, 39, 41, 42, 43, 46

*Doe v. Louisiana,*
   2 F.3d 1412 (5th Cir. 1993) ........................................................................ 37

*Doe v. Pickett,*
   480 F. Supp. 1218 (S.D. W. Va. 1979) ........................................................ 29

*E.T. v. Paxton,*
   41 F.4th 709 (5th Cir. 2022) ....................................................................... 22

*Fidelity Fed. Sav. & Loan Ass'n v. Reginald D. de la Cuesta,*
 458 U.S. 141 (1982) ............................................................... 26, 31

*Gates v. Cook,*
 376 F.3d 323 (5th Cir. 2004) ........................................... 18

*Geier v. American Honda Motor Co.,*
 529 U.S. 861 (2000) ............................................................. 30

*Gibbons v. Ogden,*
 22 U.S. (9 Wheat.) 1 (1824) ........................................... 25

*Gill v. Whitford,*
 138 S. Ct. 1916 (2018) ...................................................... 17, 49

*Henson v. Santander Consumer USA, Inc.,*
 582 U.S. 79 (2017) ............................................................... 28

*Hines v. Davidowitz,*
 312 U.S. 52 (1941) ............................................................... 26, 30

*Hollingsworth v. Perry,*
 570 U.S. 693 (2013) ........................................................... 22

*Hughes v. Talen Energy Mktg., LLC,*
 578 U.S. 150 (2016) ........................................................... 26

*International Paper Co. v. Ouellette,*
 479 U.S. 481 (1987) ........................................................... 34

*Jane Does 1 through 4 v. Utah Dep't of Health,*
 776 F.2d 253 (10th Cir. 1985) ....................................... 6, 29

*Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1,*
 469 U.S. 256 (1985) ........................................................... 26

*Littlefield v. Forney Indep. Sch. Dist.,*
 268 F.3d 275 (5th Cir. 2001) ......................................... 37, 44

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) ................................... 13, 18, 19, 20, 23

*Madsen v. Women's Health Ctr., Inc.,*
 512 U.S. 753 (1994) ........................................................... 49

*Mann v. County of San Diego,*
  907 F.3d 1154 (9th Cir. 2018) ..................................................... 45

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ................................................................. 24

*New York v. Heckler,*
  719 F.2d 1191 (2d Cir. 1983) ........................................... 5, 28, 29

*Parents United for Better Sch., Inc. v. School Dist. of Phila. Bd. of Educ.:*
  646 A.2d 689 (Pa. Comm. Ct. 1994) ............................................ 24
  148 F.3d 260 (3d Cir. 1998) ...................................................... 42

*Parker v. Hurley,*
  514 F.3d 87 (1st Cir. 2008) ....................................................... 44

*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981) .................................................................. 35

*Planned Parenthood Ass'n of Utah v. Matheson,*
  582 F. Supp. 1001 (D. Utah 1983) ............................................... 29

*Planned Parenthood Fed'n of Am., Inc. v. Heckler,*
  712 F.2d 650 (D.C. Cir. 1983) .......... 4, 5, 6, 15, 16, 25, 26, 27, 28, 29, 30, 31, 32, 34

*Planned Parenthood of Hous. & Se. Tex. V. Sanchez,*
  403 F.3d 324 (5th Cir. 2005) .............................. 16, 30, 31, 32, 34

*Prince v. Massachusetts,*
  321 U.S. 158 (1944) ................................................................. 38

*Shrimpers & Fisherman of RGV v. Texas Comm'n on Envt'l Quality,*
  968 F.3d 419 (5th Cir. 2020) ............................................... 14, 21

*South Dakota v. Dole,*
  483 U.S. 203 (1987) ................................................................. 35

*Stringer v. Whitley,*
  942 F.3d 715 (5th Cir. 2019) ............................................... 21, 23

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ......................................................... 14, 21

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
  393 U.S. 503 (1969) ................................................................. 38

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ............................................................ 14, 23

*Troxel v. Granville*,
   530 U.S. 57 (2000) ......................................................... 37, 43, 44

*Wallis v. Spencer*,
   202 F.3d 1126 (9th Cir. 2000) ......................................... 45

**Federal Statutes:**

Administrative Procedure Act (APA):
   5 U.S.C. § 703 ........................................................................ 51
   5 U.S.C. § 706(2) ......................................................... 3, 12, 17
   5 U.S.C. § 706(2)(A) ............................................................ 48

Consolidated Appropriations Act, 2022,
   Pub. L. No. 117-103, div. H, 136 Stat. 49:
      § 207, 136 Stat. 49, 466 ................................................7
      § 208, 136 Stat. 49, 466-67 ......................................... 7, 47

Department of Health and Human Services Appropriations Act, 1999,
   Pub. L. No. 105-277, tit. II, § 219, 112 Stat. 2681, 2681-363 (1998) ..........................7

Departments of Labor, Health and Human Services, and Education, and
   Related Agencies Appropriations Act, 1998,
   Pub. L. No. 105-78, § 212, 111 Stat. 1467, 1495 (1997) .................................7

Public Health Service Act,
   Pub. L. No. 91-572, tit. X, 84 Stat. 1504 (1970)
   (codified as amended at 42 U.S.C. § 300 *et seq.*):
      § 2, 84 Stat. at 1504................................................26
      § 2(1), 84 Stat. at 1504................................................3
      42 U.S.C. § 300(a) ....... 2, 3, 4, 5, 10, 15, 26, 27, 28, 29, 30, 33, 34, 35, 38, 40, 41
      42 U.S.C. § 300a-4(a) ............................................. 4, 31

Religious Freedom Restoration Act of 1993:
   42 U.S.C. § 2000bb-1 ............................................................ 9

Pub. L. No. 95-613, § 1(a)(1),
   92 Stat. 3093, 3093 (1978) ................................................................ 4, 26

Pub. L. No. 97-35, 95 Stat. 357 (1981):
   § 931(b)(1), 95 Stat. at 570 ............................................................... 5, 27
   § 955(a), 95 Stat. at 587 ........................................................................28

28 U.S.C. § 1291 .......................................................................................... 2

28 U.S.C. § 1331 .......................................................................................... 2

**State Statutes:**

Ala. Code § 22-8-4 ..................................................................................... 45

Ark. Code § 20-9-602(7) ............................................................................ 46

Miss. Code § 41-42-7 ..................................................................................38

Tenn. Code § 68-34-107 .............................................................................38

Tex. Fam. Code § 32.003 ............................................................................. 8

Tex. Fam. Code § 32.003(a) ...................................................................... 8, 46

Tex. Fam. Code § 32.003(a)(3) ...................................................................50

Tex. Fam. Code § 32.003(c) ...................................................................... 8, 46

Tex. Fam. Code § 102.003(a)(1) ............................................................... 10, 22

Tex. Fam. Code § 151.001 ....................................................................... 10, 22

Tex. Fam. Code § 151.001(6) .................................................................... 8, 19

Va. Code § 54.1-2969(E)(2) .......................................................................39

**Regulations:**

42 C.F.R. § 50.203(a) .................................................................................47

42 C.F.R. § 59.5(a)(4) .................................................................................. 4

42 C.F.R. § 59.10(a) ................................................................................. 4

42 C.F.R. § 59.10(b) ................................................... 7, 12, 15, 31, 34

## Legislative Materials:

H.R. Conf. Rep. No. 97-208 (1981)...........................................................28

H.R. Rep. No. 93-1161 (1974)....................................................................26

S. Rep. No. 94-29 (1975) ........................................................................ 26

## Other Authorities:

Ctrs. for Disease Control & Prevention, HHS, *Providing Quality Family Planning Services*, Morbidity & Mortality Weekly Report (Apr. 25, 2014), https://perma.cc/WW64-9UB2 .......................................................30

*Encourage*, Merriam-Webster, https://perma.cc/75JU-WZZW .....................................27

*Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56,144 (Oct. 7, 2021) ....................... 6, 7, 12, 31, 32, 47

49 Fed. Reg. 38,117 (Sept. 27, 1984) ................................................... 5

Guttmacher Inst., *An Overview of Consent to Reproductive Health Services by Young People* (last updated Mar. 1, 2023), https://perma.cc/Y5KL-T6NK .........................38

Healthline.com, *What Are the Side Effects of Birth Control Pills?*, https://perma.cc/2AF2-PF25 ............................................................47

Office of Population Affairs, HHS, *Fiscal Year 2022 Title X Service Grant Awards,* https://perma.cc/9UM6-MBLU ...................................................... 35

Office of Population Affairs, HHS, *Title X Family Planning Annual Report: 2021 National Summary* (Sept. 2022), https://perma.cc/M8TZ-VA7Z .............. 20, 22

*Parental Notification Requirements Applicable to Projects for Family Planning Services*, 48 Fed. Reg. 3600 (Jan. 26, 1983) ..................................................... 5

Planned Parenthood, *How safe is the birth control pill?*, https://perma.cc/5UCU-85FK ............................................................47

Marianne Sharko, et al., *State-by-State Variability in Adolescent Privacy Laws*, Am. Acad. of Pediatrics (May 9, 2022), https://perma.cc/R9DD-X7NS ........................................45

Tex. Dep't of State Health Servs., *Adolescent Health* (Aug. 2016), https://perma.cc/83Z3-WMA5................................................................. 25, 36, 37, 50

# INTRODUCTION

Plaintiff Alexander Deanda wishes to raise his children to share his faith and values, which include not engaging in sex before marriage. The Department of Health & Human Services (HHS) has taken no actions to interfere with that parental choice.

HHS, at the direction of Congress, provides grants under the Title X program to entities that provide no-cost family-planning services to those who voluntarily seek such services. For approximately four decades, Congress has directed that such services be made available to adolescents and that family participation in family-planning decision-making be encouraged to the extent practical. Consistent with decades of practice and multiple decisions from the courts of appeals, Title X providers do not require parental consent as a condition for providing services.

