No. 23-10159

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

ALEXANDER R. DEANDA, on behalf of himself and others
similarly situated,

Plaintiff-Appellee,

v.

XAVIER BECERRA, in his official capacity as Secretary of Health &
Human Services; JESSICA SWAFFORD MARCELLA, in her
official capacity as Deputy Assistant Secretary for Population Affairs;
UNITED STATES OF AMERICA,

Defendants-Appellants.

On Appeal from the United States District Court
For the Northern District of Texas, Amarillo Division
Case No. 2:20-CV-92-Z

## BRIEF FOR POWER TO DECIDE AS AMICUS CURIAE
## IN SUPPORT OF APPELLANTS AND REVERSAL

Jamila Johnson
LAWYERING PROJECT
3157 Gentilly Blvd., No. 2231
New Orleans, LA 70122
(347) 706-4981
jjohnson@lawyeringproject.org

Stephanie Toti
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
(646) 490-1083
stoti@lawyeringproject.org

Paige Suelzle
LAWYERING PROJECT
2501 SW Trenton St., No. 1097
Seattle, WA 98106
(425) 691-0890
psuelzle@lawyeringproject.org

*Attorneys for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Power to Decide (Amicus Curiae): Power to Decide is a nonprofit corporation that does not have a parent corporation or issue stock.

- Stephanie Toti (Counsel for Amicus Curiae)

- Jamila Johnson (Counsel for Amicus Curiae)

- Paige Suelzle (Counsel for Amicus Curiae)

- Lawyering Project (Counsel for Amicus Curiae): The Lawyering Project is a fiscally sponsored project of Tides Center, a nonprofit corporation that does not have a parent corporation or issue stock.

- Alexander R. Deanda (Plaintiff-Appellee)

- Jonathan F. Mitchell (Counsel for Plaintiff-Appellee)

- Mitchell Law PLLC (Counsel for Plaintiff-Appellee): No parent corporation or stock

- Charles William Fillmore (Counsel for Plaintiff-Appellee)

- Fillmore Law Firm, LLP (Counsel for Plaintiff-Appellee): No parent corporation or stock

- W. Heath Hendricks (Counsel for Plaintiff-Appellee)

- Underwood Law Firm, PC (Counsel for Plaintiff-Appellee): No parent corporation or stock

- Douglas Bryan Hughes (Counsel for Plaintiff-Appellee)

- Amici curiae filing forthcoming briefs and their counsel

Dated: May 1, 2023

*/S/ Stephanie Toti*
Stephanie Toti
Attorney for Amicus Curiae

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................... ii

TABLE OF AUTHORITIES ................................................................... vii

INTEREST OF AMICUS CURIAE ..........................................................1

SUMMARY OF ARGUMENT ..............................................................2

ARGUMENT ..............................................................................3

I.  The District Court Ignored the Right to Contraception. .......................................3

    A.  The Supreme Court Has Long Recognized a Right to Obtain Contraceptives, Which Extends to Minors............................................3

    B.  Dobbs Did Not Abrogate the Right to Contraception. .........................7

II.  The District Court Ignored the Many Benefits That Confidential Access to Contraceptives Provides Adolescents and Society. ...............................................8

    A.  As Prevailing Clinical Standards Reflect, Confidential Access to Contraceptives Provides Substantial Medical and Public Health Benefits, Including Lower Teen Pregnancy Rates. ..............................8

    B.  Contraception Allows Young People an Opportunity to Achieve Their Educational and Life Goals. .....................................................12

    C.  The District Court's Ruling Will Exacerbate the Problem of Contraceptive Deserts, Particularly for Young People of Color Who Rely on the Title X Program. .....................................................14

    D.  For Those Seeking to Avoid Adolescent Parenthood, Access to Contraceptives is Even More Critical Following Dobbs. ...................19

III. The District Court Ignored the Existence of Abusive and Dysfunctional Families...............................................................................21

    A.  Not All Minors Have Healthy Relationships with Their Parents. ......21

    B.  The District Court Cited the Supreme Court's Abortion Jurisprudence Selectively, Without Acknowledging That It Denied

Parents the Right to Exercise a Veto Over Minors' Abortion
Decisions. ............................................................................24

CONCLUSION ......................................................................26

# TABLE OF AUTHORITIES

Page(s)

## <u>Cases</u>

*Allen v. Illinois*,
   478 U.S. 364 (1986) ............................................................................. 6

*Bellotti v. Baird*,
   443 U.S. 622 (1979) ........................................................................... 25

*Breed v. Jones*,
   421 U.S. 519 (1975) ............................................................................. 6

*Brown v. Bd. of Educ. of Topeka*,
   347 U.S. 483 (1954) ............................................................................. 6

*Brown v. Ent. Merchants Ass'n*,
   564 U.S. 786 (2011) ............................................................................. 5

*Carey v. Population Servs. Int'l*,
   431 U.S. 678 (1977) .............................................................. 4, 5, 10, 11

*City of Akron v. Akron Ctr. for Reprod. Health, Inc.*,
   462 U.S. 416 (1983) ........................................................................... 24

*Deanda v. Becerra*,
   No. 2:20-CV-092-Z, 2022 WL 17572093 (N.D. Tex. Dec. 8, 2022) .......... passim

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) ................................................................. passim

*Eisenstadt v. Baird*,
   405 U.S. 438 (1972) ............................................................................. 4

*Erznoznik v. Jacksonville*,
   422 U.S. 205 (1975) ............................................................................. 5

*Gallegos v. Colorado*,
   370 U.S. 49 (1962) ............................................................................... 6

*In re Gault*,
   387 U.S. 1 (1967) ................................................................................ 6

*Goss v. Lopez*,
419 U.S. 565 (1975)..................................................................6

*Griswold v. Connecticut*,
381 U.S. 479 (1965)..................................................................4

