No. 23-10159

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

ALEXANDER R. DEANDA, on Behalf of Himself and Others Similarly Situated,

*Plaintiff-Appellee*

v.

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; JESSICA SWAFFORD MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; UNITED STATES OF AMERICA,

*Defendants-Appellants.*

On Appeal from the United States District Court,
Northern District of Texas, Amarillo Division
No. 2:20-cv-00092

## BRIEF OF THE NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL OF THE DISTRICT COURT'S RULING

Robin Summers
NATIONAL FAMILY PLANNING &
REPRODUCTIVE HEALTH ASSOCIATION
1025 Vermont Ave. NW, Suite 800
Washington, DC 20005
(202) 293-3114
rsummers@nfprha.org

Chelsea Tejada
*Counsel of Record*
Brigitte Amiri
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
ctejada@aclu.org
bamiri@aclu.org

*Counsel for Amicus Curiae*

Adriana Piñon
David Donatti
ACLU FOUNDATION OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
(713) 942-8146
apinon@aclutx.org
ddonatti@aclutx.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS

No. 23-10159, *Deanda v. Becerra*

In addition to the persons and entities previously identified by the parties, the undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. National Family Planning & Reproductive Health Association, Inc.;

2. Robin Summers of National Family Planning & Reproductive Health Association, Inc., counsel for *amicus curiae*;

3. Brigitte Amiri and Chelsea Tejada, of the American Civil Liberties Union Foundation, counsel for *amicus curiae*; and

4. Adriana Piñon and David Donatti, of the American Civil Liberties Union Foundation of Texas, counsel for *amicus curiae*.

SO CERTIFIED, this 1st day of May 2023.

/s/ *Chelsea Tejada*
Counsel of record for *Amicus Curiae*

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF *AMICUS CURIAE* ............................................................. 1

ARGUMENT ...................................................................................... 2

    FACTUAL BACKGROUND ................................................................. 3

    TITLE X STATUTE AND LEGISLATIVE HISTORY ...................................... 7

    EVERY COURT TO CONSIDER THE ISSUE, OTHER THAN THE
    DISTRICT COURT IN THIS CASE, HAS HELD THAT THE TITLE X
    STATUTE MANDATES CONFIDENTIALITY FOR MINORS .................... 16

CONCLUSION .................................................................................. 21

CERTIFICATE OF SERVICE ................................................................. 23

CERTIFICATE OF COMPLIANCE ........................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*County of St. Charles v. Mo. Fam. Health Council*,
   107 F.3d 682 (8th Cir. 1997) ...................................................20

*Doe v. Pickett*,
   480 F. Supp. 1218 (S.D. W. Va. 1979).....................................19

*Jane Does 1 Through 4 v. Utah Dep't of Health*,
   776 F.2d 253 (10th Cir. 1985) .................................................20

*Planned Parenthood Ass'n of Utah v. Matheson*,
   582 F. Supp. 1001 (D. Utah 1983)...........................................20

*Planned Parenthood Fed. of Am., Inc. v. Heckler*,
   712 F.2d 650 (D.C. Cir. 1983)........................................ *passim*

*Planned Parenthood Fed. of Am., Inc. v. Schweiker*,
   559 F. Supp. 658 (D.D.C. 1983)..................................................3

*New York v. Heckler*,
   719 F.2d 1191 (2d Cir. 1983) ...................................................19

*T.H. v. Jones*,
   425 F. Supp. 873 (D. Utah 1975).............................................19

**Statutes**

42 U.S.C. § 300(a) ........................................................ *passim*

Department of Health & Human Services Appropriations Act of 1999,
   Pub. L. No. 105-277, 112 Stat. 2681 (1998) ..........................15

Family Planning Services and Population Research Act of 1970,
   Pub. L. No. 91-572, 84 Stat. 1504, *et seq.*........................7, 11
   Pub. L. No. 91-572, § 2(1), 84 Stat. 1504 ................................8
   Pub. L. No. 91-572, § 1007, 84 Stat. 1508 (codified at 42 U.S.C. § 300a-5) ........8

Pub. L. No. 95-613, § 1(a)(1), 92 Stat. 3093 (1978) .............................................10

Pub. L. No. 97-35, 95 Stat. 357 (1981), *et seq.*
 Pub. L. No. 97-35, § 2006(a)(22), 95 Stat. 587 .....................................13
 Pub. L. No. 97-35, § 931(b)(1), 95 Stat. 570 (codified at 42 U.S.C. § 300(a))....12

## Legislative Materials

116 Cong. Rec. 24812 (1970) ...............................................................8

124 Cong. Rec. 37044 (1978) .......................................................... 10, 11

H.R. Rep. No. 93-1161 (1974).............................................................8

H.R. Rep. No. 95-1191 (1978)..........................................................9, 10