Despite not a single allegation that any of his minor children have ever sought family-planning services from any Title X provider or that they are likely to do so before they turn 18, the district court declared that HHS is violating plaintiff's rights to direct the upbringing of his children. The district court declared that a Texas law requiring parental consent in certain circumstances imposes a parental-consent requirement on Title X providers and, irrespective of any state law, that the Due Process Clause grants parents a constitutional right to consent to their minor children's use of contraception in all circumstances.

As explained below, the district court lacked jurisdiction to enter such an order, given the lack of any Article III case or controversy before the court. The district court's merits analysis was on no firmer footing. The Title X statute and regulations preempt state laws that require parental consent. And even assuming Article III permits the resolution of plaintiff's constitutional claim in a vacuum, the district court's analysis erred by entirely ignoring the countervailing interests of governments in providing confidential family-planning services and of minors in accessing such services, an interest protected by nearly all States in at least some circumstances.

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.10. The district court entered final judgment in favor of plaintiff on December 20, 2022. ROA.794. Defendants filed a timely notice of appeal on February 16, 2023. ROA.826. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Congress enacted Title X of the Public Health Service Act in 1970 to make voluntary federal family-planning services available to those who need them without consideration of ability to pay. The Act authorizes HHS to make grants for the operation of Title X projects which "shall offer a broad range of acceptable and effective family planning methods and services," including "services for adolescents." 42 U.S.C. § 300(a). Congress directed that Title X projects are to "encourage family

participation" "[t]o the extent practical." *Id.* The questions presented are the following:

**I.** Whether plaintiff has demonstrated Article III standing to challenge HHS's administration of the Title X program where plaintiff does not allege that his children have ever sought or received Title X services or that they are likely to do so before they turn 18.

**II.** Whether the Title X program preempts Texas law to the extent Texas law requires parental consent for adolescents under the age of 18 to obtain family-planning services.

**III.** Whether—although plaintiff has never alleged that his children have received or are likely to receive Title X services—the Title X program violates plaintiff's constitutional right to direct the upbringing of his children.

**IV.** Whether, even assuming the district court reached the correct result on the merits, the court abused its discretion in invoking the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), to vacate a portion of an HHS regulation.

## STATEMENT OF THE CASE

## I.    The Title X Program

**A.** In 1970, Congress enacted Title X of the Public Health Service Act with the express purpose of "making comprehensive voluntary family planning services readily available to all persons desiring such services." Pub. L. No. 91-572, § 2(1), 84 Stat. 1504, 1504 (1970) (codified as amended at 42 U.S.C. § 300 *et seq.*). The Act authorizes

3

HHS to "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). Such grants "shall be made in accordance with such regulations as the Secretary may promulgate." *Id.* § 300a-4(a).

Since 1972, HHS regulations have generally mandated that participating entities maintain confidentiality with respect to individuals seeking family-planning services through the program. *See Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 659 (D.C. Cir. 1983); *see also* 42 C.F.R. § 59.10(a) (with limited exceptions, "[a]ll information as to personal facts and circumstances obtained by the project staff about individuals receiving services must be held confidential and must not be disclosed without the individual's documented consent"). HHS regulations have also generally provided that Title X services must be made available without regard to "age" or "marital status." 42 C.F.R. § 59.5(a)(4).

**B.** Title X has served "the teenage population from the inception of the program." *Planned Parenthood Fed'n of Am.*, 712 F.2d at 652. In 1978, Congress amended the Title X statute to codify that practice and to explicitly require that Title X projects include "services for adolescents" among the "broad range of acceptable and effective family planning" services that must be offered. Pub. L. No. 95-613, § 1(a)(1), 92 Stat. 3093, 3093 (1978); *see* 42 U.S.C. § 300(a). In 1981, Congress again amended the Title X statute to provide that, "[t]o the extent practical," participating

4

entities "shall encourage family participation in projects assisted under this subsection." Pub. L. No. 97-35, § 931(b)(1), 95 Stat. 357, 570 (1981); *see* 42 U.S.C. § 300(a).

In 1983, HHS promulgated regulations that required Title X grantees to notify parents when prescribing contraceptives to a minor and required grantees to comply with any state laws mandating parental notification or consent. *See Parental Notification Requirements Applicable to Projects for Family Planning Services*, 48 Fed. Reg. 3600 (Jan. 26, 1983). The D.C. and Second Circuits held that those requirements were prohibited by the Title X statute. *See Planned Parenthood Fed'n of Am.*, 712 F.2d at 653; *New York v. Heckler*, 719 F.2d 1191, 1196 (2d Cir. 1983). Those courts reasoned that Congress had explicitly considered the question of family participation in the Title X program, and Congress chose in the Title X statute to use only the "permissive and non-obligatory" language "encourage family participation" "[t]o the extent practical." *Planned Parenthood Fed'n of Am.*, 712 F.2d at 656 (quoting 42 U.S.C. § 300(a)); *see New York*, 719 F.2d at 1196. HHS therefore could not permissibly "graft" parental consent and notification requirements onto the statute, which would severely "undermine" a "primary purpose[] of" the program: making "family planning services readily available to teenagers." *Planned Parenthood Fed'n of Am.*, 712 F.2d at 660, 663.

In light of the D.C. and Second Circuit decisions, the 1983 regulation never went into effect and was subsequently removed. *See* 49 Fed. Reg. 38,117, 38,117-18 (Sept. 27, 1984). Over the last several decades, courts of appeals have followed the

reasoning of the D.C. Circuit and Second Circuit and have held that States may not impose parental consent or notification requirements on Title X services. *See, e.g.,* *County of St. Charles v. Missouri Family Health Council*, 107 F.3d 682, 684-85 (8th Cir. 1997) ("All the circuits which have considered the validity of parental consent requirements for adolescents to receive Title X federal services have found them prohibited by statute, regardless of whether they are based on state law." (first citing *Jane Does 1 through 4 v. Utah Dep't of Health*, 776 F.2d 253, 255-6 (10th Cir. 1985); and then citing *Planned Parenthood Fed'n of Am.*, 712 F.2d at 665)).

Consistent with this precedent, HHS's "longstanding guidance" to grantees has been that Title X projects may not require parental consent for the provision of services to minors or notify parents that a minor is seeking or has sought Title X services. *See Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56,144, 56,166 (Oct. 7, 2021). On October 7, 2021, HHS promulgated a final rule codifying that longstanding guidance. The agency explained that "for decades," courts have "recognized minors' rights to receive confidential services under the Title X program," and HHS "agree[d] with comments to add specific language" to its regulations to that effect. *Id.* HHS's regulations thus provide: "To the extent practical, Title X projects shall encourage family participation. However, Title X projects may not require consent of parents or guardians for the provision of services to minors, nor can any Title X project staff notify a parent or

guardian before or after a minor has requested and/or received Title X family planning services." 42 C.F.R. § 59.10(b).

**C.** Since 1997, Congress has required in annual appropriations acts that entities participating in Title X certify that they in fact encourage family participation in minors' decisions to seek family-planning services through the Title X program and that they "provide[] counseling to minors on how to resist" attempted coercion into sexual activity. *See, e.g.*, Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. H, § 207, 136 Stat. 49, 466; Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-78, § 212, 111 Stat. 1467, 1495 (1997) (same).

In addition, since 1999, Congress has separately required in annual appropriations acts that "[n]otwithstanding any other provision of law, no provider of services under [T]itle X … shall be exempt from any State law requiring notification or the reporting of child abuse, child molestation, sexual abuse, rape, or incest." *See, e.g.*, Pub. L. No. 117-103, div. H, § 208, 136 Stat. at 466-67; Department of Health and Human Services Appropriations Act, 1999, Pub. L. No. 105-277, tit. II, § 219, 112 Stat. 2681, 2681-363 (1998).

HHS monitors and enforces grantees' compliance with these requirements, as well as other statutory and regulatory requirements of the Title X program. *See, e.g.*, 86 Fed. Reg. at 56,161.

## II.    Procedural History

**A.**  Plaintiff Alexander Deanda is a Texas resident who, at the time of the complaint, alleged that he is the "father of three daughters under the age of 18." ROA.14.  Plaintiff alleges that he "is raising each of his daughters in accordance with Christian teaching on matters of sexuality" and that he "wishes to be informed if any of his children are accessing or attempting to access prescription contraception and other family-planning services."  ROA.14.  Plaintiff has never alleged that his children have sought or are likely to seek such services.

Plaintiff filed this suit as a putative class action in 2020 seeking declaratory and injunctive relief against HHS for its administration of the Title X program.  According to plaintiff, absent certain exceptions, Texas law prohibits the distribution of "prescription contraception to minors without first obtaining parental consent."  *See* ROA.16 (citing Tex. Fam. Code §§ 32.003, 151.001(6)).[1]  Plaintiff asserts that Texas's parental-consent requirement is not preempted by the Title X program and thus HHS

---

[1] Plaintiff bases his state law argument on Texas Family Code § 151.001(6), which provides that "[a] parent of a child has" "the right to consent to the child's … medical and dental care, and psychiatric, psychological, and surgical treatment."  That right is not unqualified.  Texas Family Code § 32.003 enumerates circumstances in which parental consent is not required for medical, dental, psychological and surgical treatment, including where the child is "16 years of age or older and resides separate and apart from" their parents and is "managing the child's own financial affairs"; where the child "is unmarried and pregnant and consents to hospital, medical, or surgical treatment, other than abortion, related to the pregnancy"; or where the child has sought certain forms of treatment, including treatment for sexually transmitted diseases or drug addiction.  *See* Tex. Fam. Code § 32.003(a), (c).

is violating Texas law by "funding projects" that do not require parental consent in providing Title X services to adolescents.  ROA.16.  Plaintiff further alleges that HHS is violating "the constitutional right of parents to direct the upbringing of their children by making prescription contraception and other family-planning services available" under the Title X program without requiring parental consent.  ROA.17.[2]

Plaintiff requested a declaration that Texas's law is not preempted by the Title X program and a declaration "that the Title X program, as currently administered, violates the constitutional right of parents."  ROA.17.  Plaintiff further sought injunctive relief against HHS to prevent it from "directly or indirectly funding" Title X family-planning projects—none of which are parties in this suit—that "fail[] to obtain parental consent before distributing prescription contraception."  ROA.17.