*Hodgson v. Minnesota*,
497 U.S. 417 (1990)................................................ 21, 23, 24

*Hodgson v. Minnesota*,
853 F.2d 1452 (8th Cir. 1988) ...........................................24

*In re Winship*,
397 U.S. 358 (1970)..................................................................6

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
141 S. Ct. 2038 (2021)...........................................................5

*NAACP v. Alabama*,
377 U.S. 288 (1964)..................................................................4

*Parham v. J.R.*,
442 U.S. 584 (1979)..............................................................6, 7

*Pennsylvania v. Ritchie*,
480 U.S. 39 (1987)............................................................ 22, 23

*Planned Parenthood of Cent. Mo. v. Danforth*,
428 U.S. 52 (1976)............................................................5, 24

*Plyler v. Doe*,
457 U.S. 202 (1982)..................................................................6

*Prince v. Massachusetts*,
321 U.S. 158 (1944)........................................................ 25, 26

*Roe v. Wade*,
410 U.S. 113 (1973)................................................................19

## **Statutes**

Title X of the Public Health Service Act, 42 U.S.C. §§ 300–300a-6 ............. passim

Pub. L. No. 117-103, div. H, § 208, 136 Stat. 49, 466–67 (2022) ................ 11 n.12

Texas Family Code § 151.001 .....................................................................................3

## INTEREST OF AMICUS CURIAE

Power to Decide (originally known as the National Campaign to Prevent Teen Pregnancy) was founded in 1996 in response to President Clinton's 1995 State of the Union call to reduce teen pregnancy rates.  The organization provides trusted, high-quality, accurate information—backed by research—on sexual health and contraceptive methods so young people can make informed decisions.  Throughout its twenty-seven-year history, it has remained uniquely respected among national, state, and local advocates for providing evidence-based information and statistics on unplanned pregnancy and related issues.  Power to Decide will not stop until every young person has access to accurate sexual health information and the full range of contraceptive methods, without barriers or judgment.  Its work creates opportunities for young people to get informed, take control, advocate for themselves, and protect the amazing life opportunities that lie ahead.

Given Power to Decide's nearly three decades of work to empower young people to make informed decisions about family planning, the organization is well suited to advocate for the rights of Texas adolescents to obtain confidential services from Title X providers.  Those adolescents will be profoundly impacted by the Court's decision, but they are not directly represented in the proceedings.[1]

---

[1] All parties have consented to the filing of this brief.  No party's counsel authored this brief in whole or in part, and no one besides Power to Decide and its counsel contributed money that was intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

The district court's constitutional analysis is deeply flawed. Seemingly determined to find a constitutional basis for invalidating the statutory and regulatory provisions requiring Title X grantees to offer family planning services to minors on a confidential basis, the district court ignored controlling precedent, disregarded key public health and social science data, and cherry-picked language from prior cases in a manner that obscured their central holdings.

First, the district court ignored controlling Supreme Court precedents recognizing the right to contraception. *Infra* at 3–7. It suggested that *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), undermined the validity of those precedents when, in fact, it expressly reaffirmed them. *Infra* at 7–8.

Second, the district court ignored the compelling state interests served by making confidential contraceptive care available to minors. These interests include promoting adolescent health; reducing the teen pregnancy rate; providing opportunities for young people to achieve their educational and life goals; and promoting equity for adolescents facing socioeconomic disadvantages. *Infra* at 8–21.

Third, the district court ignored the reality that some families are abusive and dysfunctional, instead grounding its analysis in an idyllic view of the parent-child relationship. *Infra* at 21–23. And it misrepresented caselaw establishing limits on the power that parents may assert over their children. *Infra* at 24–26.

Accordingly, this Court should reverse the district court's judgment because it is based on a shoddy constitutional analysis that is riddled with errors and critical omissions.

## ARGUMENT

### I.    The District Court Ignored the Right to Contraception.

The district court held that substantive due process requires recipients of grants authorized by Title X of the Public Health Service Act ("Title X"), 42 U.S.C. §§ 300–300a-6, to comply with Texas Family Code § 151.001(a)(6), which the district court interpreted to prohibit minors' access to contraceptives without parental consent. *Deanda v. Becerra*, No. 2:20-CV-092-Z, 2022 WL 17572093, at *1, *17 (N.D. Tex. Dec. 8, 2022). But it completely ignored controlling precedents holding that individuals, including minors, have a constitutional right to obtain contraceptives, and it erroneously asserted that *Dobbs* undermined the validity of those precedents. *See Deanda*, 2022 WL 17572093, at *13 n.12. The district court's failure to acknowledge the right to contraception or give it any consideration in its constitutional analysis is a fatal flaw.

### A.    *The Supreme Court Has Long Recognized a Right to Obtain Contraceptives, Which Extends to Minors.*

The Supreme Court has long recognized that the Constitution protects access to contraceptives as a fundamental right. In *Griswold*, the Court held that a law "forbidding the use of contraceptives … cannot stand in light of the familiar

principle, so often applied by this Court, that a 'governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.'" *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965) (quoting *NAACP v. Alabama*, 377 U.S. 288, 307 (1964)).  In *Eisenstadt*, the Court declared that: "If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (invalidating a Massachusetts statute that prohibited distribution of contraceptives to single people).  In *Carey*, the Court explained that: "[T]he Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State.  Restrictions on the distribution of contraceptives clearly burden the freedom to make such decisions." *Carey v. Population Servs. Int'l*, 431 U.S. 678, 687 (1977).