H.R. Rep. No. 97-208 (1981) (Conf. Rep.) ......................................12

Parent's Right to Know Act of 2003, H.R. 2444, 108th Cong. ...............................14

Parental Notification Act of 1998, H.R. 4721, 105th Cong. ...................................14

S. Rep. No. 94-29 (1975) ...............................................................9, 12

S. Rep. No. 95-102 (1977) ...............................................................9

S. Rep. No. 95-822 (1978) .......................................................... 9, 10, 11, 12

## Executive Materials

86 Fed. Reg. 56166 (Oct. 7, 2021) (codified at 42 C.F.R. § 59.10(b)) ............ 14, 15

Christina Fowler et al., U.S. Dep't of Health & Hum. Servs.,
 *Title X Family Planning Annual Report: 2021 National Summary*
 (Sept. 2022), https://opa.hhs.gov/sites/default/files/2022-09/2021-
 fpar-national-final-508.pdf ..............................................................4, 15

Grants for Family Planning Projects; Parental Notification Requirement,
 49 Fed. Reg. 38117 (Sept. 27, 1984) ....................................................19

Loretta Gavin et al., Ctrs. for Disease Control & Prevention, *Providing Quality Family Planning Services: Recommendations of CDC and the U.S. Office of Population Affairs*, 64 Morbidity & Mortality Wkly. Rep., Apr. 25, 2014, https://www.cdc.gov/mmwr/pdf/rr/rr6304.pdf..........................7, 16

Off. of Population Affs., U.S. Dep't of Health & Hum. Servs., *OPA Program Policy Notice 2014–01—Confidential Services to Adolescents* (2014), https://opa.hhs.gov/grant-programs/archive/title-x-program-archive /opa-program-policy-notice-2014-01-confidential-services-to-adolescents ........15

Parental Notification Requirements Applicable to Projects for Family Planning Services, Final Rule, 48 Fed. Reg. 3600 (Jan. 26, 1983) ....................................17

Richard Nixon, Special Message to the Congress on Problems of Population Growth (July 18, 1969), https://www.presidency.ucsb.edu/documents/special-message-the-congress-problems-population-growth ............................................................8

Richard Nixon, Statement on Signing the Family Planning Services and Population Research Act of 1970 (Dec. 26, 1970), https://www.presidency.ucsb.edu/documents/statement-signing-the -family-planning-services-and-population-research-act-1970........................7

## Regulations

42 C.F.R. § 59.10(a)...................................................................................................15

42 C.F.R. § 59.10(b) .................................................................................................14

42 C.F.R. § 59.5(a)(4) ...............................................................................................3

## Other Authorities

Am. Coll. Obstetricians & Gynecologists' Comm. on Adolescent Health Care, *Confidentiality in Adolescent Health Care*, Comm. Op. 803 (Apr. 2020), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2020/04/confidentiality-in-adolescent-health-care......................6

Diane M. Reddy et al., *Effect of Mandatory Parental Notification on Adolescent Girls' Use of Sexual Health Care Services*, 288 JAMA 710 (2002), https://jamanetwork.com/journals/jama/fullarticle/195185...................................6

Liza Fuentes et al., *Adolescents' and Young Adults' Reports of Barriers to Confidential Health Care and Receipt of Contraceptive Services*, 62 J. Adolescent Health 36 (2018), https://www.jahonline.org/action/showPdf?pii=S1054-139 X%2817%2930508-6................................................................................6

Megan L. Kavanaugh et al., *Use of Health Insurance Among Clients Seeking Contraceptive Services at Title X-Funded Facilities in 2016*, 50 Perspectives on Sexual & Reprod. Health 101 (Sept. 2018), https://onlinelibrary.wiley.com/doi/epdf/10.1363/psrh.12061 ..............................4

Rachel K. Jones et al., *Adolescents' Reports of Parental Knowledge of Adolescents' Use of Sexual Health Services and Their Reactions to Mandated Parental Notification for Prescription Contraception*, 293 JAMA 340 (2005) ..............................................................................5

# INTEREST OF *AMICUS CURIAE*[1]

The National Family Planning & Reproductive Health Association (NFPRHA) is a national, nonprofit membership organization dedicated to promoting and supporting the work of family planning providers and administrators, especially those in the safety net, to provide high-quality, client-centered, affordable family planning services. NFPRHA represents nearly 1,000 members—including more than 900 health care organizations—in 48 states, the District of Columbia, and the U.S territories. NFPRHA's members operate or administer thousands of health centers, many of which are Title X grantees or subrecipients of Title X grants, serving millions of patients a year. NFPRHA's organizational members include state, county, and local health departments; private, nonprofit family planning organizations; family planning councils; hospital-based clinics; and federally qualified health centers. As the leading national advocacy organization for family planning providers since 1971, NFPRHA has brought several lawsuits to protect the integrity of the Title X program, including ensuring Title X's statutory requirement of confidentiality for minors. *See, e.g.*, *Planned Parenthood Fed. of Am., Inc. v. Heckler*, 712 F.2d 650 (D.C. Cir. 1983). NFPRHA submits this *amicus* brief to

---

[1] Counsel for all parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* states that no party's counsel authored this brief in whole or in part, and further, that no one—other than *amicus curiae*, its members, or its counsel—contributed money intended to fund preparing or submitting this brief.