**B.**  After the district court denied plaintiff's motion to certify a class of "all parents of minor children in the United States" or in Texas, ROA.578, plaintiff elected to file a motion for summary judgment on his own behalf, ROA.589.  The court granted summary judgment in favor of plaintiff on December 8, 2022.  ROA.729.

At the threshold, the district court held that plaintiff has Article III standing to sue HHS for its administration of the Title X program.  The court reasoned that

---

[2] Plaintiffs' complaint also raised a claim under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, but plaintiff later abandoned that claim, ROA.142 ("Mr. Deanda withdraws his claim under the Religious Freedom Restoration Act.").

plaintiff has standing because "Texas law confers Plaintiff the right to consent to his children's medical care and general standing to file suit for a violation of that right." ROA.734 (citing Tex. Fam. Code §§ 102.003(a)(1), 151.001).  The court further held that plaintiff has standing because HHS's administration of the Title X program "increas[es] the risk that Plaintiff's children might access birth control without his knowledge or consent."  ROA.738.  In support of that conclusion, the district court cited to a public report indicating that Title X grantees "in Region VI, a region that includes the State of Texas, dispensed contraception to over 35,000 girls under the age of eighteen in 2021," which the court found established an "imminent" injury to plaintiff.  ROA.739.

On the merits, the district court held that the Title X statute does not preempt Texas's parental-consent law with respect to Title X federal services and that HHS's administration of the Title X program violates the constitutional right of parents to direct the upbringing of their children.  With respect to preemption, the court concluded that the Title X statute neither expressly nor impliedly preempts state laws requiring parental consent.  ROA.745, 747.  The court held that Title X's language that projects shall "encourage family participation" "[t]o the extent practical," 42 U.S.C. § 300(a), establishes only a "floor" for parental involvement in the Title X program.  ROA.747-48.  The court further asserted that application of Texas's parental-consent requirements to the Title X program would not interfere with the accomplishment of the full purposes and objectives of Congress because a policy of

10

"requir[ing]" parental consent is "perfectly consistent with" a policy of encouraging it. ROA.748.  The court declined to follow the court of appeals decisions that have held that Title X precludes the application of state parental-consent requirements to Title X services, finding "those authorities unpersuasive."  ROA.748-49.

On the constitutional question, the court began with the principle that the right of parents "to direct the education and upbringing of one's children" is "deeply rooted in this Nation's history and tradition."  ROA.751 (quotation marks omitted). From this, the court concluded that this right encompassed the right of parents to consent to their children's use of contraception.  ROA.751-52.  The court recognized that courts of appeals "have held parents lack a [constitutional] right to consent to the distribution of contraceptives to their minor children" at voluntary public-health clinics.  ROA.755 (first citing *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256 (3d Cir. 2007); and then citing *Doe v. Irwin*, 615 F.2d 1162 (6th Cir. 1980)).  The court determined, however, that those cases incorrectly relied on the "voluntary nature of access to contraception" at those clinics, a factor the court found irrelevant to the constitutional analysis.  ROA.755.  In the district court's view, a parent's fundamental due process right to consent "does not depend on the particular form of contraception or the environment in which the contraception is distributed." ROA.760.

**C.**  In granting summary judgment to plaintiff, the court ordered the parties to submit competing proposed final judgments.  ROA.763.  The government proposed

that the court issue only declaratory relief or, at most, issue declaratory relief and an injunction tailored to plaintiff. ROA.765-66. Plaintiff's proposal raised a new argument that he was entitled under the APA, 5 U.S.C. § 706(2), to "vacatur of" the portion of HHS's regulation, 42 C.F.R. § 59.10(b), prohibiting Title X grantees from requiring parental consent or notifying parents that a minor has sought Title X services, ROA.776. That regulation was promulgated on October 7, 2021, *see* 86 Fed. Reg. at 56,166, after the filing of plaintiff's complaint but before the parties moved for summary judgment, ROA.599. In requesting vacatur, plaintiff acknowledged that he had not explicitly challenged the regulation or "explicitly request[ed] a remedy under" the APA. ROA.776-77. Plaintiff asserted, however, that the court could nonetheless vacate HHS's regulation to provide plaintiff with complete relief. ROA.776-77. The government filed a motion to strike plaintiff's belated invocation of the APA. ROA.785-86.

On December 20, 2022—very shortly after the government filed its motion to strike—the court issued final judgment declaring that HHS's administration of the Title X program "violates Plaintiff's rights" under Texas law and the United States Constitution. ROA.794. The court also invoked the APA, 5 U.S.C. § 706(2), to "hold[] unlawful and set[] aside the second sentence of" 42 C.F.R. § 59.10(b), as plaintiff had requested. ROA.794. Soon after issuing that judgment, however, the court ordered further briefing on the government's motion to strike, noting that it would amend its judgment if necessary. ROA.795.

12

The court denied the government's motion to strike on January 4, 2023, explaining that it was unnecessary to amend the final judgment because it "necessarily follows" from the court's statutory and constitutional holdings that HHS's regulation is unlawful, and the court held that plaintiff could properly "request[] vacatur as a *remedy* for the claims on which he" prevailed, even if he had not raised an APA claim. ROA.798-99.

## SUMMARY OF ARGUMENT

**I.** Plaintiff lacks Article III standing. Plaintiff seeks prospective relief against HHS for its administration of the Title X program, but plaintiff does not allege any concrete, "certainly impending" injury from the Title X program. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992). Plaintiff asserts that he wishes to be informed and to consent if his minor children receive contraceptive services. Plaintiff does not provide any facts, however, to suggest his children have ever sought family-planning services from a Title X provider (or any other provider), nor does plaintiff provide any facts to suggest they are likely to do so in the future. Plaintiff does not even provide the specific ages of his children, or *any* facts concerning their circumstances that would form a basis for his concern that they will be provided contraception without his consent.

The district court reasoned that plaintiff had established a "probabilistic injury in fact" because the Title X program increases the risk that his children will obtain contraception without his consent, citing general statistics about Title X services

13

offered in the region. This Court's precedent squarely forecloses such reasoning. This Court does "not recognize the concept of 'probabilistic standing' based on a non-particularized 'increased risk'—that is, an increased risk that equally affects the general public." *See Shrimpers & Fisherman of RGV v. Texas Comm'n on Envt'l Quality*, 968 F.3d 419, 424 (5th Cir. 2020) (per curiam); *accord Summers v. Earth Island Inst.*, 555 U.S. 488, 497-99 (2009).

The district court further erred in holding that plaintiff could establish standing based on a Texas state law that, according to the court, grants parents in Texas a right to consent to their children's medical care. That holding, too, is foreclosed by well-established Article III principles. The mere existence of a state statute is not sufficient to demonstrate a concrete injury to plaintiff, where plaintiff does not provide any facts to suggest his children have sought or are likely to seek Title X services and thus has not shown that any medical care would be provided to which he would have the right to consent. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021).

**II.** Even assuming plaintiff had demonstrated standing, the district court erred in concluding that the Title X program does not preempt Texas's parental-consent requirements with respect to the provision of Title X federal family-planning services.

Every court of appeals to have considered the question has recognized that Congress did not intend to require parental consent as a condition for adolescents to receive Title X services. *See, e.g.*, *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 659 (D.C. Cir. 1983). Rather, Congress directed only that Title X projects

14

are to "encourage family participation" "[t]o the extent practical." 42 U.S.C. § 300(a). For decades, courts have thus recognized that, under the Supremacy Clause, state laws requiring parental consent cannot constrain the provision of Title X services. *See County of St. Charles v. Missouri Family Health Council*, 107 F.3d 682, 684-85 (8th Cir. 1997). Those courts have recognized that a parental-consent requirement for Title X services would inhibit certain adolescents under 18 from receiving those federal services—undermining Congress's explicit direction that HHS serve those individuals through the Title X program. Consistent with those decisions and the plain language of the statute, HHS regulations explicitly provide that Title X projects may not require parental consent or notify parents that an adolescent has sought or is seeking services. *See* 42 C.F.R. § 59.10(b).

To the extent Texas law requires parental consent for family-planning services, that law conflicts with the Title X statute and HHS's regulation and is therefore preempted. In holding to the contrary, the district court reasoned that the Title X statute establishes only a "floor" for parental participation and that a parental-consent requirement may be imposed on Title X services under state law. That reasoning fails to give appropriate weight to Congress's and HHS's deliberate choice not to require parental consent and ignores the extent to which such a requirement would impose costs on the Title X program and interfere with important objectives of the statute. Under the Supremacy Clause, state law may not impose such additional conditions on

15

the Title X program. *See Planned Parenthood Fed'n of Am.*, 712 F.2d at 659; *see also*

*Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 338-41 (5th Cir. 2005).

**III.** The district court likewise erred in concluding that HHS violated

plaintiff's constitutional rights by not directing Title X providers to obtain parental

consent before providing family-planning services. The court's holding was premised

on a conclusion that parents have a fundamental right under the Due Process Clause

to reduce the theoretical risk that their minor children will voluntarily obtain

contraception in all circumstances. The court did not cite any decision recognizing

such an unqualified right, and such a rule would have sweeping implications. Indeed,

approximately half of all States affirmatively protect adolescents' ability to access

contraception on their own behalf, and nearly all States protect adolescents' ability to

do so in at least some circumstances.