The right to obtain contraceptives extends to minors as well as adults.  *Id.* at 693 (plurality opinion); *id.* at 702 (White, J., concurring in part and concurring in result).  In *Carey*, the Supreme Court invalidated a New York law prohibiting the distribution of contraceptives to people younger than sixteen years old.  *Id.* at 682. Five Justices subjected the law to heightened scrutiny and concluded that it could not satisfy such review.  *See id.* at 696 (plurality opinion) ("[W]hen a State, as here,

burdens the exercise of a fundamental right, its attempt to justify that burden as a rational means for the accomplishment of some significant state policy requires more than a bare assertion, based on a conceded complete absence of supporting evidence, that the burden is connected to such a policy."); *id.* at 702 (White, J., concurring in part and concurring in result) ("I concur in the result . . . because the State has not demonstrated that the prohibition against distribution of contraceptives to minors measurably contributes to the deterrent purposes which the State advances as justification for the restriction.").

The Supreme Court's recognition of minors' right to obtain contraceptives is consistent with its broad recognition of constitutional protection for minors generally. *See Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74 (1976) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights."), *abrogated on other grounds by Dobbs*, 142 S. Ct. at 2242. Thus, the Supreme Court has held that "[m]inors are entitled to a significant measure of First Amendment protection." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212–13 (1975)); *accord Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2044 (2021). The Supreme Court has likewise recognized that minors

are entitled to equal protection of the laws. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 230 (1982); *Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954).

Similarly, the Supreme Court has held that minors are entitled to robust constitutional protection in criminal and juvenile delinquency proceedings. *See Breed v. Jones*, 421 U.S. 519, 541 (1975) (prohibition against double jeopardy); *In re Winship*, 397 U.S. 358, 368 (1970) (requirement of proof beyond a reasonable doubt); *In re Gault*, 387 U.S. 1, 33–34, 41, 55, 56–57 (1967) (rights to notice, counsel, confrontation, and cross-examination, and right against self-incrimination), *overruled in part on other grounds by Allen v. Illinois*, 478 U.S. 364, 372 (1986); *Gallegos v. Colorado*, 370 U.S. 49, 55 (1962) (protection from coerced confessions).

The Supreme Court has also held that minors are entitled to procedural due process protections in a variety of contexts. *See, e.g.*, *Parham v. J.R.*, 442 U.S. 584, 599–600 (1979) (commitment to state mental health institution); *Goss v. Lopez*, 419 U.S. 565, 574 (1975) (disciplinary suspension from public school). In *Parham*, for example, the Court held that minors have a right to be evaluated by a neutral factfinder before being committed to a state mental institution, even when it is a minor's parent who seeks the commitment. 442 U.S. at 606 ("We conclude that the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a 'neutral factfinder' to determine whether the statutory requirements for admission

are satisfied.").  The Court further held that due process is satisfied when a minor's treating physician makes the required evaluation because medical professionals are well suited to determine what is in a minor's best medical interests.  *See id.* at 608 ("What is best for a child is an individual medical decision that must be left to the judgment of physicians in each case.").

### B.     *Dobbs Did Not Abrogate the Right to Contraception.*

In a footnote, the district court erroneously asserted that the "correctness" of the Supreme Court's jurisprudence concerning the right to contraception is "in doubt," relying solely on Justice Thomas' concurring opinion in *Dobbs*, which urged the Court to reconsider that jurisprudence.  *Deanda*, 2022 WL 17572093, at *13 n.12 (citing *Dobbs*, 142 S. Ct. at 2301 (Thomas, J., concurring)).  In fact, the majority opinion in *Dobbs* cited *Griswold, Eisenstadt*, and *Carey* with approval as cases upholding "the right to obtain contraceptives."  *Dobbs*, 142 S. Ct. at 2257.  And it said explicitly of those cases: "They do not support the right to obtain an abortion, and by the same token, our conclusion that the Constitution does not confer such a right does not undermine them in any way."  *Id.* at 2258; *see also id.* at 2309 (Kavanaugh, J., concurring) ("I emphasize what the Court today states: Overruling *Roe* does *not* mean the overruling of [*Griswold*, *Eisenstadt*, or other precedents concerning contraception and marriage], and does *not* threaten or cast doubt on those precedents.").  Thus, notwithstanding Justice Thomas' concurring opinion, *Dobbs*

did not abrogate the right to contraception, and *Griswold*, *Eisenstadt*, and *Carey* remain controlling precedents.

The district court erred in ignoring those precedents when assessing whether the Constitution requires Title X grantees to comply with a Texas law prohibiting the distribution of contraceptives to minors without parental consent. The court's complete failure to give the right to contraception any consideration in its constitutional analysis is a glaring and inexcusable omission.

## II. The District Court Ignored the Many Benefits That Confidential Access to Contraceptives Provides Adolescents and Society.

When discussing the strength of the Government's interest in making confidential contraceptive care available to minors through the Title X program, the district court failed to recognize the many benefits that access to such care bestows. *See Deanda*, 2022 WL 17572093, at *17.

### A. *As Prevailing Clinical Standards Reflect, Confidential Access to Contraceptives Provides Substantial Medical and Public Health Benefits, Including Lower Teen Pregnancy Rates.*

Professional medical associations—including the American Academy of Pediatrics; Society for Adolescent Health and Medicine; American College of Obstetricians and Gynecologists; and American Academy of Family Physicians— strongly recommend that healthcare providers promote and protect adolescent confidentiality, including in the provision of sexual and reproductive healthcare such

as contraceptive services.[2]  The Centers for Disease Control and Prevention ("CDC") likewise advises that family planning providers "should offer confidential services to adolescents" because "[c]onfidentiality is critical for adolescents and can greatly influence their willingness to access and use services."[3]  These organizations recommend that healthcare providers encourage and support effective communication between young people and their parents, but avoid mandating parental involvement.[4]

There are several reasons why medical and public health standards call for confidentiality in adolescent healthcare.  Critically, limitations on confidentiality and consent are linked to higher adolescent pregnancy rates.[5]  In addition, concerns about confidentiality lead young people—including those who are sexually active and have experience with sexually transmitted infections—to forgo seeking medical