1

provide the Court with additional facts and perspective about the history of Title X's confidentiality requirement and the importance of ensuring confidentiality in the Title X program.

## ARGUMENT

Since its inception in 1970, the Title X program has guaranteed confidential access to high-quality family planning care for all individuals regardless of age or income. Specifically, the statutory text, legislative history, and underlying policy have consistently demonstrated Congress's unwavering commitment to confidential, voluntary access to contraceptive care for adolescent patients, as a way to achieve one of Congress's statutory goals to prevent unintended teen pregnancies. For decades, courts have uniformly concluded that Title X unambiguously precludes the imposition of parental notification or consent requirements on minors seeking the program's contraceptive services, even where state laws may otherwise allow or require parental involvement. Here, however, the district court ignored the plain language and legislative history of Title X to become the sole court to hold that the Title X statute does not preempt the state parental consent law at issue. For the reasons below, and for the reasons in Defendants-Appellants' brief, this Court should reverse the district court's ruling.

## **FACTUAL BACKGROUND**

For more than fifty years, Congress has consistently funded the Title X program to help ensure that low-income and marginalized populations, including adolescents, who want but cannot afford family planning services, are able to access them. The program's purpose is to make family planning services and information widely available so that all individuals can prevent unintended or unwanted pregnancies. *See Planned Parenthood Fed. of Am., Inc. v. Schweiker*, 559 F. Supp. 658, 660 (D.D.C. 1983) ("Title X was enacted in response to a growing congressional concern with the number of unwanted pregnancies in the United States, and the social and medical costs associated with such pregnancies."). By enacting Title X, Congress intended to provide patients across the country with a network of high-quality family planning medical care providers, equal access to contraceptives, and the freedom to make decisions about whether and when to have children. Throughout the program's history, Title X grants to public and private nonprofit entities have served as the nation's only dedicated federal funding for family planning services.

Title X-funded projects provide confidential family planning services, supplies, and information to all patients regardless of age or income. *See* 42 U.S.C. § 300(a); 42 C.F.R. § 59.5(a)(4). In practice, the Title X program "serve[s] a socioeconomically disadvantaged population, most of whom are female, low

3

income, and young," and provides a lifeline for a number of marginalized communities.[2] For example, a 2016 study found that 60 percent of the women who received contraceptive care from Title X-funded health centers had seen no other medical provider in the previous year.[3] In 2021, the most recent year for which data are available, Title X-funded 3,284 service sites, serving almost 1.7 million family planning patients.[4] Sixty-five percent of those patients had family incomes at or below the federal poverty level, and 53 percent were under age 30.[5]  Specifically, in 2021, Title X-funded sites served nearly 138,000 family planning patients under age 18.[6]

Adolescents' confidential access to contraception is a key component of Title X and essential to achieving Congress's goals for the family planning program, including preventing unintended teen pregnancies. While research indicates that a majority of adolescents already involve a parent or guardian in their reproductive

---

[2] Christina Fowler et al., U.S. Dep't of Health & Hum. Servs., *Title X Family Planning Annual Report: 2021 National Summary*, ES-2 (Sept. 2022), https://opa.hhs.gov/sites/default/files/2022-09/2021-fpar-national-final-508.pdf [hereinafter "Title X Annual Report: 2021"].

[3] Megan L. Kavanaugh et al., *Use of Health Insurance Among Clients Seeking Contraceptive Services at Title X-Funded Facilities in 2016*, 50 Perspectives on Sexual & Reprod. Health 101, 105 (Sept. 2018), https://onlinelibrary.wiley.com/doi/epdf/10.1363/psrh.12061.

[4] Title X Annual Report: 2021, *supra* note 2, at 7, 9.

[5] *Id.* at ES-2.

[6] *Id.* at 12.