The Sixth and Third Circuits have rejected the unqualified constitutional rule

the district court embraced. *Doe v. Irwin*, 615 F.2d 1162, 1166 (6th Cir. 1980); *see*

*Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 266 (3d Cir.

2007). As those courts have recognized, making voluntary contraceptive services

available at a public clinic without requiring parental consent does not interfere in the

parent-child relationship within the meaning of the Due Process Clause. That is

particularly true here, where plaintiff does not allege that his children have ever tried

to obtain such services or that they are likely to do so before they turn 18. Plaintiff

remains free to instruct his children about contraception in line with his religious beliefs and to direct his children never to visit a Title X clinic.

**IV.**   Even assuming the district court reached the correct conclusion on the merits, the court abused its discretion in invoking the Administrative Procedure Act, 5 U.S.C. § 706(2), to vacate HHS's regulation.

Plaintiff did not bring an APA claim in his complaint, disclaimed an APA claim at summary judgment, and only purported to challenge HHS's regulation after the district court granted summary judgment in his favor.  A grant of vacatur was therefore improper.

And even setting aside the procedural impropriety of the district court's vacatur order, it cannot be squared with well-established constitutional and equitable principles.  These principles require that any remedy be no broader than necessary to remedy demonstrated harm to plaintiff.  *See, e.g.*, *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018).  To the extent plaintiff has demonstrated any Article III injury at all, that injury is limited to his interest in preventing his minor children from receiving contraception without his consent.  The declaratory relief awarded by the district court is sufficient to remedy any such harm, and if the district court believed that further relief was warranted, the court could have enjoined HHS to instruct local Title X providers to not provide such services to plaintiff's children without his consent.  But the court did more than that: it vacated HHS's regulation, thereby throwing decades of practice into question, including in States that protect the right of minors

17

to consent to family-planning services.  The APA does not require such sweeping

relief; nor, as explained below and in the government's brief in *United States v. Texas*,

No. 22-58 (U.S. Sept. 12, 2022), does it permit it.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo.

*See Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 184 (5th Cir. 2018).  The district

court's equitable remedy is reviewed for abuse of discretion.  *See Gates v. Cook*, 376

F.3d 323, 333 (5th Cir. 2004).

## ARGUMENT

### I.    Plaintiff Lacks Article III Standing

"To establish Article III standing, an injury must be concrete, particularized,

and actual or imminent; fairly traceable to the challenged action; and redressable by a

favorable ruling." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013).  The

Supreme Court has "repeatedly reiterated that [a] 'threatened injury must be *certainly*

*impending* to constitute injury in fact,' and that 'allegations of *possible* future injury' are

not sufficient." *Id.* (alteration omitted); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555,

564 n.2 (1992).  "The party invoking federal jurisdiction bears the burden of

establishing these elements." *Lujan*, 504 U.S. at 561.  At the summary judgment stage,

plaintiff must support each element not by "mere allegations" that might suffice at a

pleading stage but rather by "specific facts" established by "affidavit or other

evidence." *Id.* (quotation marks omitted).

18

**A.** Plaintiff seeks prospective relief against HHS with respect to its administration of the Title X program, but plaintiff has not met his burden of establishing any concrete and "certainly impending" injury from that program. *See Lujan*, 504 U.S. at 564 n.2. In support of his standing at summary judgment, plaintiff asserted only that, as of July 23, 2021, he is "the father of three daughters under the age of 18," that he is "raising each of [his] daughters in accordance with Christian teaching on matters of sexuality," and that he "wish[es] to be informed" and to consent before his children "access prescription contraception and other family-planning services" in accordance with what plaintiff asserts are his "statutory rights as a parent under" Texas law. ROA.627 (citing Tex. Fam. Code § 151.001(6)). Plaintiff does not allege that his children, whom he is raising to share his values, have ever obtained or sought to obtain family-planning services from a Title X provider (or any other provider); nor does plaintiff allege any facts to suggest that his children are likely to do so in the near future. Plaintiff does not identify any particular Title X provider from whom his children might seek services. Plaintiff does not even allege the specific ages of his children, or *anything* about their circumstances that would form a basis for his concern that they will be provided contraception without his consent. Plaintiff's abstract interest in consenting to his children obtaining family-planning services from some unknown Title X provider at some hypothetical, "indefinite future time" does not establish any "'actual or imminent' injury" from HHS. *See Lujan*, 504 U.S. at 564 & n.2.

19

**B.** The district court's theories of standing cannot be reconciled with established law; nor can they be squared with plaintiff's failure to provide any facts specific to himself and his own children establishing a likelihood of injury.

**1.** First, the district court concluded that plaintiff had established a "probabilistic injury in fact," ROA.739, because HHS's administration of the Title X program "increas[es] the risk that Plaintiff's children might access birth control without his knowledge or consent," ROA.738. The court did not cite any evidence provided by plaintiff demonstrating such an increased risk. Rather, the court cited public statistics that, according to the court, demonstrate that Title X grantees "in Region VI, a region that includes the State of Texas, dispensed contraception to over 35,000 girls under the age of eighteen in 2021." ROA.739 (citing Office of Population Affairs, HHS, *Title X Family Planning Annual Report: 2021 National Summary* 12 (Sept. 2022) (*2021 National Summary*)).[3] The court reasoned that, "[g]iven the number of Title X grantees and sub-recipients in Region VI and the number of minor girls to whom they dispense contraception," "the odds of this net 'increased risk' occurring asymptotically approach 100%," "thereby making Plaintiff's injury 'imminent.'" ROA.739.

This Court's precedent squarely forecloses such reasoning. This Court does "not recognize the concept of 'probabilistic standing' based on a non-particularized

---

[3] https://perma.cc/M8TZ-VA7Z.

'increased risk'—that is, an increased risk that equally affects the general public."

*Shrimpers & Fisherman of RGV v. Texas Comm'n on Envt'l Quality*, 968 F.3d 419, 424 (5th Cir. 2020) (per curiam); *accord Summers v. Earth Island Inst.*, 555 U.S. 488, 497-99 (2009) (rejecting theory of standing based on "statistical probability" that an organization's members "are threatened with concrete injury"). The mere fact that plaintiff lives in a State where voluntary federal family-planning services are being made available to the "general public" throughout the region does not establish that plaintiff *himself* suffers a substantial risk of his own children accessing those services without his knowledge or consent. *See Shrimpers*, 968 F.3d at 424-25 (holding organizations lacked standing to challenge air-permit grant to facility where they provided only general evidence of an "elevated risk[] of harm" in the vicinity of facility but no evidence that their members living near the facility "will suffer imminent injuries"); *Stringer v. Whitley*, 942 F.3d 715, 722-23 (5th Cir. 2019) (rejecting theory of standing based on general statistics and a lack of any "Plaintiff-specific evidence" demonstrating imminent harm to plaintiffs themselves).

The district court's error is underscored by the statistics upon which it purported to rely. *See* ROA.739. As an initial matter, the court overstated the statistics in the HHS annual report for 2021. Although the court asserted that the report showed that Title X grantees in "Region VI" "dispensed contraception to over 35,000 girls under the age of eighteen in 2021," *id.*, the report in fact says that Title X grantees in Region VI provided family-planning services to fewer than 17,000 female

21

clients under the age of 18 in 2021, and it does not specify that the services provided were contraceptives as opposed to other services offered under the Title X program. *See 2021 National Summary*, *supra*, at 12. More fundamentally, Region VI includes five States—"Arkansas, Louisiana, New Mexico, Oklahoma, and Texas," *id.* at 3—and thus contains *millions* of teenagers. Those statistics therefore in no way establish that it is "certainly impending" that plaintiff's own children will receive contraception from a Title X project without his knowledge or consent. The district court appeared to believe that if there is a nearly "100%" likelihood of plaintiff facing an "increased risk"—however small the baseline risk of injury actually is—that alone is sufficient to confer standing. *See* ROA.739. That conclusion finds no basis in law or logic. *See E.T. v. Paxton*, 41 F.4th 709, 715-16 (5th Cir. 2022) ("[E]ven where increased-risk claims *are* particularized, they generally 'cannot satisfy the actual or imminent requirement.'").

**2.** The district court also reasoned that, separate from any risk that plaintiff's own children will ever obtain contraception from a Title X provider, plaintiff has standing to sue HHS based on Texas law that gives plaintiff "the right to consent to his children's medical care" and "general standing" under state law "to file suit." ROA.734 (citing Tex. Fam. Code §§ 102.003(a)(1), 151.001). But "standing in federal court is a question of federal law, not state law." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013). And this theory of injury is also premised on plaintiff's minor children receiving family-planning services: without his children receiving such services, there

is nothing to which plaintiff can even theoretically consent. As explained above, plaintiff does not provide *any* facts to suggest that his children have ever sought Title X services or that they will do so before they turn 18. Plaintiff has thus not demonstrated that HHS has caused any injury to his state-law right to consent that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks omitted).

The mere existence of a state law providing Texas parents with a right to consent to their children's medical care does not change this analysis; a concrete and imminent injury-in-fact is still required. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("[T]his Court has rejected the proposition that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'"). If the district correct were correct, any parent (or potential parent) in Texas would presumably have standing to sue HHS for its administration of the Title X program, no matter how likely or unlikely it is that his or her own children would ever seek services from a Title X provider. Such reasoning would distort Article III beyond recognition. *See id.*; *see also, e.g.*, *Stringer*, 942 F.3d at 722-23 (holding plaintiffs failed to establish injury from Texas's non-compliance with federal voting law where they did not produce any facts to suggest "an imminent injury to" themselves rather than "a generalized grievance available to all Texans").