---

[2] Sofya Maslyanskaya & Elizabeth M. Alderman, *Confidentiality and Consent in the Care of the Adolescent Patient*, 40 Pediatrics in Review 508, 509 (2019); Am. Acad. of Pediatrics, *Policy Statement: Contraception for Adolescents*, 134 Pediatrics e1244, e1245 (2014), https://publications.aap.org/pediatrics/article/134/4/e1244/32981/Contraception-for-Adolescents; Carol Ford et al., *Confidential Health Care for Adolescents: Position Paper of the Society of Adolescent Medicine*, 35 J. of Adolescent Health 160, 160 (2004); Am. Coll. of Obstetricians & Gynecologists, *Counseling Adolescents About Contraception*, 130 Obstetrics & Gynecology e74, e75 (2017) , https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2017/08/counseling-adolescents-about-contraception (reaffirmed 2021); *Adolescent Health Care, Confidentiality*, Am. Acad. of Family Physicians (2020), https://www.aafp.org/about/policies/all/adolescent-confidentiality.html.

[3] Loretta Gavin et al., *Providing Quality Family Planning Services: Recommendations of CDC and the U.S. Office of Population Affairs*, 63 MMWR 1, 13 (2014), https://www.cdc.gov/mmwr/pdf/rr/rr6304.pdf.

[4] Ford, *supra* note 2, at 160.

[5] *Policy Statement: Contraception for Adolescents*, *supra* note 2, at e1245.

advice and treatment.[6]  Confidentiality in sexual and reproductive healthcare is also especially important to help foster young people's growth and autonomy.[7]

The district court's suggestion that confidential access to contraceptives promotes "teenage promiscuity" is unfounded.  *Deanda*, 2022 WL 17572093, at *16. Since *Carey* was decided forty-six years ago, research has consistently demonstrated that limiting access to contraception does not decrease adolescent sexual activity. *See* 431 U.S. at 695 & n.19.  For example, a 2002 study of Wisconsin girls published in the *Journal of the American Medical Association* ("JAMA") found that nearly half would stop seeking contraceptive care (and other reproductive healthcare services) if parental notification were required, but 99% would remain sexually active nonetheless.[8]  Similarly, a qualitative study of Texas adolescents published earlier this year found that participants who lacked access to highly effective

---

[6] Jocelyn A. Lehrer et al., *Forgone Health Care Among U.S. Adolescents: Associations Between Risk Characteristics and Confidentiality Concern*, 40 J. of Adolescent Health 218, 222 (2007).

[7] *See* Ford, *supra* note 2, at 160 ("Confidentiality protection … is consistent with [adolescents'] development of maturity and autonomy …."); *see also* Brooke Whitfield et al., *Minors' Experiences Accessing Confidential Contraception in Texas*, 72 J. of Adolescent Health 591, 596 (2023) (reporting that adolescent study participants "were unanimously frustrated with Texas' parental consent laws" because "society expects them to act like adults in the event they get pregnant, yet policies treat them like children who are incapable of making their own contraceptive decisions").

[8] Diane M. Reddy et al., *Effect of Mandatory Parental Notification on Adolescent Girls' Use of Sexual Health Care Services*, 288 JAMA 710, 713 (2002) ("[T]he evidence suggests that requiring parental notification would impede girls' use of prescribed contraceptive services, with the majority of girls continuing to have sexual intercourse …. Given this information, requiring parental notification for obtaining prescribed contraceptives would likely increase unintended pregnancies ….").

contraceptive methods did not abstain from sex but instead used less effective methods such as withdrawal.[9] Further, a 2011 study showed that an emphasis on abstinence-only education is positively correlated with teenage pregnancy and birth rates.[10] "This trend remains significant after accounting for socioeconomic status, teen educational attainment, ethnic composition of the teen population, and availability of Medicaid waivers for family planning services in each state."[11]

The district court's suggestion that confidentiality in adolescent healthcare may conceal sex crimes is likewise unfounded. *See Deanda*, 2022 WL 17572093, at *16. If a minor patient shares information about abuse or victimization, healthcare providers, as mandatory reporters, are required to disclose that information.[12] Moreover, the district court ignored the fact, discussed in more detail below, that a significant number of minors experience abuse, including sexual abuse, by a parent. *See infra* at 21–23.

---

[9] Whitfield, *supra* note 7, at 595.

[10] Kathrin Stanger-Hall & David Hall, *Abstinence-Only Education and Teen Pregnancy Rates: Why We Need Comprehensive Sex Education in the U.S.*, 6 PLoS ONE 1, 1 (2011).

[11] *Id.*

[12] *See* Pub. L. No. 117-103, div. H, § 208, 136 Stat. 49, 466–67 (2022) ("Notwithstanding any other provision of law, no provider of services under title X of the PHS Act shall be exempt from any State law requiring notification or the reporting of child abuse, child molestation, sexual abuse, rape, or incest.").

### B.     *Contraception Allows Young People an Opportunity to Achieve Their Educational and Life Goals.*

Contraception is not *only* about preventing pregnancy: contraception allows young people the time and resources to build the life they want to live.  Adolescents have a greater chance of reaching their educational and life goals when they can use contraception to avoid pregnancy.  To do so, they need full access to confidential, safe, and convenient family planning services.

In the United States, compared to those who did not give birth as teenagers, teen mothers are less likely to obtain a high school diploma or General Education Development certificate before the age of twenty-two,[13] and less likely to complete a two- or four-year college program.[14]  Teenage fatherhood also shifts educational outcomes by decreasing years of schooling and the likelihood of receiving a high school diploma.[15]

---

[13] Kate Perper et al., *Diploma Attainment Among Teen Mothers*, Child Trends, 1 (2010), https://cms.childtrends.org/wp-content/uploads/2010/01/child_trends-2010_01_22_FS_diploma attainment.pdf.