4

health care, the option to confidentially obtain prescription contraception without parental involvement is critically important to adolescent patients. A 2005 national study of publicly funded family planning centers, including Title X facilities, found that six in ten patients under age 18 reported that a parent or guardian knew they were at the health center for contraceptive services.[7] However, for the many young people who are not able to talk with their parents or guardians about seeking sexual health services, including because of fear they will face punishment or abuse,[8] the ability to confidentially access this care is crucial. Indeed, even for those who chose to involve a parent or guardian, a mandate requiring parental involvement would decrease the number of minors who access highly effective prescription contraceptives while not significantly reducing the number who are sexually active.[9] Further, a survey indicated that if family planning health centers mandated parental notification for prescription contraception, nearly half of the adolescent patients would stop using the health centers for that service and some would also discontinue using the health centers to access other sexual health services, such as testing or

---

[7] Rachel K. Jones et al., *Adolescents' Reports of Parental Knowledge of Adolescents' Use of Sexual Health Services and Their Reactions to Mandated Parental Notification for Prescription Contraception*, 293 JAMA 340, 343 (2005).

[8] *Id.*

[9] *Id.* at 345 (noting if parental notification were mandated then 40.7% of all minors, including 21.0% of the minors whose parents knew they were at the clinic, would no longer come to the clinic for prescription birth control while only 7.3% would stop having sex).

treatment for sexually transmitted infections.[10] Thus, "requiring parental notification for obtaining prescribed contraceptives would likely increase unintended pregnancies, abortions, and out-of-wedlock births,"[11] defeating the intent of the Title X program. In accordance with such evidence, the American College of Obstetricians and Gynecologists, as well as many other associations of health professionals caring for minors, "recognize the importance of confidentiality in providing health care for adolescents."[12]

As explained in detail below, minors' confidential access to contraception has been a cornerstone of Title X since the program's inception, and remains vitally important today. Due in part to the Title X program, adolescent birth rates declined by more than 61 percent from 1991 to 2012; however, the United States still has one of the highest adolescent pregnancy rates in the developed world, with more than

---

[10] Diane M. Reddy et al., *Effect of Mandatory Parental Notification on Adolescent Girls' Use of Sexual Health Care Services*, 288 JAMA 710, 713 (2002), https://jamanetwork.com/journals/jama/fullarticle/195185. *See also* Liza Fuentes et al., *Adolescents' and Young Adults' Reports of Barriers to Confidential Health Care and Receipt of Contraceptive Services*, 62 J. Adolescent Health 36, 38 (2018), https://www.jahonline.org/action/showPdf?pii=S1054-139X%2817%2930508-6 (finding 18% of 15–17 year-olds would not go for *any* sexual or reproductive health care because their parents might find out).

[11] Reddy et al., *supra* note 10, at 713.

[12] *See* Am. Coll. Obstetricians & Gynecologists' Comm. on Adolescent Health Care, *Confidentiality in Adolescent Health Care*, Comm. Op. 803 (Apr. 2020), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2020/04/confidentiality-in-adolescent-health-care.

700,000 adolescents aged 15 to 19 becoming pregnant each year.[13] To achieve Title X's goal of preventing unintended pregnancies, minor patients' confidential access to no- or low-cost contraceptive services remains an indispensable part of the nation's family planning program.

## TITLE X STATUTE AND LEGISLATIVE HISTORY

Since its inception, the Title X program has guaranteed confidential access to high-quality family planning medical care for individuals across the nation. As evidenced by the statutory text, legislative history, and implementing regulations, confidential access to contraception for all—especially for adolescent patients—has been indispensable to the integrity of the program.

Title X was enacted in 1970 by President Richard Nixon. Family Planning Services and Population Research Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504. The groundbreaking program passed Congress with strong bipartisan support,[14]

---

[13] Loretta Gavin et al., Ctrs. for Disease Control & Prevention, *Providing Quality Family Planning Services: Recommendations of CDC and the U.S. Office of Population Affairs*, 64 Morbidity & Mortality Wkly. Rep., Apr. 25, 2014, at 1, https://www.cdc.gov/mmwr/pdf/rr/rr6304.pdf.

[14] Richard Nixon, Statement on Signing the Family Planning Services and Population Research Act of 1970 (Dec. 26, 1970), https://www.presidency.ucsb.edu/documents/statement-signing-the-family-planning-services-and-population-research-act-1970 (President Nixon asserted that it was "noteworthy that this landmark legislation on family planning and population has had strong bipartisan support" and indicated that he was "proud to affix [his] signature to this important legislation").

seeking to fulfill President Nixon's goal that "no American woman should be denied access to family planning assistance because of her economic condition."[15] Upon passage, George H.W. Bush, then a Representative of Texas and co-sponsor of the bill, declared, "No one has to feel timid about discussing birth control any more." 116 Cong. Rec. 24812 (July 16, 1970). The Title X program was originally funded for three years but has since been continuously refunded.