The cases cited by the district court do not support its holding. The court primarily relied on an intermediate-state-court decision, *Parents United for Better Sch., Inc. v. School Dist. of Phila. Bd. of Educ. (PUBS)*, 646 A.2d 689, 692 (Pa. Comm. Ct. 1994), which held that an organization had standing to sue a school district for its operation of a condom-distribution program because the organization included parents whose children attended the public schools where the challenged program was being implemented. *See* ROA.737. Even assuming that state-court decision was applying principles relevant to Article III and did so correctly, plaintiff's allegations do not establish any analogous proximity or immediacy. Whereas that case involved a "school-based" program that public-school children were required to participate in as a default, *PUBS*, 646 A.2d at 690-91, plaintiff here does not state that his children have ever sought contraception from a Title X provider, that any Title X provider has ever offered them contraception, or that either of these is likely to occur.

The other cases cited by the district court are even further afield and underscore plaintiff's lack of standing here. ROA.738. The court relied, for example, on *Massachusetts v. EPA*, 549 U.S. 497 (2007), but in that case, "unchallenged affidavits" established that rising sea levels had affected Massachusetts's "coastal land," *id.* at 522, and the Supreme Court emphasized the "special solicitude" owed to the State's "quasi-sovereign interests." *Id.* at 520. That bears no resemblance to this case, where no State has sued and where plaintiff has not provided any evidence establishing a concrete injury to himself.

24

## II.     State Laws Requiring Parental Consent and Notification Do Not Apply to Title X Federal Family-Planning Services

For over forty years, courts of appeals have recognized that state parental-consent requirements cannot constrain the federal family-planning services provided under the Title X program. *See, e.g.*, *Planned Parenthood Fed'n of Am.*, 712 F.2d at 663-64. The State of Texas has itself recognized that, "[u]nder federal law, minors may give their own consent and receive confidential family planning services on request" from the "Title X Family Planning Program." Tex. Dep't of State Health Servs., *Adolescent Health* 13 (Aug. 2016).[4] Plaintiff nonetheless argues—and the district court held—that Texas's parental-consent requirements are not preempted by the Title X program with respect to Title X federal family-planning services, and thus Title X providers (none of which is a party in this suit) violate Texas law in providing contraception to minors without requiring parental consent. That is incorrect, as every court of appeals to have addressed the question has concluded.

### A.     The Title X Statute and HHS's Regulations Preempt Parental Consent and Notification Requirements for Title X Federal Family-Planning Services

Under the Supremacy Clause, state laws that "interfere with, or are contrary to," federal law are preempted. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824). Federal law may preempt state law expressly or preempt it implicitly when the state law conflicts with the federal law. *Crosby v. National Foreign Trade Council*, 530 U.S. 363,

---

[4] https://perma.cc/83Z3-WMA5.

372 (2000).  In determining the preemptive effect of a federal statute, "the purpose of Congress is the ultimate touchstone." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 162-63 (2016).  Thus, when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," it is preempted.  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 260 (1985).  "Federal regulations have no less pre-emptive effect than federal statutes." *Fidelity Fed. Sav. & Loan Ass'n v. Reginald D. de la Cuesta*, 458 U.S. 141, 153 (1982).

**1.**  Congress in Title X "establish[ed] a nationwide program with the express purpose of making 'comprehensive family planning services readily available to all persons desiring such services.'"  *Planned Parenthood Fed'n of Am.*, 712 F.2d at 651 (quoting Pub. L. No. 91-572, § 2, 84 Stat. at 1504).  Although the Title X program served adolescents from its "inception," Congress expressed particular concern in the years following the statute's enactment about "the still unmet family planning needs of sexually active teenagers." *Id.* at 652 (first citing H.R. Rep. No. 93-1161, at 14 (1974); and then citing S. Rep. No. 94-29, at 55 (1975)).  Congress thus amended the Title X statute in 1978 to explicitly include "services for adolescents" among the "broad range of acceptable and effective family planning … services" that must be offered.  *See* Pub. L. No. 95-613, § 1(a)(1), 92 Stat. at 3093.  Around that same time, Congress also debated the question of parental participation in the Title X program. *See Planned Parenthood Fed'n of Am.*, 712 F.2d at 655-56, 660.  In 1981, Congress

amended the statute to require Title X grantees to "encourage family participation" "[t]o the extent practical." Pub. L. No. 97-35, § 931(b)(1), 95 Stat. at 570 (codified as amended at 42 U.S.C. § 300(a)).

In directing grantees to "encourage family participation" "[t]o the extent practical," 42 U.S.C. § 300(a), Congress did not intend to require parental consent as a condition for adolescents to receive Title X services. To the contrary, as the plain meaning of the verb "encourage" suggests, Congress intended only to direct Title X grantees to communicate with those seeking Title X services to motivate and advise them to include their family in their decision-making. *See Encourage*, Merriam-Webster, https://perma.cc/75JU-WZZW ("[T]o inspire with courage, spirit, or hope"; "to spur on"); *Encourage*, Oxford English Dictionary Online ("[t]o inspire with courage sufficient for any undertaking"; "to embolden, make confident"). And even then, Congress directed grantees to do so only "[t]o the extent practical," 42 U.S.C. § 300(a), an important "qualifier" indicating that Congress understood that even the "goal of encouraging family participation may well have to give way to other," competing considerations. *Planned Parenthood Fed'n of Am.*, 712 F.3d at 656 (emphasizing the statute's "permissive and non-obligatory" language).

That language stands in stark contrast to language Congress used in a separate provision of the Public Health Service Act, where Congress explicitly required parental consent and notification in authorizing the Secretary to make grants for demonstration projects under a different program related to adolescent pregnancy and

27

sexuality.  *See New York v. Heckler*, 719 F.2d 1191, 1197 (2d Cir. 1983).  In Title XX of

the Public Health Service Act, enacted in the same legislation as the 1981 amendment

to Title X, Congress explicitly required grantees to provide assurances that they "will

notify the parents or guardians of any unemancipated minor requesting services and,"

with limited exceptions, "obtain the permission of such parents or guardians with

respect to the provision of such services."  Pub. L. No. 97-35, § 955(a), 95 Stat. at

587.  Congress in Title X, by contrast, used the quite different language "encourage

family participation" "[t]o the extent practical," 42 U.S.C. § 300(a), and it is generally

"presume[d] [that] differences in language like this convey differences in meaning,"

*Henson v. Santander Consumer USA, Inc.*, 582 U.S. 79, 86 (2017).

The legislative history confirms this interpretation.  Prior to the 1981

amendment to Title X, legislative proposals were introduced to "expressly require[]

Title X grantees to notify parents prior to prescribing contraceptives," but those

proposals were defeated.  *See Planned Parenthood Fed'n of Am.*, 712 F.2d at 660 & n.43.

The conference committee report accompanying the 1981 amendment stated that "[i]t

is the intent of the conferees that grantees will encourage *participants* in Title X

programs to include their families … and involve them in decisions about services."

*Id.* at 657 (some emphasis omitted) (quoting H.R. Conf. Rep. No. 97-208, at 799

(1981)).  In other words, the conferees understood that they were directing grantees to

"communicate with and encourage those seeking services to make their contraceptive

choices with the assistance of their families," not that they were requiring "Title X

projects to communicate *directly* with the parents" of those seeking services to obtain their consent. *Id.* at 657-58; *see New York*, 719 F.2d at 1196.

For all of these reasons, courts of appeals have consistently recognized that Congress in Title X intended, as the plain language of the statute suggests, merely to direct projects to "encourage family participation" "[t]o the extent practical," 42 U.S.C. § 300(a), not to require parental consent as a condition for adolescents to receive Title X services. *See, e.g.*, *Planned Parenthood Fed'n of Am.*, 712 F.2d at 654, 656; *New York*, 719 F.2d at 1196. Given that deliberate congressional choice, "[a]ll the circuits which have considered the validity of [state] parental consent requirements for adolescents to receive Title X federal services" have held that those requirements conflict with the Title X statute and cannot validly be applied to Title X services. *County of St. Charles, v. Missouri Family Health Council*, 107 F.3d 682, 684-85 (8th Cir. 1997); *see Jane Does 1 through 4 v. Utah Dep't of Health*, 776 F.2d 253, 256 (10th Cir. 1985); *Planned Parenthood Fed'n of Am.*, 712 F.2d at 654; *see also, e.g.*, *Planned Parenthood Ass'n of Utah v. Matheson*, 582 F. Supp. 1001, 1006 (D. Utah 1983); *Doe v. Pickett*, 480 F. Supp. 1218, 1220 (S.D. W. Va. 1979). These courts have reasoned that state law may not impose conditions on federal family-planning services that Congress itself chose not to require and that would interfere with a "primary purpose[]" of the Title X program: making "family planning services readily available to teenagers." *See Planned Parenthood Fed'n of Am.*, 712 F.2d at 660.

29

Similarly here, to the extent Texas law requires parental consent for minors to obtain family-planning services, that law cannot validly be applied to Title X federal family-planning services because it would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000) (quoting *Hines*, 312 U.S. at 67). Where Congress directly considered the question of parental involvement in the Title X program and chose only to direct grantees to "encourage family participation" "[t]o the extent practical," 42 U.S.C. § 300(a), a parental-consent requirement cannot nonetheless be imposed on Title X services under state law. To do so would hinder individuals from receiving those federal family-planning services that Congress explicitly intended the program to serve. *See Planned Parenthood Fed'n of Am.*, 712 F.2d at 660; *see also* Ctrs. for Disease Control & Prevention, HHS, *Providing Quality Family Planning Services*, Morbidity & Mortality Weekly Report 13 & nn. 60-67 (Apr. 25, 2014) (citing sources demonstrating that "[c]onfidentiality is critical for adolescents and can greatly influence their willingness to access and use [family-planning] services").[5]

This Court's opinion in *Planned Parenthood of Houston & Southeast Texas v. Sanchez*, 403 F.3d 324 (5th Cir. 2005), confirms this analysis. In *Sanchez*, the plaintiffs challenged a Texas law that arguably prohibited Title X funds from going to entities that performed abortions, even though such entities are eligible to provide Title X

---

[5] https://perma.cc/WW64-9UB2.

services under federal law so long as the federal funds are used "for legitimate Title X purposes" and not for abortions. *Id.* at 338-40. Citing the D.C. Circuit's decision in *Planned Parenthood Federation of America*, 712 F.2d at 663, this Court recognized that Texas could not "impose regulations that restrict the scope of" the Title X program. *Sanchez*, 403 F.3d at 340-41, 341 n.84. As this Court explained, to the extent Texas law disqualified entities from participating in Title X that Congress and HHS determined to be eligible, the law was "doomed to preemption." *Id.* at 338-41.