[14] Rebecca Maynard & Saul Hoffman, *The Costs of Adolescent Childbearing*, *in* Kids Having Kids: Economic Costs & Social Consequences of Teen Pregnancy 359, 362 (Saul Hoffman & Rebecca Maynard eds., 2d ed. 2008).

[15] Jason Fletcher & Barbara Wolfe, *The Effects of Teenage Fatherhood on Young Adult Outcomes*, 50 Economic Inquiry 182, 183 (2012).

Adolescent pregnancy is strongly linked to poverty,[16] while not becoming a parent in the teen years can expand one's social and financial well-being.[17] Having children before age twenty greatly increases the chances a mother will be unemployed or earn less in her lifetime.[18] And teen fathers make approximately $20,000 to $25,000 less in their twenties than men who wait until they are not in their teens to become fathers.[19]

Power to Decide's own polling in 2021 showed an overwhelming, bipartisan conviction that contraception operates to help people work toward educational and professional goals.[20] Moreover, the ability to plan one's childbearing increases confidence that investments in education will yield benefits, improves mental health, and creates more opportunities in the labor market associated with employers' reduced concerns that young women will leave work due to unplanned births.[21] This

---

[16] Ana Penman-Aguilar et al., *Socioeconomic Disadvantage as a Social Determinant of Teen Childbearing in the U.S.*, 128 Pub. Health Reps. 5, 20 (2013).

[17] *See id.* at 6.

[18] Sandra Hofferth, *Social and Economic Consequences of Teenage Childbearing*, in 2 Risking the Future: Adolescent Sexuality, Pregnancy, and Childbearing 123, 143 (Sandra Hofferth & Cheryl Hayes eds., 1987).

[19] Michael J. Brien & Robert J. Willis, *Costs and Consequences for the Fathers*, *in* Kids Having Kids: Economics Costs and Social Consequences of Teen Pregnancy 119, 119 (Saul Hoffman & Rebecca Maynard eds., 2ed 2008).

[20] *See Thxbirthcontrol 2021: Survey Says*, Power to Decide (Nov. 2021), https://powertodecide .org/what-we-do/information/resource-library/thxbirthcontrol-2021-survey-says.

[21] Amanda Stevenson et al., *The Impact of Contraceptive Access on High School Graduation*, 7 Sci. Advances 1, 1 (2021).

is true regardless of whether a person is sexually active when they engage in family planning.

The district court ignored these additional benefits that young people and society derive from confidential access to contraceptives.

### C.     The District Court's Ruling Will Exacerbate the Problem of Contraceptive Deserts, Particularly for Young People of Color Who Rely on the Title X Program.

For decades, the United States has sought to address elevated teen birth rates. The nation's teen birth rate declined dramatically since the 1990s—down 77% since 1991.[22]  This is due, in large part, to countless programs to increase access to, and education about, contraceptives.[23]  Despite the substantial decline in teen births, the teen birth rate in the United States remains higher than in many other developed countries, including Canada and the United Kingdom.[24]

Title X is a critical source of confidential, safe, and convenient contraceptives across the nation.  Specifically, it is designed to provide "a broad range of acceptable and effective family planning methods and services (including natural family

---

[22] Brady E. Hamilton et al., *Births: Provisional Data for 2021*, Div. of Vital Stats., Nat'l Ctr. for Health Stats. Reps., CDC, 3 (May 2022), https://www.cdc.gov/nchs/data/vsrr/vsrr020.pdf.  In 2021, the teen birth rate was 14.4.  This means there were 14.4 births for every 1,000 females ages 15–19.  *Id.* at 1.

[23] Joyce C. Abma & Gladys M. Martinez, *Sexual Activity and Contraceptive Use Among Teenagers in the United States, 2011–2015*, Div. of Vital Stats., Nat'l Ctr. for Health Stats. Reps., CDC, 1–2 (June 2017),  https://www.cdc.gov/nchs/data/nhsr/ nhsr104.pdf.

[24] *Adolescent fertility rate (births per 1,000 women ages 15–19)*, The World Bank, https://data.worldbank.org/indicator/SP.ADO.TFRT (last visited Apr. 28, 2023).

planning methods, infertility services, and services for adolescents).” 42 U.S.C. §

300(a).  In 2021, Title X served almost 1.7 million people, including 137,924 people

under the age of eighteen.[25]  These young people were able to access confidential

medical care without stigma and often for free, provided that the Title X provider

documented taking specific actions to encourage the minor to involve a parent or

guardian in their decision to seek family planning services.[26]

Although Title X provides a valuable resource to young people seeking to

achieve their life goals, many young people still face barriers to contraceptive access.

Contraceptive deserts are one such barrier.  An analysis conducted by Power to

Decide, updated this year, found that approximately nineteen million women of

reproductive age who are eligible for publicly funded contraception lack reasonable

access to a health center offering the full range of birth control methods in the county

where they live.[27]  To get the method of birth control that works best for them, these

---

[25] Christina Fowler et al., *Family Planning Annual Report: 2021 National Summary* 12, Office of Population Affairs, Off. of the Assistant Sec’y for Health, Dep’t of Health and Hum. Servs., 9, 12 (Sept. 2022), https://opa.hhs.gov/sites/default/files/2022-09/2021-fpar-national-final-508.pdf.

[26] *Id.*

[27] *Contraceptive Deserts*, Power to Decide, https://powertodecide.org/contraceptive-deserts (last visited Apr. 28, 2023). This project relied on data from the U.S. Census Bureau, Guttmacher Institute, CDC, and Federal Communications Commission, as well as data collected by Power to Decide.

women have to travel long distances, which typically requires extra gas or bus fare, time away from school, unpaid time off work, additional childcare costs, and other obstacles.