Congress's purpose in passing Title X was to create a program to make "comprehensive voluntary family planning services readily available to **all persons** desiring such services."[16] Pub. L. No. 91-572, § 2(1), 84 Stat. 1504, 1504 (emphasis added). From the start, "all persons" has included adolescents, and several years after Title X passed, Congress looked for additional ways to achieve Title X's goals to ensure that family planning services would be readily available to teens. *See* H.R. Rep. No. 93-1161, at 14 (1974) ("[C]ertain population groups requiring these

---

[15] Richard Nixon, Special Message to the Congress on Problems of Population Growth (July 18, 1969), https://www.presidency.ucsb.edu/documents/special-message-the-congress-problems-population-growth.

[16] From its inception, receipt of Title X family planning services by any individual was entirely voluntary. Pub. L. No. 91-572, § 1007, 84 Stat. 1504, 1508 (codified at 42 U.S.C. § 300a-5) ("The acceptance by any individual of family planning services . . . provided through financial assistance under this title (whether by grant or contract) shall be voluntary . . . ."). *See also* H.R. Rep. No. 93-1161, at 18 (1974) ("The Committee continues to require that participation by any individual in the program is to be voluntary and free of compulsion or coercion of any kind.").

services are not being reached . . . includ[ing] teenagers . . . ."); S. Rep. No. 94-29, at 55 (1975).    In so doing, Congress specifically noted the importance of confidentiality in serving teenage patients and repeatedly expressed its intent that Title X should provide confidential family planning care to all teens. For example, the Senate report accompanying the 1977 reauthorization of the program noted the importance of Title X's longstanding confidentiality protections, especially as it relates to teenagers:

> [T]he committee believes [the Department of Health, Education & Welfare] must not overlook the preference of many individuals, particularly the teenage target group, for family planning clinics as the initial entry point to family planning information and services. This preference is due partially to the greater degree of teenage confidence in the confidentiality which can be assured by a family planning clinic and in the proficiency of the family planning services provided in a clinic specializing in those and related services.

S. Rep. No. 95-102, at 26 (1977); *see also* H.R. Rep. No. 95-1191, at 31 (1978); S. Rep. No. 95-822, at 27–31 (1978) ("Many teenagers cite the difficulty in securing a contraceptive as the reason for failure to protect themselves from an unwanted pregnancy . . . . 'With a family doctor or community health clinic, the teenager may be rightfully concerned that her parents will learn or be told of her request for contraception.'").

    As the program continued, Congress remained "committed to addressing the increased needs of adolescents," including unwanted teen pregnancies. H.R. Rep.

No. 95-1191, at 31 (1978).[17] In an effort to ensure Title X services met the needs of adolescents, Congress amended the statute in 1978 to explicitly mention this population. Pub. L. No. 95-613, § 1(a)(1), 92 Stat. 3093 (1978) (requiring Title X health centers to offer "a broad range of acceptable and effective family planning methods and services (including . . . services for adolescents)") (codified at 42 U.S.C. § 300(a)). This change codified existing practice and clarified Congress's intent to place "a special emphasis on preventing unwanted pregnancies among sexually active adolescents." S. Rep. No. 95-822, at 24 (1978). Congress recognized that the option to obtain family planning services confidentially was key to reaching and appropriately caring for this vulnerable population.

In fact, when adding the specific language about adolescents, the House of Representatives simultaneously rejected an amendment that would have required Title X grantees to notify parents prior to prescribing contraceptives to adolescents under sixteen years old. 124 Cong. Rec. 37044 (1978) (Volkmer amendment). In introducing his amendment, Representative Harold Volkmer asserted that "[t]his

---

[17] "According to DHEW, approximately one million women under 20 years of age (10 percent of all teenage women) become pregnant annually. . . . Such pregnancies are often unwanted, and are likely to have adverse health, social, and economic consequences for the individuals involved. Clearly, the problems of teenage pregnancy have become critical. . . . The Committee intends that the proposed increase in authorizations for services be translated into programs to serve sexually active young adults . . . ." *Id.*

amendment is brought about by the concern of many parents in this Nation that, contrary to their beliefs both as to their social beliefs and to their moral beliefs, that their children are being provided such contraceptive devices without their knowledge or information." *Id.* Representative Paul Rogers "agreed[d] that family planning programs should encourage adolescents to discuss their sexual activities with their parents," but voted against requiring parental involvement because "many simply will not come in if we require such discussion." *Id.* The House agreed with Representative Rogers and rejected Representative Volkmer's proposed amendment. The Senate concurred, and the Senate report noted that while it was federal policy to encourage family involvement in adolescents' family planning care, that policy "is *not intended to restrict* or discourage the provision of voluntary family planning services to those adolescents who want them, but only to try to enhance communication within the family unit." S. Rep. No. 95-822, at 40 (1978) (emphasis added). In sum, Congress recognized that confidentiality was crucial to serving adolescent patients, and any parental involvement mandate would contravene not only congressional intent but also the textual directive that contraception be made "readily available" on a voluntary basis to "all persons desiring such services," "including adolescents." Pub. L. No. 91-572; 42 U.S.C. § 300(a).