**2.** "Federal regulations have no less preemptive effect than federal statutes." *Sanchez*, 403 F.3d at 336 (citing *Fidelity Fed. Sav. & Loan Ass'n*, 458 U.S. at 153). In October 2021, after plaintiff filed his complaint in this case but before the parties moved for summary judgment, HHS promulgated a final rule through notice-and-comment rulemaking codifying the agency's "longstanding guidance" that grantees may not require parental consent or notify parents that an adolescent has sought or obtained services. *See* 86 Fed. Reg. at 56,166-67. HHS's regulations thus now explicitly provide that, "[t]o the extent practical, Title X projects shall encourage family participation," but "Title X projects may not require consent of parents or guardians for the provision of services to minors, nor can any Title X project staff notify a parent or guardian before or after a minor has requested and/or received Title X family planning services." 42 C.F.R. § 59.10(b).

Congress gave the Secretary express authority to promulgate regulations governing grants under the Title X program. *See* 42 U.S.C. § 300a-4(a). For the

reasons explained above, HHS's regulation is consistent with the text, structure, and purpose of the Title X statute, as well as the "decades" of judicial precedent recognizing "minors' rights to receive confidential services under the Title X program." *See* 86 Fed. Reg. at 56,166 (citing *Planned Parenthood Fed'n of Am.*, 712 F.2d 650). This Court has explicitly recognized the preemptive effect of HHS's regulations under the Title X statute. *See Sanchez*, 403 F.3d at 336, 339 (recognizing that "[f]ederal regulations have no less preemptive effect than federal statutes" and that Texas law would be preempted to the extent it denied participation in Title X by entities "deemed eligible by Title X and the associated regulations"). To the extent Texas law requires parental consent for adolescents to receive family-planning services, it directly conflicts with HHS's regulation and is therefore preempted for that reason, as well.

**B.    The District Court Erred in Concluding That a Parental-Consent Requirement Can Be Imposed on the Title X Program Under Texas Law**

In holding that Texas's parental-consent law was not preempted by the Title X program, the district court reasoned that Congress intended to establish only a "floor" for parental participation in Title X and that Texas's law therefore "does not stand as an obstacle to the accomplishment of" Congress's objectives. ROA.747-48. According to the court, a law "requir[ing] parental involvement" is "perfectly consistent with" Congress's aim to "encourag[e] parental involvement" in the Title X program. ROA.747-48. That reasoning is flawed in every respect.

First, Congress's use of the phrase "encourage family participation" "[t]o the extent practical," 42 U.S.C. § 300(a), cannot plausibly be interpreted as establishing only a "floor," permitting parental consent to be required under state law for Title X federal services. ROA.747-48. As discussed above, Congress directly considered the question of adolescent participation and family involvement in Title X, and although Congress explicitly required parental consent and notification as a condition for adolescents to receive services provided under a separate grant program in the Public Health Service Act, Congress chose a different path with respect to Title X services: Congress chose only to direct grantees to "encourage" those seeking Title X services to include their families in their decision-making; and even then, Congress was not categorical: it specified "[t]o the extent practical." 42 U.S.C. § 300(a). The district court's interpretation fails to give appropriate weight to that "considered judgment." *See Arizona v. United States*, 567 U.S. 387, 405-07 (2012) (recognizing that the "text, structure, and history" of federal statute reflected Congress's choice to not impose certain criminal penalties on noncitizens and finding States were therefore preempted from imposing such penalties under state law).

For similar reasons, the district court erred in concluding that Texas's law "does not stand as an obstacle to the accomplishment" of Congress's aims because "requir[ing]" parental consent is "perfectly consistent with" Congress's policy of "encouraging parental involvement." ROA.747-48. To state this reasoning is to refute it: "encouraging" and "requiring" are not the same. Even assuming that Texas

and Title X share a similar policy goal of having parents participate in an adolescents' family-planning decisions, "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." *Arizona*, 567 U.S. at 406 (alteration and quotation marks omitted); *see International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) ("A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach [its] goal."). The approach Congress chose to family participation in the Title X program was to direct grantees to "encourage family participation" "[t]o the extent practical," 42 U.S.C. § 300(a), not to require parental consent—a different approach that would have carried different costs, including financial costs and costs to other important goals of the Title X program. As explained *supra* pp. 29-30, a state law requiring parental consent would deter and prevent adolescents from receiving important family-planning services that Congress intended Title X to provide. State law may not impose such additional conditions on the Title X program. *See Sanchez*, 403 F.3d at 340-41; *Planned Parenthood Fed'n of Am.*, 712 F.2d at 663-64.

The district court's analysis also failed to fully consider HHS's regulation, which has "no less preemptive effect than [a] federal statute[]." *Sanchez*, 403 F.3d at 336, 339. As explained above, 42 C.F.R. § 59.10(b) explicitly prohibits grantees from requiring parental consent as a condition for adolescents to receive Title X services, and that regulation is therefore clearly in conflict with Texas law to the extent it would require such consent. Although the court cited HHS's regulation—and erroneously

34

vacated it in purporting to remedy plaintiff's claims, *see infra* pp. 48-51—the court did

not discuss it further in its preemption analysis. *See* ROA.730, 746 (quoting and citing

regulation).

No more persuasive is the district court's reliance on cases such as *South Dakota*

*v. Dole*, 483 U.S. 203, 207 (1987), and *Pennhurst State School & Hospital v. Halderman*, 451

U.S. 1 (1981). From these cases, the court perceived a requirement that Title X

contain a "clear and unambiguous statement that participating States are forbidden to

enforce their parental-involvement laws against Title X projects." ROA.750

(quotation marks omitted). Those cases are inapposite for several reasons. First,

although Congress must speak "unambiguously" when it "desires to condition the

States' receipt of federal funds" on the States' compliance with federal standards,

*South Dakota*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17), that principle has no

application here. Indeed, the State of Texas is currently not itself a Title X grantee;

HHS currently funds only private entities and a local government in the State. *See*

Office of Population Affairs, HHS, *Fiscal Year 2022 Title X Service Grant Awards*;[6] *see*

*also* 42 U.S.C. § 300(a) (authorizing grants to "public or nonprofit private entities").

The relevant question here is whether, under the Supremacy Clause, a state-law

parental-consent requirement can validly be applied to Title X federal family-planning

---

[6] https://perma.cc/9UM6-MBLU.

services, regardless of whether or not Texas (or any other State) has accepted any Title

X funds.  That question is answered by the preemption doctrine, as discussed above.

Second, even if a Title X grantee could object to the clarity of the conditions

placed on those federal funds, plaintiff here is not a Title X grantee, and the record

does not contain any evidence to suggest that a Title X grantee has found the

program's requirements ambiguous.  That is unsurprising, given that courts of appeals

have held for approximately forty years that the Title X statute precludes the

application of state parental-consent requirements to Title X services.  Indeed, as

noted above, Texas itself has recognized that "[u]nder federal law, minors may give

their own consent and receive confidential family planning services on request" from

the "Title X Family Planning Program."  Tex. Dep't of State Health Servs., *Adolescent*

*Health*, *supra*, at 13.

### III.  The District Court Erred in Recognizing an Abstract and Unqualified Constitutional Right of Parents to Insist that Contraception Not Be Provided to Minors

After concluding that Title X projects in Texas may not provide contraception

without complying with Texas's parental-consent requirements, the district court

proceeded to consider plaintiff's constitutional claim, which asserted that, irrespective

of any state law, the Due Process Clause provides parents a fundamental right to

choose whether to consent to their children's receipt of contraceptives.  *See* ROA.16-

17.  The district court agreed with plaintiff, concluding that parents have a

fundamental due process right to "consent to [their children's] use of contraceptives,"

ROA.762, which "does not depend on the particular form of contraception or the environment in which the contraception is distributed," ROA.760. That novel constitutional holding "stretch[es] the parental liberty interest well beyond its previously defined borders," *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Hlth.*, 503 F.3d 256, 269 (3d Cir. 2007), and recognizes a sweeping constitutional rule that seemingly extends beyond the rights provided even under Texas's parental-consent laws, *see* Tex. Dep't of State Health Servs., *Adolescent Health*, *supra*, at 13 (recognizing that "[p]arental consent is not required for minors to purchase nonprescription contraceptives" and that "minors may consent for prescription contraceptives" under certain circumstances). If applied broadly, that reasoning would also invalidate dozens of state laws across the country that affirmatively protect adolescents' access to contraceptive services. No precedent supports the district court's sweeping rule that parents have a constitutional right to object to their children's voluntary receipt of contraceptives from a public-health clinic in all circumstances, and the Sixth and Third Circuits have rejected such a rule.