Texas is one of the most underserved states, with only 400 clinics to serve 1,774,230 women eligible for publicly funded contraception (generally those with income below 250% of the federal poverty level).[28] Consider Angelina County, Texas—a county of 86,771 people.  It has no health centers providing all methods of birth control.  It is estimated that 6,440 women in that county are in need of publicly funded contraceptive services and supplies.[29]  Now consider Hildalgo County, Texas—a county of 774,769 people.  There are eleven health centers, but 70,890 women who are in need of publicly funded contraceptive services and supplies.[30]  There is simply an insufficient number of clinics to provide reasonable access to serve these women.  Both contraceptive deserts like Angelina County and low-served communities like Hildalgo County make up the majority of counties in Texas.

---

For precision, when discussing data or research findings, we adopt the gender categories used in the underlying sources.  We note, however, that until recently, researchers have largely used the terms "women" and "girls" to describe all people assigned female at birth, even though some have different genders.  We expressly acknowledge that not all people assigned female at birth are women or girls and that childbearing capacity is not limited to women and girls.

[28] *Id.*

[29] *Id.*

[30] *Id.*

There is strong evidence that adding additional barriers, such as parental consent, to contraceptive access would exacerbate the problem and significantly impact the teen birth rate, particularly for Black and Latine young people. The teen birth rate affects all racial and ethnic groups, but Black and Latine young people are disproportionately burdened.[31] In 2020, Black adolescents had a teen birth rate of 24.4 births per 1,000 young women, and Latine adolescents had a rate of 23.5 per 1,000.[32] Disparities in teen pregnancy and birth rates are driven, in part, by differential access to contraceptives and other reproductive healthcare services.[33] Black and Latine females aged fifteen to nineteen years are also more likely to report having sex than white females in that age range.[34]

A 2012 focus group of Black and Latine young people in South Carolina highlights why it is likely that contraceptive use among this group would decrease with parental consent mandates, leading to an increased birth rate. Researchers

---

[31] Charlotte T. Galloway et al., *Exploring African-American and Latino Teens' Perceptions of Contraception and Access to Reproductive Health Care Services*, 60 J. Adolescent Health S57, S57 (2017), 10.1016/j.jadohealth.2016.12.006; *see also Trends in Teen Pregnancy and Childbearing*, Office of Population Affairs, https://opa.hhs.gov/adolescent-health/reproductive-health-and-teen-pregnancy/trends-teen-pregnancy-and-childbearing (last visited Apr. 28, 2023).

[32] *Trends in Teen Pregnancy and Childbearing*, *supra* note 31.

[33] Galloway, *supra* note 31, at S57–58 (citing Christine Dehlendorf et al., *Disparities in Family Planning*, 202 Am. J. of Obstetrics & Gynecology (2010)); Ruby Jean Vasser Woodruff et al., *Reasons Youth of Color Give for Not Accessing Primary Healthcare: A Survey of Patients at a Teen Clinic*, 4 Cal. J. of Health Promotion 175, 178 (2006); Wilhelmina A. Leigh, *Does place matter? Racial/ethnic differences in reproductive health outcomes of adolescents,* 32 Black Pol. Econ. 47, 47 (2003).

[34] Galloway, *supra* note 31, at S57.

leading the focus group found that the inability of healthcare providers to offer sufficient assurances about confidentiality was a factor that would lead participants to forgo contraception: *"Everybody will know your business." "Every day doctors say oh, this is going to be confidential but it's not. People talk and gossip…and it's not really that confidential. …you know my mom…you know all of my friends. it's not confidential." "Most of the time if you're under age, [clinics] have to know that your parents know [that you are at the clinic to get contraception] because they cannot give you any treatment if you're under 18."*[35]  For Black and Latine young people in contraceptive deserts, or with other geographic challenges to access, eliminating the option of obtaining confidential care would add to the burden upon them and their disparity in access.

Black young people are overrepresented in groups that are likely to lack a strong relationship with a trusted adult, also making parental consent fraught.  As an example, current estimates indicate that 37% of all U.S. children and more than one-half of Black children are involved in a state child protective services ("CPS") investigation before age eighteen.[36]  Further, 6% of all U.S. children and 12% of Black children experience one or more foster care placements by their eighteenth

---

[35] *Id.* at S59–S60.

[36] Sarah A. Font et al., *Prevalence and Risk Factors for Early Motherhood Among Low-Income, Maltreated, and Foster Youth*, 56 Demography 261, 262 (2018), (citing Hyunil Kim et al., *Lifetime Prevalence of Investigating Child Maltreatment Among US children*, 107 Am. J. of Pub. Health 274–280 (2017)).

birthday.[37]   There is also an elevated risk of teen pregnancy and birth for young

people involved with CPS.[38]  This includes both those who remain in home and those

who experience foster care.[39]  In fact, young people involved in CPS or in foster care

are two to three times as likely to become teen parents, relative to the general

population.[40]

Thus, by offering young people the opportunity to obtain contraceptive care

on a confidential basis, the Title X program promotes equity in access to care,

eliminating a barrier to using contraceptives that disproportionately affects young

people of color.  This is yet another compelling governmental interest that the district

court overlooked.

### D.    For Those Seeking to Avoid Adolescent Parenthood, Access to Contraceptives is Even More Critical Following Dobbs.

On June 24, 2022, the Supreme Court issued the *Dobbs* decision, overruling

*Roe v. Wade*, 410 U.S. 113 (1973), and authorizing states to ban abortion.  *Dobbs*,

---

[37] *Id.* (citing Christopher Wildeman & Natalia Emanuel, *Cumulative Risks of Foster Care Placement by Age 18 for U.S. Children*, 2000–2011, 9 *PLoS One* 1 (2014)).