In 1981, Congress again amended the Title X statute to add language requiring Title X health centers to "encourage family participation" in all patients' (not just

adolescents') family planning services. Pub. L. No. 97-35, § 931(b)(1), 95 Stat. 357, 570 (1981) (codified at 42 U.S.C. § 300(a)). As with the explicit reference to adolescents added to the Title X statute in 1978, the amendment to encourage family participation was not a shift in Congress's approach but rather "raised to the statutory level pre-existing policy on this issue." *Planned Parenthood Fed. of Am., Inc. v. Heckler*, 712 F.2d 650, 658 (D.C. Cir. 1983). *See also* S. Rep. No. 95-822, at 40 (1978) (noting encouraging family participation "has been stressed in prior committee reports and is a reassertion of existing Federal policy"); S. Rep. No. 94-29, at 55 (1975). Under the 1981 amendment, Title X-funded health centers only need to *encourage* patients to include family members of their choosing, and only "*[t]o the extent practical*." 42 U.S.C. § 300(a) (emphasis added). The plain language of this statutory directive means that, in some circumstances, family participation is not practical and therefore is not required. Indeed, the Conference Committee Report accompanying the 1981 amendment made clear that "family involvement *is not mandated*." H.R. Rep. No. 97-208, at 799 (1981) (Conf. Rep.) (emphasis added).[18] As such, Title X's encouragement of family involvement goes hand-in-hand with the ability to receive confidential care. For adolescent patients, this means that Title

---

[18] "The conferees believe that, while family involvement is not mandated, it is important that families participate in the activities authorized by this title as much as possible. It is the intent of the conferees that grantees will encourage participants in the Title X program to include their families in counseling and involve them in their decisions." *Id.*

X-funded health centers will encourage them to include a parent or guardian in their family planning care, but they can still access services confidentially if they decide that is best based on their own personal circumstances.

Since 1981, consistent with the ultimate goals of the family planning program, Congress has repeatedly funded Title X with the understanding and expectation that confidentiality is required, including for adolescent patients, without changing the pertinent statutory language. If Congress had wanted to remove confidentiality protections for minors or require parental consent or notification, it certainly could have done so. Indeed, at the same time that Congress passed Title X's 1981 amendments, it also passed the Title XX Adolescent Family Life Demonstration Projects, which expressly imposed parental notification and consent requirements. Pub. L. No. 97-35 § 2006(a)(22), 95 Stat. 357, 587 (1981) (requiring providers to "notify the parents or guardians of any unemancipated minor requesting services," including any "pregnant unemancipated minor," and to "obtain the permission of such parents or guardians with respect to the provision of such services"). Congress re-authorized Title X without adding similar language even after, as further discussed *infra*, courts repeatedly rejected as contrary to the Title X statute any regulatory or state law attempts to mandate parental involvement, such as a 1983 proposed Title X regulation that would have mandated parental notification prior to providing prescription contraceptives and compliance with state laws regarding

parental notice or consent. In fact, Congress never adopted any later attempts to amend the Title X statute to require parental involvement. *See, e.g.*, Parental Notification Act of 1998, H.R. 4721, 105th Cong.; Parent's Right to Know Act of 2003, H.R. 2444, 108th Cong. Throughout the history of Title X, the statutory text, legislative intent, congressional actions, and underlying policy consistently demonstrate Congress's unwavering commitment to ensuring confidential access to contraceptive care for adolescent patients.

Consistent with Congress's intent discussed above, in 2021, the Department of Health and Human Services updated the Title X regulations to reflect the Title X statutory directive that "Title X projects may not require consent of parents or guardians for the provision of services to minors, nor can any Title X project staff notify a parent or guardian before or after a minor has requested and/or received Title X family planning services." 86 Fed. Reg. 56166 (Oct. 7, 2021) (codified at 42 C.F.R. § 59.10(b)). This regulation merely made explicit what had already been mandated by the Title X statute for fifty years. *See* 86 Fed. Reg. 56166 (Oct. 7, 2021) (noting that family "involvement is not mandatory and grantees are required to protect clients' confidentiality"). This 2021 regulation supplemented longstanding regulations mandating that Title X health centers maintain the confidentiality of their

14

patients. *See* 42 C.F.R. § 59.10(a) (with limited exceptions,[19] "[a]ll information as to personal facts and circumstances obtained by the project staff about individuals receiving services must be held confidential and must not be disclosed without the individual's documented consent") It also codified long-standing agency guidance to Title X grantees, namely the Office of Population Affairs (OPA) Program Policy Notice 2014-01. 86 Fed. Reg. 56166.[20] Additionally, it aligns with the agency's Quality Family Planning (QFP) recommendations for Title X service providers.[21] Per the QFP, confidential family planning services should be made available to adolescents because, according to studies and in line with Title X goals, it leads to "increased use of reproductive health services by adolescents, improved

---

[19] Since fiscal year 1999, appropriations acts for the Department of Health and Human Services have included language making clear that Title X providers are required to follow state mandated reporting laws regarding child abuse, child molestation, sexual abuse, rape, and incest. *See, e.g.*, Department of Health & Human Services Appropriations Act of 1999, Pub. L. No. 105-277, tit. II § 219, 112 Stat. 2681, 2681-363 (1998).