**A.** The Supreme Court has recognized that the Due Process Clause protects "the interest of parents in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.). The Supreme Court "has never found that interest to be absolute or unqualified," however. *Doe v. Louisiana*, 2 F.3d 1412, 1416-17 (5th Cir. 1993); *see Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 291 (5th Cir. 2001) (explaining that although parents "have a fundamental right in the

37

upbringing and education of their children, this right does not cover" an objection to a mandatory school uniform policy). The Supreme Court has recognized that minors, too, have important rights and interests, *see, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506-07 (1969); as does the government, which may appropriately "regulat[e] in the public interest," *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944).

With respect to adolescents' access to contraceptive services, legislatures have addressed the balancing of the interests of parents, children, and the government in several ways. Under the Title X program, as discussed above, federal law encourages but does not require parental participation for adolescents to obtain Title X family-planning services. 42 U.S.C. § 300(a). Approximately half of all States affirmatively protect under state law adolescents' ability to access contraceptive services, and nearly all States protect adolescents' ability to do so at least when certain conditions are met. *See* Guttmacher Inst., *An Overview of Consent to Reproductive Health Services by Young People* (last updated Mar. 1, 2023);[7] *see also, e.g.*, Miss. Code § 41-42-7 ("Contraceptive supplies and information may be furnished by physicians to any minor … who has been referred for such service by another physician, a clergyman, a family planning clinic, a school or institution of higher learning, or any agency or instrumentality of this state."); Tenn. Code § 68-34-107 ("Contraceptive supplies and information may be furnished by physicians to any minor … who requests and is in need of birth

---

[7] https://perma.cc/Y5KL-T6NK.

control procedures, supplies or information."); Va. Code § 54.1-2969(E)(2)

(authorizing minors to consent to "[m]edical or health services required in case of

birth control").

Considering the "three separate sets" of interests involved, the Sixth and Third

Circuits have held that parents do not have an unqualified constitutional right to

object to their minor child's voluntary receipt of contraception from a public-health

clinic. *Doe v. Irwin*, 615 F.2d 1162, 1166 (6th Cir. 1980); *see Anspach*, 503 F.3d at 266.

In *Doe*, the Sixth Circuit considered parents' claims under the Due Process Clause

against officials at a public-health center that had distributed contraception to minors

without requiring parental consent. *See* 615 F.2d at 1164, 1167. The Sixth Circuit

recognized that although parents have a constitutional interest in the care and custody

of their children, minors also have privacy and health interests that include an interest

in obtaining contraceptive services, and the State has a substantial interest "in the

well-being of its youth." *Id.* at 1167 (quotation marks omitted). In making voluntary

contraceptive services available at the public clinic, the State had not required

adolescents to "avail themselves of the services offered by" the clinic, nor had it

prohibited adolescents from contacting their parents to include them in their decision-

making. *Id.* at 1168 & n.2. Absent additional facts, the Sixth Circuit held that the

State had not unconstitutionally interfered "with the plaintiffs' rights as parents" by

"not notifying them of their children's voluntary decisions to participate in the

activities of the Center." *See id.* at 1168-69.

The Third Circuit reached a similar conclusion in *Anspach*, holding that the City of Philadelphia had not unconstitutionally interfered in the parent-child relationship in dispensing contraceptives to an adolescent at a public-health clinic without first obtaining her parent's consent. *See* 503 F.3d at 266. The Third Circuit explained that the services provided by the clinic were "wholly voluntary," *id.* at 269, and nothing in the record suggested that the minor had been compelled to visit the clinic or that she had been told by the clinic "not to consult her parents" or prohibited from doing so. *Id.* at 267. The Third Circuit concluded that the record "in no way suggest[ed] that the state injected itself into the [plaintiff's] private familial sphere as required for a constitutional violation." *Id.*

**B.** The record here is even more devoid of facts suggesting an unconstitutional interference with plaintiff's constitutional rights than in *Doe* or *Anspach*. As discussed above, plaintiff does not allege any connection between his own children and the Title X program. Plaintiff alleges only that HHS is violating his constitutional right "to direct the upbringing of [his] children" by generally making voluntary contraceptive services available to the public under the Title X program without requiring parental consent. *See* ROA.17-18. As with the public clinics at issue in *Doe* and *Anspach*, services provided under the Title X program are wholly "voluntary." 42 U.S.C. § 300(a). No one is required to visit a Title X clinic, and indeed plaintiff does not allege that his daughters have ever done so or intend to do so. Plaintiff remains free as a parent to raise his children in accordance with his faith, to instruct his children

40

"to practice abstinence," and to direct his children not to obtain contraception or visit a Title X clinic against his wishes. *See* ROA.14. If plaintiff's children ever were, hypothetically, to nonetheless seek Title X services, they would be free to inform him of that decision and include him in their decision-making; indeed, they would be "encourage[d]" to do so. *See* 42 U.S.C. § 300(a). Plaintiff has therefore not established that HHS has unconstitutionally interfered with his right to direct the upbringing of his children. *See Anspach*, 503 F.3d at 267; *Doe*, 615 F.2d at 1168.

**C.** In holding to the contrary, the district court analyzed plaintiff's parental interests entirely in the abstract and derived from the Due Process Clause a newly identified constitutional principle that parents have a fundamental right to "consent to" their children's "use of contraceptives," ROA.762, which "does not depend on the particular form of contraception or the environment in which the contraception is distributed," ROA.760. The district court did not cite any precedent recognizing such an unqualified constitutional right, and its reasoning in arriving at such a principle does not withstand scrutiny.

**1.** The district court acknowledged that the Sixth and Third Circuits have rejected the absolute constitutional right it identified, but the court dismissed those decisions' reliance on the "voluntary" nature of access to contraception at public-health clinics. ROA.757-58. But that voluntary nature is a critical fact in the context of a claim that the government has unconstitutionally interfered with parents' liberty interests under the Due Process Clause. The Sixth and Third Circuits have correctly

41

recognized that, where the government has merely made contraceptive services voluntarily available at a public clinic, the government has not required anyone to access those services; it has not prevented parents from instructing their children on moral and sexual values or from directing their children not to visit the clinic; and it has not prevented adolescents from including their parents in their decision-making. *See Doe*, 615 F.2d at 1168; *Anspach*, 503 F.3d at 267. Indeed, in the Title X context, providers not only do not *prevent* adolescents from including their parents in their decision-making, they *encourage* family participation. In these circumstances, the voluntary distribution of contraception at a public clinic does not establish an unconstitutional interference with parents' right to direct the upbringing of their children. *See Doe*, 615 F.2d at 1168; *Anspach*, 503 F.3d at 267; *see also Parents United for Better Sch., Inc. v. School Dist. of Phila. Bd. of Educ.*, 148 F.3d 260, 277 (3d Cir. 1998) (recognizing that, "[i]n enacting a voluntary program" making condoms available, "the Board did not offend parental rights regarding the custody and care of their children").

The cases relied upon by the district court only underscore its error. The court cited a New York state court decision that held that a condom-distribution program in public schools violated parents' constitutional right to direct the upbringing of their children. *Alfonso v. Fernandez*, 195 A.D.2d 46 (N.Y. App. Div. 1993). That decision relied, however, on the fact that "[p]arents must send their children to" public schools, which it explicitly distinguished from circumstances where, as here, the

government has merely offered a voluntary "public clinic." *Id.* at 56-57 (citing *Doe*, 615 F.2d 1162); *see id.* at 54-55 ("The distribution of condoms in our public high schools, where attendance is compulsory, … is quite different from making them available at clinics, where attendance is wholly voluntary, …."). Indeed, in holding that the State did not have a sufficiently strong interest in its condom-distribution program to overcome the rights of parents, the *Alfonso* court emphasized that adolescents in New York have other means of obtaining condoms, including "confidential family planning" services provided under the "Public Health Service Act." *Id.* at 58. In balancing the three sets of interests in that case, the *Alfonso* court thus recognized adolescents' interest in obtaining contraceptives, and it cast no doubt on the constitutionality of confidential services provided at voluntary public-health clinics. *See id.* at 54-55, 57.[8] That decision undermines, rather than supports, the district court's holding here.

No more persuasive is the district court's reliance on *Troxel v. Granville*, 530 U.S. at 66 (plurality op.). *See* ROA.757. *Troxel* involved a state law that gave "sweeping" authority to state courts to issue orders granting "forced visitation" rights to third parties over parents' objections, and thus concerned the State intruding through compulsory means on "the private realm of the family." 530 U.S. at 67-68 (plurality

---

[8] Other courts have rejected challenges to condom-distribution programs in public schools, disagreeing with the state court's decision in *Alfonso*. *See, e.g.*, *Curtis v. School Comm. of Falmouth*, 652 N.E.2d 580, 759-60 (Mass. 1995).

43

op.) (quotation marks omitted). That bears no resemblance to plaintiff's allegations here. To the extent the district court interpreted *Troxel* as establishing an absolute, fundamental "right of parents to 'make decisions' concerning the rea[r]ing of their children," ROA.758 (quoting 530 U.S. at 66 (plurality op.)), that reads the plurality opinion far too broadly. Indeed, the *Troxel* plurality emphasized that "constitutional protections in this area are best 'elaborated with care,'" and the plurality stressed that it was addressing parental rights only "in the visitation context" and only with respect to the "sweeping breadth" of the state law in that case. *See Troxel*, 530 U.S. at 73 (plurality op.). This Court and others have thus correctly rejected unqualified assertions of parental-liberty rights premised on "the sweeping statements of the plurality opinion in *Troxel.*" *See Littlefield*, 268 F.3d at 289; *see also, e.g.*, *Parker v. Hurley*, 514 F.3d 87, 101-02 (1st Cir. 2008) ("*Troxel* is not so broad as plaintiffs assert.").