[38] *Id.* (citing Lars Brännström et al., *Risk Factors for Teenage Childbirths Among Child Welfare Clients: Findings from Sweden*, 53 Children and Youth Servs. Rev. 44–51 (2015), and Joseph Doyle, *Child Protection and Child Outcomes: Measuring the Effects of Foster Care*, American Economic Review, 97, 1583–1610 (2007); Emily Putnam-Hornstein & Bryn King, *Cumulative Teen Birth Rates Among Girls in Foster Care at Age 17: An Analysis of Linked Birth and Child Protection Records from California*, 38 Child Abuse & Neglect 698–705 (2014)).

[39] Font, *supra* note 36, at 262.

[40] Jennie Noll & Chad Shenk, *Teen Birth Rates in Sexually Abused and Neglected Females*, 131 Pediatrics e1181, e1181–e1187 (2013); Terry Shaw et al., *Fostering Safe Choices: Final Report*, Ruth H. Young Center for Families and Children Collection, University of Maryland - Baltimore, (2010), https://archive.hshsl.umaryland.edu/ handle/10713/3533.

142 S. Ct. at 2242.  Since then, thirteen states, including Texas, have begun enforcing laws prohibiting abortion in almost all circumstances, and others have sharply curtailed access to abortion care.[41]  Approximately twenty-two million women and girls of reproductive age in the United States now live in states where abortion is banned.[42]  It is thus more critical than ever that young people who wish to avoid adolescent parenthood have confidential access to contraception.

Prior to *Dobbs*, all but two of the thirteen ban states had teen birth rates higher than the national average of 14.4 per 1,000 young women.[43]  In Texas, for instance, an average of 20.3 teenagers give birth for every 1,000 young women.[44]  Texas also leads the nation in teens who give birth multiple times.[45]  Young people in states with abortion bans are less likely than adults to have the resources or wherewithal—

---

[41] *After Roe Fell: Abortion Laws by State*, Ctr. for Reprod. Rights, https://reproductiverights.org/maps/abortion-laws-by-state (last visited Apr. 28, 2023); *see also* Power to Decide, *State-by-State Guide*, Abortion Finder, https://www.abortionfinder.org/abortion-guides-by-state (last visited Apr. 28, 2023). The thirteen states are Alabama, Arkansas, Idaho, Kentucky, Louisiana, Mississippi, Missouri, North Dakota, Oklahoma, South Dakota, Tennessee, Texas, and West Virginia.  The number of states with abortion bans is likely to change over time as new laws are enacted and new challenges to these laws are filed in court.

[42] *Human Rights Crisis: Abortion in the United States after Dobbs*, Human Rights Watch (Apr. 18, 2023, 12:01 AM), https://www.hrw.org/news/2023/04/18/human-rights-crisis-abortion-united-states-after-dobbs.

[43] *Teen Birth Rate by State 2021*, CDC, https://www.cdc.gov/_nchs/pressroom/sosmap/teen-births/teenbirths.htm (last visited Apr. 28. 2023).

[44] *Id.*

[45] Eleanor Klibanoff & Mandi Cai, *Texas tops the nation in teens who give birth multiple times*, Tex. Trib. (Feb. 21, 2022), https://www.texastribune.org/2022/02/21/texas-teenage-pregnancy-abortion/.

particularly in instances of abuse, rape, or unsupportive parents—to travel to a state where abortion care remains lawful.  Permitting states that ban abortion to also erect barriers to contraceptive access by adolescents will undoubtedly drive up the teen birth rates in these states even further, hindering the young people who live in them from setting their life goals.

## III.    The District Court Ignored the Existence of Abusive and Dysfunctional Families.

### A.    *Not All Minors Have Healthy Relationships with Their Parents.*

Research shows that minors who have healthy relationships with their parents typically involve them in their reproductive healthcare decisions voluntarily.[46]  But, as both caselaw and governmental data recognize, not all minors have healthy relationships with their parents.  As a result, denying minors the option of obtaining confidential reproductive healthcare can be profoundly harmful.

Some minors cannot rely on their parents for safety, comfort, or support. Many "'live in fear of violence by family members' and 'are, in fact, victims of rape, incest, neglect and violence.'"  *Hodgson v. Minnesota*, 497 U.S. 417, 439 (1990), *abrogated on other grounds by Dobbs*, 142 S. Ct. at 2242; *see generally*

---

[46] *See* Rachel K. Jones et al., *Adolescents' reports of parental knowledge of adolescents' use of sexual health services and their reactions to mandated parental notification for prescription contraception*, 293 JAMA 340, 340 (2005) ("Most minor adolescent females seeking family planning services report that their parents are aware of their use of services."); *see also* Lee A. Hasselbacher et al., *Factors Influencing Parental Involvement Among Minors Seeking an Abortion: A Qualitative Study*, 104 Am. J. Pub. Health 2207, 2207 (2014).

*Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) (holding that a father accused of sexually abusing his daughter was not entitled to review the case file maintained by the state CPS agency) ("Child abuse is one of the most difficult crimes to detect and prosecute .... A child's feelings of vulnerability and guilt and his or her unwillingness to come forward are particularly acute when the abuser is a parent. It therefore is essential that the child have a state-designated person to whom he may turn, and to do so with the assurance of confidentiality.").

In fact, one in seven minors in the United States has experienced abuse or neglect in the past year.[47] Ninety-one percent of the time the perpetrator is a parent.[48] In all confirmed cases of abuse and neglect in Texas, parents continue to be the most common perpetrators.[49] Minors experiencing poverty, who are more likely to utilize Title X family planning services,[50] face an increased risk of abuse and neglect.[51] In fact, rates of abuse and neglect are *five times higher* for minors in families with low

---

[47] *Fast Facts: Preventing Child Abuse & Neglect*, CDC (Apr. 6, 2022), https://www.cdc.gov/violenceprevention/childabuseandneglect/fastfact.html.