[20] Off. of Population Affs., U.S. Dep't of Health & Hum. Servs., *OPA Program Policy Notice 2014–01—Confidential Services to Adolescents* (2014), https://opa.hhs.gov/grant-programs/archive/title-x-program-archive/opa-program-policy-notice-2014-01-confidential-services-to-adolescents ("It continues to be the case that Title X projects may not require written consent of parents or guardians for the provision of services to minors. Nor can any Title X project staff notify a parent or guardian before or after a minor has requested and/or received Title X family planning services.").

[21] Title X Annual Report: 2021, *supra* note 2, at 29 ("When delivering family planning care, Title X service providers are also required to comply with the Quality Family Planning (QFP) Recommendations . . . For adolescent clients, the QFP also recommends that services be 'youth-friendly.").

contraceptive use, use of more effective methods, more consistent use of contraception, and reduced rates of teen pregnancy."[22]

Accordingly, pursuant to the plain terms of the statute, Title X's legislative history, agency regulations, and policy requirements, Title X has *always* required Title X grantees to provide confidential services to minors. By encouraging family participation, where practical, but not requiring parental involvement, Title X balances parental and adolescents' interests while achieving Congress's statutory purpose of ensuring that all persons, especially minors, have access to comprehensive and voluntary family planning services. In holding that the federal statute does not pre-empt the state parental consent law at issue below, the district court ignored the plain language and legislative history of Title X, becoming the sole outlier in court interpretation of Title X.

## EVERY COURT TO CONSIDER THE ISSUE, OTHER THAN THE DISTRICT COURT IN THIS CASE, HAS HELD THAT THE TITLE X STATUTE MANDATES CONFIDENTIALITY FOR MINORS

For decades, courts have consistently interpreted Title X's statutory language as mandating confidentiality for minors seeking contraceptive services. Federal courts throughout the country, including the U.S. Court of Appeals for the District of Columbia, Second, Eighth, and Tenth Circuits, have uniformly concluded that Title X precludes the imposition of parental notification or consent requirements on

---

[22] Gavin et al., *supra* note 13, at 40. *Id.* at 38–39.

minors seeking the program's contraceptive services, even where state law would otherwise allow or require parental involvement. The district court below ignored Title X's plain language and legislative history to reach the erroneous conclusion that Title X does not preempt Texas law. As the sole outlier, the district court's decision should be reversed.

The seminal case regarding Title X's confidentiality protections for minors is *Planned Parenthood Federation of America, Inc. v. Heckler*, 712 F.2d 650 (D.C. Cir. 1983). At issue were 1983 regulations promulgated following the addition of statutory language requiring Title X providers to "encourage family participation." 42 U.S.C. § 300(a). The regulations required, in relevant part, Title X grantees to notify a parent or guardian within ten days of initially providing prescription contraceptives to a minor. The regulations also mandated compliance with state law requiring parental consent or notification for contraception. Parental Notification Requirements Applicable to Projects for Family Planning Services, Final Rule, 48 Fed. Reg. 3600, 3614 (Jan. 26, 1983). The plaintiffs in that case, including *amicus curiae* NFPRHA, challenged the regulations before they took effect, arguing, *inter alia*, that they conflicted with Title X's statutory requirement that all persons, especially minors, must receive confidential services in the Title X program. The D.C. Court of Appeals found that the case "present[ed] a straightforward issue of statutory construction." *Heckler*, 712 F.2d at 654. The Court held that "careful

17

review of the language of the statute and its legislative history makes it clear that these regulations not only violate Congress's specific intent as to the issue of parental notification, but also undermine the fundamental purposes of the Title X program." *Id.* at 655–56. The Court found "that the 'plain meaning' of the statute is clear from its terms," including Congress's use of the "permissive and non-obligatory term" "encourage" to modify "family participation." *Id.* at 656. Especially when "it could easily have" used language to mandate such involvement, as Congress had done in other statutes, specifically the Title XX program discussed *supra*. *Id.* at 656 & n.30. Further, the Court found that the legislative history, discussed in detail *supra*, "is equally illuminating" and affirms that the plain language of the Title X statute requires confidentiality for minors: "Congress made clear that confidentiality was essential to attract adolescents to the Title X clinics; without such assurance, one of the primary purposes of Title X—to make family planning services readily available to teenagers—would be severely undermined." *Id.* at 657, 660. As to the regulation requiring Title X grantees to follow state laws mandating parental involvement for contraception, the Court in *Heckler* held that,

> [E]ven if Congress had authorized the Secretary to delegate to the states the power to set eligibility standards, the state laws would still have to conform with the existing requirements of Title X and its regulations. It is elementary that under the Supremacy Clause of the Constitution states are not permitted to establish eligibility standards for federal assistance programs that conflict with the existing federal statutory or regulatory scheme.