Cases discussing parents' "right to consent to the medical treatment of one's minor child," ROA.752, ROA.760, likewise provide scant support for the district court's unqualified holding that parents have a fundamental right to object to their children's voluntary receipt of contraceptives in all circumstances. The cases cited by the court that addressed parents' constitutional interests concerned the very different circumstance of state officials forcefully taking children away from their homes and conducting medical examinations to investigate child abuse without providing any notification to the parents that the medical examinations were occurring. *See Mann v. County of San Diego*, 907 F.3d 1154, 1161-63 (9th Cir. 2018) (holding that a State

44

violates parents' "substantive due process rights when it performs … medical examinations" for investigatory purposes without parental notification and consent or judicial authorization); *Wallis v. Spencer*, 202 F.3d 1126, 1131, 1141-42 (9th Cir. 2000) (examining circumstance where police officers, "on the basis of a non-existent court order, seized the children" and "took them to a hospital for the performance of highly intrusive" medical examinations).  Plaintiff alleges nothing remotely similar here.

Contrary to the district court's absolute view of the parental-liberty interest here, *see* ROA.758-61, as explained above, approximately half of all States affirmatively protect the ability of adolescents under 18 to access contraceptive services, and nearly all States protect adolescents' ability to access such services on their own behalf at least when certain conditions are met.  *Supra* pp. 38-39.  Legislatures have also enacted a range of statutes that protect adolescents' right to access general medical care on their own behalf.  *See generally* Marianne Sharko, et al., *State-by-State Variability in Adolescent Privacy Laws*, Am. Acad. of Pediatrics (May 9, 2022).[9]  Some States, for example, permit adolescents to access medical services on their own behalf at specific ages or when they are of sufficient maturity.  *See, e.g.*, Ala. Code § 22-8-4 ("Any minor who is 14 years of age or older … may give effective consent to any legally authorized medical, dental, health or mental health services for himself or herself, and the consent of no other person shall be necessary."); Ark. Code § 20-9-602(7) (authorizing

---

[9] https://perma.cc/R9DD-X7NS.

consent by "[a]ny unemancipated minor of sufficient intelligence to understand and appreciate the consequences of the proposed surgical or medical treatment or procedures, for himself or herself"). States also allow minors to consent on their own behalf to specific forms of medical treatment, including treatment for sexually transmitted diseases or for drug or alcohol dependency. *See, e.g.*, Tex. Fam. Code § 32.003(a), (c) (permitting minors to consent to "diagnosis and treatment of" sexually transmitted diseases and "examination and treatment for drug or chemical addiction").

In sum, in announcing an "overriding constitutional requirement" of parental consent for minors to obtain contraception in all circumstances, the district court ignored numerous state laws recognizing adolescents' right to consent to contraception and other medical procedures in at least certain circumstances, minimized the legitimate interests of legislatures in enacting such laws, and gave no weight to adolescents' own rights and interests. *See Doe*, 615 F.2d at 1169. The court's decision was in error.

**2.** The district court's other observations only confirm the extent to which it erred. The court cited online sources and expressed concern over the "serious side effects" of "[s]everal popular methods of birth control." ROA.760 & n.16 (citing online articles from Planned Parenthood and Healthline.com). The online sources cited, however, emphasize the general safety of prescription contraceptives and the

relative rarity of severe side effects.[10]  And in any event, the district court's

constitutional holding does not distinguish in any way among "particular form[s] of

contraception," ROA.760, undermining any such safety rationale.  To the extent the

court was concerned about "sterilization" procedures, *e.g.*, ROA.760 & n.17,

individuals must be "at least 21 years old" to consent to such a procedure under

federal programs, 42 C.F.R. § 50.203(a), and such procedures are therefore not

provided to minors under the Title X program.

Equally removed from the realities of the Title X program is the district court's

suggestion that Title X "drastically disrespects and disregards parental rights" by

"[t]reating information that a minor was raped as 'confidential.'" ROA.761.  The Title

X program does no such thing: Congress has annually specified that Title X grantees

are not "exempt from any State law requiring notification or the reporting of child

abuse, child molestation, sexual abuse, rape, or incest," *e.g.*, Pub. L. No. 117-103, div.

H, § 208, 136 Stat. at 466-67; and HHS has reiterated that grantees must comply with

such requirements, *see* 86 Fed. Reg. at 56,161.

---

[10] *See* Planned Parenthood, *How safe is the birth control pill?*
https://perma.cc/5UCU-85FK (emphasizing that the risk of severe side effects from
taking the birth control pill is "really, really low for most people" and that "pregnancy
is more likely to cause serious health problems than the pill"); Healthline.com, *What
Are the Side Effects of Birth Control Pills?* https://perma.cc/2AF2-PF25 ("The birth
control pill is a popular, effective way to prevent unintended pregnancy and is
generally accepted as a safe method of birth control.").

## IV.    Even Assuming It Were Correct on the Merits, the District Court Abused Its Discretion in Vacating HHS's Regulation

In granting relief to plaintiff, the district court declared that HHS's administration of the Title X program violates plaintiff's rights under Texas law and that HHS's administration of the "Title X program violates Plaintiff's fundamental right to control and direct the upbringing of his minor children." ROA.794.  In addition, although plaintiff did not raise an APA claim in his complaint, the court invoked § 706(2) of that statute to vacate the portion of HHS's regulation that prohibits Title X grantees from requiring parental consent, *see* ROA.794—a remedy plaintiff requested only after the court's grant of summary judgment, *see* ROA.776. Even assuming the district court were correct on the merits, the court abused its discretion in granting vacatur.

As an initial matter, it was inappropriate for the district court to invoke the APA to vacate HHS's regulation where plaintiff did not raise an APA claim in his complaint and where plaintiff asserted as late as summary judgment that he was "not asking th[e] court to 'hold unlawful and set aside' any agency rule under section 706 of the APA." ROA.607; *see id.* ("Mr. Deanda is merely asking for a declaration of his rights . . . along with an injunction to ensure those rights are observed."); ROA.776 (acknowledging that "Mr. Deanda did not challenge 42 C.F.R. § 59.10(b) in his complaint or explicitly request a remedy under" the APA).  Plaintiff's request for vacatur of HHS's regulation came only after the court awarded summary judgment to

plaintiff, *see* ROA.776, and the court cited no authority for its conclusion that it could ignore plaintiff's litigation conduct and vacate the regulation.

The district court's error is compounded by the fact that the declaratory remedy plaintiff sought—and was granted—fully remedied any injury to plaintiff. Equitable principles require that any relief "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quotation marks omitted). Similarly, under Article III, any remedy ordered by a federal court "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (quotation marks omitted).

Here, assuming plaintiff has demonstrated any injury-in-fact at all, *but see supra* pp. 18-24, that injury is limited to plaintiff's interest in ensuring that his own minor children do not receive services under Title X without his consent. ROA.14. The declaratory relief awarded by the district court is sufficient to remedy any demonstrated harm to that interest. That relief declares that HHS's administration of the Title X program is violating plaintiff's rights under Texas law and the Constitution, ROA.794, and HHS has instructed Title X providers to not provide Title X services to plaintiff's children in a manner that is inconsistent with that declaration of rights. To the extent the court believed that declaratory relief alone was insufficient, it could have awarded injunctive relief to that effect. *See, e.g.*, ROA.769 (proposing narrow injunction that HHS provide information to Title X grantees "with

instructions to respect Plaintiff's parental-consent right as described in the" court's judgment).  The court abused its discretion in vacating HHS's regulation and granting relief that extends beyond what is necessary to remedy the alleged harm to plaintiff as an individual.  That alone is reason to reverse the grant of vacatur.

Indeed, the district court's vacatur is overbroad even as to plaintiff himself. The court held that the Title X program violates plaintiff's parental-consent rights under Texas law and plaintiff's due process right to consent to his children's use of contraceptives.  ROA.764.  The Title X program, however, provides services that are not contraception—for example, Title X projects provide pregnancy testing and services related to sexually transmitted diseases, services to which Texas law recognizes minors may consent.  *See, e.g.*, Tex. Fam. Code § 32.003(a)(3); Tex. Dep't of State Health Servs., *Adolescent Health*, *supra*, at 13 ("Minors may consent to diagnosis and treatment of STIs.").  The district court nonetheless vacated the second sentence of HHS's regulation across the board, without any tailoring to the type of services involved.

Finally, and apart from the arguments advanced above, even assuming it were appropriate for the district court to rely on the APA, that statute does not require vacatur.  Section 706(2) of the APA does not dictate any particular remedy but is rather a rule of decision directing the reviewing court to disregard unlawful "agency action, findings, and conclusions" in resolving the case before it.  *See* Brief for the Petitioners at 40-44, *United States v. Texas*, No. 22-58 (U.S. Sept. 12, 2022).  A different

provision, § 703, points outside the APA for available remedies. *See* 5 U.S.C. § 703. Where no special review proceedings apply, § 703 provides that "[t]he form of proceeding" under the APA is a traditional "form of legal action," such as "actions for declaratory judgments or writs of prohibitory or mandatory injunction." At a minimum, the APA does not displace a court's equitable discretion even in cases in which it applies.

This Court's precedent does not suggest otherwise. The government respectfully disagrees with this Court's conclusion that vacatur is an available remedy in challenges to agency rules. *See, e.g., Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022). But this Court has also recognized that vacatur is merely the "default" remedy, *id.* at 859, and that courts have discretion to deviate from that remedy in appropriate circumstances even where an APA claim has succeeded on the merits, *see, e.g., Central & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000). Nothing in this Court's precedent therefore compels the vacatur remedy the district court provided, and, for the reasons explained above, Article III and equitable principles forbid it.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

ABBY C. WRIGHT
*s/ Courtney L. Dixon*
COURTNEY L. DIXON
*Attorneys, Appellate Staff*
*Civil Division, Room 7246*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-8189*
*courtney.l.dixon@usdoj.gov*

April 2023

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Courtney L. Dixon*
Courtney L. Dixon

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,955 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Courtney L. Dixon*
Courtney L. Dixon