[48] Casey L. Brown et al., *Child Physical Abuse and Neglect*, StatPearls (2023), https://www.ncbi.nlm.nih.gov/books/NBK470337/.

[49] *Fiscal Year 2022 Child Maltreatment Fatalities and Near Fatalities Annual Report*, Tex. Dept. of Family and Protective Servs., 4 (2023), https://www.dfps.texas.gov/About_DFPS/Reports_and_Presentations/PEI/documents/2023/2023-03-01_Child_Maltreatment_Fatalities_and_Near_Fatalities_Annual_Report.pdf.

[50] In 2021, 86% of Title X clients had family incomes at or below 250% of the federal poverty level; 65% had family incomes at or below 100% of the federal poverty level. Fowler, *supra* note 25, at 23.

[51] *See Fast Facts: Preventing Child Abuse & Neglect*.

incomes.[52]  The district court disregards this reality, assuming instead that every young person's parents have their best interests at heart.  In so doing, it attempts to make the "'private realm of family life' conform to some state-designed ideal," which "is not a legitimate state interest at all."  *Hodgson*, 497 U.S. at 452.

The district court also failed to recognize that many adolescents reside with or seek advice and solace from adults who are not their parents.  Power to Decide advocates for every young person to have a trusted adult to talk to about sex, love, and relationships.[53]  In some instances, this may be a young person's parent, but in others, this person might be an adult sibling; another relative, such as an aunt, uncle, or grandparent; a coach, teacher, physician; or another person in the community who is committed to supporting that young person's wellbeing and development.[54]  These beneficial and safe relationships, existing outside of the traditional family structure, should be valued and encouraged.  Instead, the district court ignored the reality that many adolescents live with or otherwise rely on adults who are not their parents and imposed its own limited view of family life on the constitutional analysis.

---

[52] *Id.*

[53] *See #TalkingIsPower*, Power to Decide, https://powertodecide.org/TalkingIsPower (last visited Apr. 28, 2023).

[54] *See* Aletha Y. Akers et al., *Family Discussions About Contraception and Family Planning: A Qualitative Exploration of Black Parent and Adolescent Perspectives*, 42 Persp. on Sexual & Reprod. Health 160, 164 (2010) (discussing mothers who "reported that their daughters were more likely to learn about contraceptives and access to services from a female sibling or other relative than from them").

**B.    The District Court Cited the Supreme Court's Abortion Jurisprudence Selectively, Without Acknowledging That It Denied Parents the Right to Exercise a Veto Over Minors' Abortion Decisions.**

The district court cherry-picked language about parental rights from cases concerning parental involvement in minors' abortion decisions while ignoring the central holding of these cases: that a parent could not exercise an absolute veto over a minor's abortion decision. *See Deanda*, 2022 WL 17572093, at *12. For example, the district court selectively quoted a lower court decision for the proposition that "[t]he Supreme Court has recognized the significant state interest in providing an opportunity for parents to supply essential medical and other information to a physician," *id.* at *12 (quoting *Hodgson v. Minnesota*, 853 F.2d 1452, 1464 (8th Cir. 1988)), without acknowledging the Supreme Court's holding in the same case that "[a]ny independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the competent minor mature enough to have become pregnant." *Hodgson*, 497 U.S. at 453 (citing *Danforth*, 428 U.S. at 75).

Prior to their abrogation by *Dobbs*, the Supreme Court's abortion cases made clear that "parents may not exercise 'an absolute, and possibly arbitrary, veto' over th[e] decision" to have an abortion. *Hodgson*, 497 U.S. at 445 (citing *Danforth*, 428 U.S. at 74); *accord City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 440 (1983) ("[I]t is clear that Akron may not make a blanket determination …

24

that an abortion never may be in the minor's best interests without parental approval."), *abrogated on other grounds by Dobbs*, 142 S. Ct. at 2242; *Bellotti v. Baird*, 443 U.S. 622, 643 (1979) (plurality opinion) ("[T]he State may not impose a blanket provision … requiring the consent of a parent or person *in loco parentis* as a condition for abortion of an unmarried minor during the first 12 weeks of her pregnancy."), *abrogated on other grounds by Dobbs*, 142 S. Ct. at 2242. The district court's reliance on this line of cases to support the kind of absolute parental veto power over minors' reproductive health decision-making that the cases expressly reject is clearly misplaced.

The district court similarly obscured the central holding of *Prince v. Massachusetts*, 321 U.S. 158 (1944), in which the Supreme Court upheld a parent's conviction for violating child labor laws in connection with promoting the sale of religious magazines. *Deanda*, 2022 WL 17572093, at *12. There, the Supreme Court explained that: "[N]either rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways." *Prince*, 321 U.S. at 166 (footnotes omitted). The Supreme Court also noted that: "It is the interest of youth itself, and of the whole community, that children be both

safeguarded from abuses and given opportunities for growth into free and independent well-developed men and citizens." *Id.* at 165.

## CONCLUSION

This Court should reverse the district court's judgment.

Dated:  May 1, 2023

Respectfully submitted,

*/S/ Stephanie Toti*
Stephanie Toti
LAWYERING PROJECT
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
(646) 490-1083
stoti@lawyeringproject.org

Jamila Johnson
LAWYERING PROJECT
3157 Gentilly Blvd., No. 2231
New Orleans, LA 70122
(347) 706-4981
jjohnson@lawyeringproject.org

Paige Suelzle
LAWYERING PROJECT
2501 SW Trenton St., No. 1097
Seattle, WA 98106
(425) 691-0890
psuelzle@lawyeringproject.org

*Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,382 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated:  May 1, 2023

*/S/ Stephanie Toti*
Stephanie Toti
Attorney for Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that, on May 1, 2023, a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF system.


Dated:  May 1, 2023

*/S/ Stephanie Toti*
Stephanie Toti
Attorney for Amicus Curiae