18

*Id.* at 663–64.[23] The Court found the regulation contrary to Title X and, as a result, the parental notification requirements were removed from the regulations before they took effect. Grants for Family Planning Projects; Parental Notification Requirement, 49 Fed. Reg. 38117, 38117–18 (Sept. 27, 1984).

Both before *Heckler* was decided, and after, until the district court's decision below, every court to consider the issue has agreed that Title X leaves no room for federal or state parental notification or consent requirements, including state law mandates. *See, e.g.*, *Doe v. Pickett*, 480 F. Supp. 1218, 1220 (S.D. W. Va. 1979) (finding West Virginia Department of Health's policy "not to extend family planning services to the [minor] plaintiff [without parental consent] is contrary to the federal statutes and implementing regulations" because "[i]t is elementary that the states are not, unless otherwise indicated by the applicable federal legislation, empowered to add additional eligibility requirements to federally funded programs for the provision of services and benefits"); *New York v. Heckler*, 719 F.2d 1191, 1196 (2d Cir. 1983) ("[T]he 1981 amendment to Title X [encouraging family participation] did not authorize the regulations regarding mandatory [parental] notification. . . .");

---

[23] *See also T.H. v. Jones*, 425 F. Supp. 873 (D. Utah 1975) ("The state's regulations [requiring parental consent for contraception in Aid to Families with Dependent Children and Medicaid] impermissibly engrant upon the federal scheme a condition for eligibility where Congress has undertaken fully to define the class of persons who may receive family planning assistance."), *aff'd on statutory grounds*, 425 U.S. 986 (1976).

*Planned Parenthood Ass'n of Utah v. Matheson*, 582 F. Supp. 1001, 1006 (D. Utah 1983) (holding that Utah law requiring parental notification for contraception was preempted by Title X under the Supremacy Clause, noting that "the provision of family planning services to minors on a confidential basis was critically significant to Congress when it enacted and amended Title X"); *Jane Does 1 Through 4 v. Utah Dep't of Health*, 776 F.2d 253 (10th Cir. 1985) (finding Utah Health Department's imposition of state law requiring parental consent for minors seeking Title X family planning services violated Title X by unlawfully "seek[ing] to add an additional condition or requirement sought to be placed by the state on eligibility for Title X services"); *County of St. Charles v. Mo. Fam. Health Council*, 107 F.3d 682, 684, 685 (8th Cir. 1997) (rejecting county's claims that it was eligible for Title X funding while adhering to Missouri's parental consent law because Title X "states that family participation should be encouraged only 'to the extent practical,' and the legislative history indicates that Congress did not desire mandatory parental notification or parental consent for a minor to receive Title X services" and "[a]ll the circuits which have considered the validity of parental consent requirements for adolescents to receive Title X federal services have found them prohibited by statute, regardless of whether they are based on state law").

This longstanding and widespread judicial consensus demonstrates that Title X unambiguously precludes imposing state parental consent laws. Anything to the

contrary would undermine the Title X statute and its purpose, and ignore basic principles of federalism. The district court—the sole exception in this long line of cases—was incorrect in holding that Title X does not preempt the Texas law at issue below.

## CONCLUSION

For the foregoing reasons, as well as those presented by Defendants-Appellants, the Court should reverse the district court's ruling.

Dated: May 1, 2023

Respectfully submitted,

*/s/ Chelsea Tejada*

Chelsea Tejada
*Counsel of Record*
Brigitte Amiri
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
ctejada@aclu.org
bamiri@aclu.org

Robin Summers
NATIONAL FAMILY PLANNING &
REPRODUCTIVE HEALTH ASSOCIATION
1025 Vermont Ave. NW, Suite 800
Washington, DC 20005
(202) 293-3114
rsummers@nfprha.org

Adriana Piñon
David Donatti
ACLU FOUNDATION OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
(713) 942-8146
apinon@aclutx.org
ddonatti@aclutx.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will send a notification of such filing to the appropriate counsel.

/s/ *Chelsea Tejada*
Counsel of record for *amicus curiae*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I hereby certify that the foregoing complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 4,955 words, excluding the items exempted by Fed. R. App. P. 32(f). This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: May 1, 2023                    /s/ *Chelsea Tejada*_____
                                       Counsel of record for *amicus curiae*