## 23-10159

# United States Court of Appeals for the Fifth Circuit

ALEXANDER R. DEANDA,
on Behalf of Himself and Others Similarly Situated,

*Plaintiff-Appellee,*

v.

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; JESSICA SWAFFORD MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; UNITED STATES OF AMERICA,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas

**BRIEF FOR STATES OF NEW YORK, CALIFORNIA, ARIZONA, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN, AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF APPELLANTS**

ROB BONTA
  *Attorney General*
  *State of California*
KATHLEEN BOERGERS
  *Supervising Deputy Attorney General*
ANNA RICH
KETAKEE KANE
  *Deputy Attorneys General*
  *Healthcare Rights & Access Section*
1515 Clay Street
Oakland, California 94612
(510) 879-1519

*(Additional counsel listed on signature pages.)*

LETITIA JAMES
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
ELIZABETH A. BRODY
  *Assistant Solicitor General*
28 Liberty Street
New York, New York 10005
(212) 416-6167

Dated: May 1, 2023

# CERTIFICATE OF INTERESTED PERSONS
## Supplemental Statement of Interested Parties
## Pursuant to Local Rule 29.2

### *Deanda v. Becerra*, No. 23-10159

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| **Amici Curiae:** | **Counsel for Amici Curiae:** |
|---|---|
| State of New York | Letitia James, Attorney General<br>Barbara D. Underwood, Solicitor General<br>Ester Murdukhayeva, Deputy Solicitor General<br>Galen Sherwin, Special Counsel for<br> Reproductive Justice |
| State of Arizona | Kris Mayes, Attorney General |
| State of California | Rob Bonta, Attorney General<br>Kathleen Boergers, Supervising Deputy<br> Attorney General<br>Anna Rich, Deputy Attorney General<br>Ketakee Kane, Deputy Attorney General |
| State of Colorado | Philip J. Weiser, Attorney General |
| State of Connecticut | William Tong, Attorney General |
| State of Delaware | Kathleen Jennings, Attorney General |
| State of Hawaiʻi | Anne E. Lopez, Attorney General |
| State of Illinois | Kwame Raoul, Attorney General |

| | |
|---|---|
| State of Maine | Aaron M. Frey, Attorney General |
| State of Maryland | Anthony G. Brown, Attorney General |
| Commonwealth of Massachusetts | Andrea Joy Campbell, Attorney General |
| State of Michigan | Dana Nessel, Attorney General |
| State of Minnesota | Keith Ellison, Attorney General |
| State of Nevada | Aaron D. Ford, Attorney General |
| State of New Jersey | Matthew J. Platkin, Attorney General |
| State of New Mexico | Raúl Torrez, Attorney General |
| State of North Carolina | Joshua H. Stein, Attorney General |
| State of Oregon | Ellen F. Rosenblum, Attorney General |
| Commonwealth of Pennsylvania | Michelle A. Henry, Attorney General |
| State of Rhode Island | Peter F. Neronha, Attorney General |
| State of Vermont | Charity R. Clark, Attorney General |
| State of Washington | Robert W. Ferguson, Attorney General |
| State of Wisconsin | Joshua L. Kaul, Attorney General |
| District of Columbia | Brian L. Schwalb, Attorney General |

　*/s/ Elizabeth A. Brody*　
Elizabeth A. Brody
*Counsel of Record for Amici Curiae*

C-2

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

INTERESTS OF AMICI CURIAE ............................................................. 1

ARGUMENT

    TITLE X'S ASSURANCE OF CONFIDENTIALITY PROMOTES THE
    PROVISION OF CRITICAL HEALTHCARE SERVICES TO ADOLESCENTS ........ 4

    A.   Adolescents Receive Particularly Important Care from
         Title X Grantees. ........................................................................ 7

    B.   Title X's Confidentiality Protections Follow Best Clinical
         Practices and Are Critical to Providing Adolescents with
         Access to Reproductive Healthcare. ........................................ 12

    C.   As States' Experience Shows, Confidentiality Permits
         Teenagers to Involve Their Parents While Protecting
         Teenagers Who Are at High Risk of Family Violence,
         Suicide, and Other Serious Harms. ........................................ 16

CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Baird v. Attorney General,*
  371 Mass. 741 (1977) ...................................................................... 20

*Belcher v. Charleston Area Med. Ctr.,*
  188 W. Va. 105 (1992) ..................................................................... 21

*Cardwell v. Bechtol,*
  724 S.W.2d 739 (Tenn. 1987) ......................................................... 20

*In re E.G.,*
  133 Ill. 2d 98 (1989) ........................................................................ 20

*Planned Parenthood Fed'n of Am., Inc. v. Heckler,*
  712 F.2d 650 (D.C. Cir. 1983) .......................................................... 4

*Younts v. St. Francis Hosp. & Sch. of Nursing, Inc.,*
  205 Kan. 292 (1970) ......................................................................... 20

**Laws**

*Federal*

Family Planning Services and Population Research Act of 1970,
  Pub. L. No. 91-572, 84 Stat. 1504 ..................................................... 4

Pub. L. No. 95-613, 92 Stat. 3093 (1978) ............................................. 4

Pub. L. No. 97-35, 95 Stat. 357 (1981) .................................................. 5

42 U.S.C. § 300(a) ........................................................................... 4-5, 24

*State (alphabetical by jurisdiction)*

Ala. Code § 22-8-6 ................................................................................ 18

Alaska Stat. § 25.20.025 ........................................................................ 17

ii

**Laws**                                                                **Page(s)**

*State (alphabetical by jurisdiction)*

Cal. Civ. Code
  § 56.10 ................................................................................21
  § 56.11 ................................................................................21

Cal. Fam. Code § 6925 ......................................................17

Cal. Health & Safety Code
  § 123110 ..............................................................................21
  § 123115 ..............................................................................21

D.C. Mun. Regs. tit. 22,
  § 600.7 .............................................................................17-18
  §§ 603.1-603.2 ...................................................................17

410 Ill. Comp. Stat. 210/1 ...............................................19

Ind. Code § 16-36-1-3 .................................................18-19

Ky. Rev. Stat. Ann. § 214.185 ........................................17

Me. Stat. tit. 22, § 1908 ..................................................17

Md. Code Ann., Health-Gen. § 20-102 ....................17-19

Mass. Gen. Laws ch. 112 § 12F .....................................20

Minn. Stat.
  § 144.291 ............................................................................21
  § 144.341 ............................................................................20
  § 144.342 ............................................................................20
  § 144.343 ............................................................................18

Mont. Code Ann. § 41-1-402 ..........................................20

N.M. Stat. Ann. § 32A-6A-24 .........................................21

**Laws**                                                                **Page(s)**

*State (alphabetical by jurisdiction)*

N.Y. Pub. Health Law
  § 2305 .................................................................... 18
  § 2504 ............................................................... 18, 20
  § 2994-a ................................................................. 20

Or. Rev. Stat.
  § 109.640 ............................................................ 17-18
  § 743B.555 .............................................................. 22

35 Pa. Stat. § 10101 ................................................... 20

R.I. Gen. Laws § 23-4.6-1 ........................................ 17, 20

Tex. Fam. Code Ann. § 32.003 ................................. 18, 20

Va. Code Ann. § 54.1-2969 ......................................... 18

Wash. Rev. Code
  § 70.02.130 ............................................................. 21
  § 70.02.220 ............................................................. 21

**Regulations**

42 C.F.R. § 59.10(a) ..................................................... 4

**Miscellaneous Authorities\***

Am. Acad. of Fam. Physicians, *Adolescent Health Care, Confidentiality* (2023), https://www.aafp.org/about/policies/all/adolescent-confidentiality.html ................................................... 16

Am. Acad. of Pediatrics, Comm. on Adolescence, *Policy Statement, Contraception for Adolescents*, 134 Pediatrics e1244 (2014), https://publications.aap.org/pediatrics/article/134/4/e1244/32981/Contraception-for-Adolescents ................................... 16

*\*All websites last visited May 1, 2023.*

iv

**Miscellaneous Authorities**                                **Page(s)**

Am. Acad. of Pediatrics, Comm. on Adolescence, *Policy Statement, The Adolescent's Right to Confidential Care When Considering Abortion*, 139 Pediatrics e20163861 (2017), https://publications.aap.org/pediatrics/article/139/2/e20163861/59961/The-Adolescent-s-Right-to-Confidential-Care-When ...........23-24

Am. Coll. of Obstetricians & Gynecologists, Comm. on Adolescent Health, Comm. Op. No. 710, Counseling Adolescents About Contraception (2017), https://www.acog.org/-/media/project/acog/acogorg/clinical/files/committee-opinion/articles/2017/08/counseling-adolescents-about-contraception.pdf....................................................................... 12

Am. Coll. of Obstetricians & Gynecologists, Comm. on Adolescent Health Care, Op. No. 803, *Confidentiality in Adolescent Health Care*, 135 Obstetrics & Gynecology e171 (2020), https://www.acog.org/-/media/project/acog/acogorg/clinical/files/committee-opinion/articles/2020/04/confidentiality-in-adolescent-health-care.pdf.........................................................6, 15-16

Am. Med. Ass'n, Op. No. 5.055, *Confidential Care for Minors*, 16 Am. Med. Ass'n J. of Ethics 901 (2014), https://journalofethics.ama-assn.org/sites/journalofethics.ama-assn.org/files/2018-05/coet1-1411.pdf ................................................ 16

Amanda F. Dempsey et al., *Adolescent Preventive Health Care: What Do Parents Want?*, 155 J. of Pediatrics 689 (2009), https://www.jpeds.com/article/S0022-3476(09)00508-3/fulltext ........ 23

Anna Brittain, *Confidentiality in Family Planning Services for Young People*, 49 Am. J. Preventative Med. (Suppl.) S85 (2016), https://www.ajpmonline.org/article/S0749-3797(15)00137-3/fulltext .......................................................................... 13

Bixby Ctr. for Global Reprod. Health, *The Impact of Title X on Publicly Funded Family Planning Services in California: Access and Quality* (2014), https://bixbycenter.ucsf.edu/sites/bixbycenter.ucsf.edu/files/OPAreportRev_April2014.pdf..................8-9

**Miscellaneous Authorities**                                    **Page(s)**

C. Emily Hendrick & Julie Maslowsky, *Teen Mothers' Educational Attainment and their Children's Risk for Teenage Childbearing*, 55 Dev. Psych. 1259 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6533138 ............. 9, 11

Carol Ford et al., *Confidential Health Care for Adolescents: Position Paper of the Society for Adolescent Medicine*, 35 J. of Adolescent Health 160 (2004), https://www.jahonline.org/action/showPdf?pii=S1054-139X%2804%2900086-2 ................................................................. 13, 15

Cong. Rsch. Serv., Title X Family Planning Program (ver. 24, Sept. 15, 2022), https://crsreports.congress.gov/product/pdf/IF/IF10051/24 ................. 8

Diane Reddy et al., *Effect of Mandatory Parental Notification on Adolescent Girls' Use of Sexual Health Care Services*, 288 JAMA 710 (2002) ............................................................................. 13

Donna Barry & McKinley Sherrod, Ctr. for Am. Progress, *Ensuring Access to Sexually Transmitted Infection Care for All* (2014), https://www.americanprogress.org/wp-content/uploads/sites/2/2014/10/STI-brief.pdf ...................................... 5

Guttmacher Inst., *An Overview of Consent to Reproductive Health Services by Young People* (last updated Mar. 1, 2023), https://www.guttmacher.org/state-policy/explore/overview-minors-consent-law .............................................................. 18

H.R. Rep. No. 95-1191 (1978) ................................................... 5

Heike Thiel de Bocanegra et al., *Enhancing Service Delivery Through Title X Funding: Findings from California*, 44 Persp. on Sexual & Reprod. Health 262 (2012), https://onlinelibrary.wiley.com/doi/10.1363/4426212 ........................... 9

**Miscellaneous Authorities**                                    **Page(s)**

J. Shoshanna Ehrlich, *Grounded in the Reality of Their Lives: Listening to Teens Who Make the Abortion Decision Without Involving Their Parents*, 18 Berkeley Women's L.J. 61 (2003), https://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID451460_code031003560.pdf?abstractid=451460&mirid=1 .................................. 23

Jane E. Dopkins Broecker & Paula J. Adams Hillard, *Pregnancy in Adolescence* (Glob. Libr. of Women's Med., Feb. 2009), https://www.glowm.com/section-view/heading/Pregnancy in Adolescence/item/413 ......................................................... 11

Jennifer J. Frost et al., Guttmacher Inst., *Variation in Service Delivery Practices Among Clinics Providing Publicly Funded Family Planning Services in 2010* (2012), https://www.guttmacher.org/sites/default/files/report_pdf/clinic-survey-2010.pdf ..................................................... 9

Jocelyn A. Lehrer et al., *Forgone Health Care Among U.S. Adolescents: Associations Between Risk Characteristics and Confidentiality Concern*, 40 J. of Adolescent Health 218 (2007), https://www.jahonline.org/action/showPdf?pii=S1054-139X%2806%2900375-2 ................................................. 24

Kaiser Fam. Found., Fact Sheet, *Sexual Health of Adolescents and Young Adults in the United States* (Aug. 20, 2014), https://www.kff.org/womens-health-policy/fact-sheet/sexual-health-of-adolescents-and-young-adults-in-the-united-states/ ......... 7-8

Lee A. Hasselbacher et al., *Factors Influencing Parental Involvement Among Minors Seeking an Abortion: A Qualitative Study*, 104 Am. J. Pub. Health 2207 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4202942/pdf/AJPH.2014.302116.pdf ......................................................... 23

**Miscellaneous Authorities**                                  **Page(s)**

Loretta Gavin et al., *Providing Quality Family Planning Services:
Recommendations of CDC and the U.S. Office of Population
Affairs*, 63 Morbidity & Mortality Weekly Reps:
Recommendations & Reps. 1 (Apr. 25, 2014),
https://www.cdc.gov/mmwr/pdf/rr/rr6304.pdf ............................... 14, 23

Margaret Moon, *Adolescents' Right to Consent to Reproductive
Medical Care: Balancing Respect for Families with Public
Health Goals*, 12 Am. Med. Ass'n J. of Ethics 805 (2012),
https://journalofethics.ama-assn.org/sites/journalofethics.ama-
assn.org/files/2018-05/msoc1-1210.pdf ................................................. 23

Megan Kavanaugh et al., *Use of Health Insurance Among Clients
Seeking Contraceptive Services at Title X-Funded Facilities in
2016*, 50 Persps. on Sexual & Reprod. Health 101 (2018),
https://onlinelibrary.wiley.com/doi/epdf/10.1363/psrh.12061 .... 6, 8, 12

Michelle Oberman, *Turning Girls into Women: Re-Evaluating
Modern Statutory Rape Law*, 85 J. Crim. L. & Criminology 15
(1994) ................................................................................................ 19

Nat'l Acads., Inst. of Med., *A Review of the HHS Family Planning
Program: Mission, Management, and Measurement of Results*
(Adrienne Stith Butler & Ellen Wright Clayton eds., 2009),
https://nap.nationalacademies.org/read/12585/chapter/1 ................. 12

Nat'l Ctr. for Health Statistics, U.S. Ctrs. for Disease Control &
Prevention, *Teen Birth Rate by State* (last reviewed Feb. 25,
2022), https://www.cdc.gov/nchs/pressroom/sosmap/teen-
births/teenbirths.htm ....................................................................... 10

Nat'l Fam. Plan. & Reprod. Health Ass'n, Title X in California:
Improving Public Health and Saving Taxpayer Dollars (Dec.
2016), https://www.nationalfamilyplanning.org/file/documents-
-policy--communication-tools/state-snapshots/Title-X-in-
California.pdf ..................................................................................... 10

**Miscellaneous Authorities** <span style="float:right">**Page(s)**</span>

Nat'l Fam. Plan. & Reprod. Health Ass'n, Title X in New Mexico:
  Improving Public Health and Saving Taxpayer Dollars (Dec.
  2016), https://www.nationalfamilyplanning.org/file/Title-X-in-
  New-Mexicov2.pdf ................................................................ 10

Nat'l Fam. Plan. & Reprod. Health Ass'n, Title X in New York:
  Improving Public Health and Saving Taxpayer Dollars (Jan.
  2015), https://www.nationalfamilyplanning.org/document.doc?
  id=598#:~:text=Title%20X%20supports%20critical%20infrastru
  cture,health%2C%20and%20sexual%20health%20issues. ................ 10

Off. of Population Affs., U.S. Dep't of Health & Hum. Servs., *Title
  X Program Handbook* (2022), https://opa.hhs.gov/sites/
  default/files/2022-07/title-x-program-handbook-july-2022-
  508.pdf ................................................................................... 23

Off. of Population Affs., U.S. Dep't of Health & Hum. Servs., *Title
  X Family Planning Annual Report: 2018 National Summary*
  (2019), https://opa.hhs.gov/sites/default/files/2020-07/title-x-
  fpar-2018-national-summary.pdf ............................................. 6

Off. of Population Affs., U.S. Dep't of Health & Human Servs.,
  *About Title X Service Grants* (n.d.), https://opa.hhs.gov/grant-
  programs/title-x-service-grants/about-title-x-service-grants .............. 8

R.I. Dep't of Health, *State of Adolescent Health in Rhode Island:
  Improving Access to Care* (2012), https://health.ri.gov/
  publications/programreports/AdolescentHealth.pdf ......................... 15

Rachel Benson Gold, *Title X: Three Decades of Accomplishment*, 4
  Guttmacher Rep. on Pub. Pol'y 5 (Feb. 2001) (Feb. 2001),
  https://www.guttmacher.org/sites/default/files/article_files/gr04
  0105.pdf ................................................................................. 5

**Miscellaneous Authorities**                                   **Page(s)**

Rachel Jones & Heather Boonstra, *Confidential Reproductive Health Services for Minors: The Potential Impact of Mandated Parental Involvement for Contraception*, 36 Persps. on Sexual & Reprod. Health 182 (2004), https://www.guttmacher.org/ sites/default/files/article_files/3618204.pdf ....................................... 14

Rachel Jones et al., *Adolescents' Reports of Parental Knowledge of Adolescents' Use of Sexual Health Services and Their Reactions to Mandated Parental Notification for Prescription Contraception*, 293 JAMA 340 (2005) .................................................. 22

Restatement of Children and the Law § 19.01 (Am. L. Inst. Tentative Draft No. 2, 2019)................................................................ 19

S. Rep. No. 95-102 (1977) ........................................................................... 6

S. Rep. No. 95-822 (1978) ........................................................................ 5-8

Tex. Health & Hum. Servs., Responsibilities for Treatment of Minors within the Family Planning Program and Healthy Texas Women Program (n.d.), https://www.hhs.texas.gov/sites/ default/files/documents/doing-business-with-hhs/providers/ health/women/responsibilities-treattment-minors-fpp-htw.pdf ........ 18

U.S. Ctrs. for Disease Control & Prevention, *About Teen Pregnancy* (Nov. 15, 2021), https://www.cdc.gov/teenpregnancy/ about/index.htm#:~:text=Teen%20pregnancy%20and%20childb earing%20are,school%20dropout%20rates%20among%20girl .......... 11

## INTERESTS OF AMICI CURIAE

For over five decades, the Title X program has been the linchpin of publicly funded family planning and reproductive medical services, serving nearly 200 million individuals, including many adolescents, on a confidential basis. In this lawsuit, the U.S. District Court for the Northern District of Texas (Kacsmaryk, J.) granted plaintiff's motion for summary judgment and prohibited all Title X grantees in Texas from providing medical services to adolescents without parental consent. The district court first found that the plaintiff had standing to challenge Title X's decades-old confidentiality protections for adolescents, even though plaintiff did not allege that his daughters had ever visited a Title X provider or were likely to do so. Without considering the significant contributions of the Title X program or the importance of confidentiality in adolescent medicine, the district court further concluded that protecting minors' confidentiality violated plaintiff's rights under a Texas parental-consent statute and the Due Process Clause of the federal Constitution.

The States of New York, California, Arizona, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts,

Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin, and the District of Columbia file this brief in support of the defendants-appellants.[1] Amici States have significant experience with the Title X program and the important family planning and reproductive healthcare services that it funds for adolescents. Many amici States' health departments are the direct recipients of Title X service grant awards. And other Title X grantees operating in amici States provide critical health services to adolescents, especially those who are low-income and uninsured.

Amici States submit this brief to underscore the importance of the Title X program to adolescent health and how vital confidentiality is in protecting adolescents' access to Title X services. In amici States' decades of experience, the services provided by the Title X program have been crucial to preventing teenage pregnancies and to lowering the transmission rates of sexually transmitted infections—urgent public health issues

---

[1] Defendants-appellants are Xavier Becerra, Secretary of the U.S. Department of Health and Human Services; Jessica Swafford Marcella, Deputy Assistant Secretary for Population Affairs, U.S. Department of Health and Human Services; and the United States.

for which States bear a substantial fiscal burden. Title X's guarantee of confidentiality has both encouraged sexually active adolescents to seek necessary medical care and enhanced the quality and effectiveness of the services provided by fostering open and trusting clinical relationships.

Amici States' experience and independent research also reflect that providing confidential Title X services to adolescents is compatible with encouraging parental involvement in healthcare decisions. In addition to amici States' robust experience with the Title X program, many amici States allow adolescents to consent in non–Title X-funded settings to their own reproductive care and to care for sexually transmitted infections. And many amici States protect the confidentiality of such care. As independent research confirms, confidentiality protections for adolescents do not necessarily or even usually result in adolescents declining to involve their parents in their healthcare decisions. To the contrary, many adolescents do inform and involve their parents. The subset of adolescents that do not involve their parents often choose not to do so because they are at risk of family violence, suicide, or other serious harms. Title X thus protects these vulnerable adolescents and promotes

3

their access to important care, while also encouraging family involve-
ment in the mine run of cases where those concerns are not present.

## ARGUMENT

### Title X's Assurance of Confidentiality Promotes the Provision of Critical Healthcare Services to Adolescents

Enacted by Congress in 1970, Title X awards annual grants to
States and other entities to provide family planning and reproductive
healthcare services. *See* Family Planning Services and Population
Research Act of 1970, Pub. L. No. 91-572, §§ 2, 4, 84 Stat. 1504, 1504-05;
*see also* 42 U.S.C. § 300(a). Title X programs aim to make comprehensive
family planning services readily available to everyone, including patients
who have low incomes, live in rural communities, or face other barriers
to accessing medical care. *See* Pub. L. No. 91-572, § 2, 84 Stat. at 1504.

For over forty years, Congress has also expressly required Title X
grantees to offer their "services to adolescents." *See* Pub. L. No. 95-613,
§ 1, 92 Stat. 3093, 3093 (1978). Title X programs must maintain adoles-
cent patients' confidentiality. *See* 42 U.S.C. § 300(a); 42 C.F.R. § 59.10(a);
*Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 655-56
(D.C. Cir. 1983). At the same time, Title X requires grantees to "encourage

family participation" in Title X projects "[t]o the extent practical." 42 U.S.C. § 300(a); *see* Pub. L. No. 97-35, § 931, 95 Stat. 357, 570 (1981).

In the States' experience, adolescents' access to Title X-funded confidential family planning services is essential to achieving Congress's goal of reducing barriers to healthcare that contribute to high rates of teenage pregnancy, sexually transmitted infections, and other serious health issues.[2] The Title X program funds services that are important to adolescents' care, and offers those services at little or no cost.[3] And the confidentiality of Title X-funded services encourages teenagers to use these important services, promotes teenage confidence in the services provided, and fosters an environment in which teenagers feel able to

---

[2] *See* Rachel Benson Gold, *Title X: Three Decades of Accomplishment*, 4 Guttmacher Rep. on Pub. Pol'y 5, 7 (Feb. 2001) ("By helping to prevent 5.5 million adolescent pregnancies, Title X funded clinics have helped young women avoid more than two million births and a similar number of abortions over the last two decades."). *See also* H.R. Rep. No. 95-1191, at 22, 30-31 (1978); S. Rep. No. 95-822, at 27-31, 33, 37 (1978).

[3] *See* Donna Barry & McKinley Sherrod, Ctr. for Am. Progress, *Ensuring Access to Sexually Transmitted Infection Care for All* 9-10 (2014) (noting the importance of free and low-cost services to populations served by publicly funded clinics).

discuss "sensitive topics and behaviors that may substantially affect their health and well-being."[4]

Amici States depend on the Title X program to deliver this critical healthcare to adolescents, particularly low-income and uninsured adolescents. In 2018, for example, Title X served over 318,000 clients under the age of eighteen, including approximately 264,000 adolescents between the ages of fifteen and seventeen.[5] That same year, 65% of all Title X users reported incomes under 101% of the federal poverty line, and 40% of all Title X users reported being uninsured.[6]

---

[4] Am. Coll. of Obstetricians & Gynecologists, Comm. on Adolescent Health Care, Comm. Op. No. 803, *Confidentiality in Adolescent Health Care,* 135 Obstetrics & Gynecology e171, e172 (2020); *see* Megan Kavanaugh et al., *Use of Health Insurance Among Clients Seeking Contraceptive Services at Title X–Funded Facilities in 2016,* 50 Persps. on Sexual & Reprod. Health 101 (2018); *see also* S. Rep. No. 95-102, at 26 (1977); S. Rep. No. 95-822, *supra,* at 21.

[5] Off. of Population Affs., U.S. Dep't of Health & Human Servs., *Title X Family Planning Annual Report: 2018 National Summary* 10 (2019).

[6] *Id.* at 23-24.

## A.     Adolescents Receive Particularly Important Care from Title X Grantees.

The family planning and reproductive care offered by Title X grantees is essential to young people's health and satisfies critical unmet needs. A substantial proportion of high school students (47% in 2013, according to a Kaiser Family Foundation survey) reported being sexually active; yet 22% of female teenagers and 14% of male teenagers reported that they used no contraception the first time they had sexual intercourse, and only half of female teenagers reported discussing contraception with a healthcare provider.[7] The vast majority (82%) of teenage pregnancies each year are unplanned, comprising more than one-sixth of total unintended pregnancies nationwide.[8] And the United States continues to have the highest teenage pregnancy, teenage birth, and teenage abortion rates in the developed world.[9] In addition, sexually active

---

[7] Kaiser Fam. Found., Fact Sheet, *Sexual Health of Adolescents and Young Adults in the United States* (Aug. 20, 2014).

[8] *Id.*

[9] *Id.* Congress intended for the Title X program to reduce teenage abortions by reducing teenage pregnancies. *See* S. Rep. No. 95-822, *supra*, at 27 ("An estimated 1.100,000 [*sic*] abortions were performed in 1976, one-third of them involving adolescents. Undoubtedly, many of these abortions could have been avoided with greater availability of effective
*(continued on the next page)*

teenagers and young adults also account for nearly half of new sexually transmitted infection (STI) cases, despite making up only a quarter of the sexually active population.[10]

Title X providers have proven particularly effective at serving the adolescent patient population, many of whom, like all Title X patients, use Title X clinics as their sole source of medical care.[11] Title X providers are more likely than non–Title X public clinics and private practitioners to provide patients with onsite, specialized family planning services that are effective and cost-efficient,[12] and are more likely than non–Title X

---

family planning methods."); *id.* at 33 ("The proportionate increase in the number of teenage unwanted pregnancies and the increasing number of abortions have highlighted the inadequacy of the available methods of contraception.").

[10] Kaiser Fam. Found., Sexual Health of Adolescents, *supra.*

[11] *See* Off. of Population Affs., U.S. Dep't of Health & Human Servs., *About Title X Service Grants* (n.d.). In one study that surveyed a representative sample of 2,911 female Title X clients, 7% of whom were under the age of eighteen, approximately 60% received their broader health care from a Title X facility only. Kavanaugh, *supra*, at 103-04; *cf.* Cong. Rsch. Serv., Title X Family Planning Program 2 (ver. 24, Sept. 15, 2022) ("[I]n 2015-2019, 60% of contraceptive clients said their Title X clinic was their usual source of broader health care over the past year.").

[12] Bixby Ctr. for Global Reprod. Health, *The Impact of Title X on Publicly Funded Family Planning Services in California: Access and Quality* 14 (2014).

public clinics to demonstrate better adherence to age-appropriate STI screening guidelines.[13] Title X clinics are also more likely to offer enhanced services to underserved populations, including individuals with limited English proficiency; lesbian, gay, and transgender patients; and persons with disabilities, who are homeless, or who are experiencing alcohol or other substance abuse.[14]

Although rates of teenage pregnancy and birth in the United States remain high, improved access to family planning services and reproductive care has led in recent decades to measurable declines in teenage pregnancy and birth, and a resulting improvement in the lives of American adolescents. Teenage childbearing nationwide has decreased by more than half since 2007, a decline attributed in large part to increases in effective contraceptive use among adolescents.[15] Amici

---

[13] *Id.* at 13.

[14] *See* Jennifer J. Frost et al., Guttmacher Inst., *Variation in Service Delivery Practices Among Clinics Providing Publicly Funded Family Planning Services in 2010*, at 15 (2012); Heike Thiel de Bocanegra et al., *Enhancing Service Delivery Through Title X Funding: Findings from California*, 44 Persp. on Sexual & Reprod. Health 262, 265 (2012).

[15] C. Emily Hendrick & Julie Maslowsky, *Teen Mothers' Educational Attainment and their Children's Risk for Teenage Childbearing*, 55 Dev. Psych. 1259, 1259 (2019)v.

States have experienced similar declines in teenage pregnancies and births over the same time period, leading to hundreds of millions of dollars in cost-savings to both federal and state governments. In New York, for example, the percentage of female teenagers who give birth in a given year has decreased from 2.7% in 2005 to 0.91% in 2021. In California, this percentage decreased from 3.9% to 0.99% over the same time period. And in New Mexico, this percentage decreased from 6.2% to 1.9%.[16] One nonprofit organization estimated that Title X services provided in each of these three States in 2010 saved state and federal taxpayers $459.4 million, $1.29 billion, and $65.9 million, respectively.[17]

By assisting in the reduction of teenage pregnancy and birth, Title X facilities also reduce the many serious adverse health and economic consequences that can result therefrom. Pregnant adolescents experience

---

[16] *See* Nat'l Ctr. for Health Statistics, U.S. Ctrs. for Disease Control & Prevention, *Teen Birth Rate by State* (last reviewed Feb. 25, 2022) (illustration rates calculated per 1,000).

[17] *See* Nat'l Fam. Plan. & Reprod. Health Ass'n, Title X in New York: Improving Public Health and Saving Taxpayer Dollars 2 (Jan. 2015); Nat'l Fam. Plan. & Reprod. Health Ass'n, Title X in California: Improving Public Health and Saving Taxpayer Dollars 2 (Dec. 2016); Nat'l Fam. Plan. & Reprod. Health Ass'n, Title X in New Mexico: Improving Public Health and Saving Taxpayer Dollars 2 (Dec. 2016).

higher rates of pregnancy complications, and their infants experience higher rates of health problems.[18] Only about 50% of teenage mothers receive a high school diploma by age twenty-two, whereas approximately 90% of women who do not give birth during adolescence graduate from high school.[19] A teenager whose education is disrupted by parenthood or pregnancy is disproportionately likely to need public assistance.[20] And negative effects are intergenerational: the children of teenage mothers are more likely to have lower school achievement and drop out of high school, have more health problems, be incarcerated at some time during adolescence, give birth as a teenager, and face unemployment as a young adult.[21]

---

[18] *See* Jane E. Dopkins Broecker & Paula J. Adams Hillard, *Pregnancy in Adolescence* (Glob. Libr. of Women's Med., Feb. 2009) ("Medical risks known to be associated with teen pregnancy include higher rates of pregnancy induced hypertension (preeclampsia and eclampsia), low-birth-weight (LBW) infants, and higher rates of neonatal or infant death.").

[19] U.S. Ctrs. for Disease Control & Prevention, *About Teen Pregnancy* (Nov. 15, 2021).

[20] *See* Dopkins Broecker & Hillard, *supra* ("Adolescent mothers who fail to complete high school within 5 years after birth of their first child have twice the risk of welfare dependence two decades later.").

[21] *Id.*; Hendrick & Maslowsky, *supra*, at 1259-60.

**B.     Title X's Confidentiality Protections Follow Best Clinical Practices and Are Critical to Providing Adolescents with Access to Reproductive Healthcare.**

Research confirms that the Title X program's confidentiality provisions are an essential component of providing to adolescents the important family planning services and reproductive care that Title X funds.[22] The option to seek family planning services with a guarantee of confidentiality substantially increases the number of sexually active adolescents who are likely to seek such care and promotes the provision of necessary comprehensive care.

Many minors who choose to use Title X services do so because of the confidentiality that the program guarantees.[23] And a significant

---

[22] *See* Nat'l Acads., Inst. of Med., *A Review of the HHS Family Planning Program: Mission, Management, and Measurement of Results 122 (Adrienne Stith Butler & Ellen Wright Clayton eds., 2009)* ("By ensuring confidentiality and not requiring parental consent (although minors must be encouraged to involve their parents), Title X clinics play a special role in providing care for adolescents.").

[23] Kavanaugh et al., *supra*, at 105 ("Concern over someone's finding out about the visit was more commonly reported by insured clients younger than 20 than by those aged 20-29 (53% vs. 20%)."). Indeed, the American College of Gynecologists recommends that providers who cannot maintain confidentiality themselves refer their minor patients to Title X clinics. Am. Coll. of Obstetricians & Gynecologists, Comm. on Adolescent Health, Comm. Op. No. 710, Counseling Adolescents About Contraception (2017).

proportion of sexually active adolescents indicate that they would forgo

medical care (but not discontinue sexual activity) absent confidentiality.

One study found that mandatory parental notification would likely cause

over half of single, sexually active girls under eighteen to stop using

family planning clinics.[24] And the same study found that only *one percent*

of the same population would likely stop having sexual intercourse. The

remainder would continue to have sex but use less effective contraception

or none at all.[25] Mandating parental involvement for teenagers seeking

---

[24] Diane Reddy et al., *Effect of Mandatory Parental Notification on Adolescent Girls' Use of Sexual Health Care Services*, 288 JAMA 710 (2002) ("Fifty-nine percent (n = 556) indicated they would stop using all sexual health care services, delay testing or treatment for HIV or other STDs, or discontinue use of specific (but not all) sexual health care services if their parents were informed that they were seeking prescribed contraceptives."); *see also* Carol Ford et al., *Confidential Health Care for Adolescents: Position Paper of the Society for Adolescent Medicine*, 35 J. of Adolescent Health 160, 161-62 (2004).

[25] Ford et al., *supra*, at 162; Anna Brittain, *Confidentiality in Family Planning Services for Young People*, 49 Am. J. Preventative Med. (Suppl.) S85 (2016) (abstract) ("Family planning services are essential for reducing high rates of unintended pregnancies among young people, yet a perception that providers will not preserve confidentiality may deter youth from accessing these services.").

contraceptive care would thus reduce the likelihood that teenagers would obtain such care and increase rates of teenage pregnancy.[26]

Many experts agree that confidentiality enhances not only the availability of care but also its quality, by improving adolescents' sense of autonomy and by fostering open and trusting clinical relationships with providers. Expert federal agencies recommend confidentiality for adolescents as part of their best-practice guidelines. For example, the Centers for Disease Control and Prevention and the U.S. Office of Population Affairs have compiled extensive research supporting joint guidance to providers of family planning services (both in the Title X program and beyond), recommending that all family planning service providers "offer confidential services to adolescents" because "[c]onfidentiality is critical for adolescents and can greatly influence their willingness to access and use services."[27] As one amici State's health department has explained,

---

[26] Rachel Jones & Heather Boonstra, *Confidential Reproductive Health Services for Minors: The Potential Impact of Mandated Parental Involvement for Contraception*, 36 Persps. on Sexual & Reprod. Health 182, 189 (2004).

[27] Loretta Gavin et al., *Providing Quality Family Planning Services: Recommendations of CDC and the U.S. Office of Population Affairs*, 63 Morbidity & Mortality Weekly Reps: Recommendations & Reps. 1, 13 (Apr. 25, 2014).

confidentiality is "necessary for adolescents to seek healthcare, especially pertaining to sensitive information," and the purpose of confidentiality is "to create access."[28]

Several leading medical organizations similarly recommend confidentiality for adolescents receiving care. The Society for Adolescent Health and Medicine has explained: "Confidentiality protection is an essential component of health care for adolescents because it is consistent with their development of maturity and autonomy and without it, some adolescents will forgo care."[29] The American College of Obstetricians and Gynecologists has stated that lack of confidentiality "can be a barrier to receiving appropriate care,"[30] and explained that such confidentiality is vital because:

- Adolescents gain more ownership over their own health as a step towards becoming adults;

- Adolescents may be too self-conscious or embarrassed to ask questions in front of their parents or guardians; and

---

[28] R.I. Dep't of Health, *State of Adolescent Health in Rhode Island: Improving Access to Care* 6 (2012).

[29] Ford, *supra*, at 160.

[30] Am. Coll. of Obstetricians & Gynecologists, *Confidentiality in Adolescent Health Care, supra*, at e172.

- Confidentiality builds trust between the provider and the adolescent. [31]

The American Academy of Pediatrics, the American Medical Association, and the American Academy of Family Physicians have issued similar statements.[32]

## C.     As States' Experience Shows, Confidentiality Permits Teenagers to Involve Their Parents While Protecting Teenagers Who Are at High Risk of Family Violence, Suicide, and Other Serious Harms.

Amici States have extensive experience with protecting teenagers' access to reproductive healthcare services. As that experience shows and as research confirms, providing adolescents with the option to seek confidential family planning and reproductive healthcare services does not mean that adolescents necessarily or even usually will decline to involve their parents in their decisions about those services. Indeed, studies indicate that most adolescents do involve their parents in those decisions.

---

[31] *Id.* at e173.

[32] Am. Acad. of Pediatrics, Comm. on Adolescence, *Policy Statement, Contraception for Adolescents*, 134 Pediatrics e1244 (2014); Am. Med. Ass'n, Op. No. 5.055, *Confidential Care for Minors*, 16 Am. Med. Ass'n J. of Ethics 901 (2014); Am. Acad. of Fam. Physicians, *Adolescent Health Care, Confidentiality* (2023).

For the subset of adolescents that do not do so, it is frequently due to legitimate fear of family violence, abuse, or other serious dangers that could result if they discuss reproductive healthcare issues with their parents. See *infra* at 24-26.

Amici States have extensive experience with and strongly support adolescents' ability to access confidential family planning and reproductive healthcare services. For example, several of the amici States have enacted statutes that permit older adolescents to consent to medical treatment in general.[33] Many States, including several of the amici States, have enacted statutes that enable minors to consent to treatment related to pregnancy or contraception.[34] *See* Br. for Appellants (Br.) at

---

[33] *See, e.g.*, **Oregon:** Or. Rev. Stat. § 109.640(2) (fifteen years or older). **Rhode Island:** R.I. Gen. Laws § 23-4.6-1(a) (sixteen years or older).

[34] *See, e.g.*, **Alaska:** Alaska Stat. § 25.20.025(a)(4) (care related the "diagnosis, prevention or treatment of pregnancy"). **California:** Cal. Fam. Code § 6925(a) ("medical care related to the prevention or treatment of pregnancy"). **District of Columbia:** D.C. Mun. Regs. tit. 22, §§ 600.7 ("prevention, diagnosis, or treatment of" pregnancy), 603.1-603.2 ("[b]irth control information, services, and devices" and "[p]renatal and postnatal care"). **Kentucky:** Ky. Rev. Stat. Ann. § 214.185(1) (care relating to "contraception, pregnancy, or childbirth"). **Maine:** Me. Stat. tit. 22, § 1908 ("family planning services"). **Maryland:** Md. Code Ann., Health-Gen. § 20-102(c)(4)-(5) (treatment for or advice about pregnancy

*(continued on the next page)*

38-39, 45-46 (listing state laws). And as the district court recognized (ROA 754), all fifty States, including Texas, allow minors to consent to the testing and treatment of sexually transmitted infections.[35] *See also* Br. at 50.

---

or contraception). **Minnesota:** Minn. Stat. § 144.343(1) (care related to pregnancy). **New York:** N.Y. Pub. Health Law § 2504(3) (prenatal care). **Oregon:** Or. Rev. Stat. § 109.640(1) (birth control information and services). ; **Texas:** Tex. Fam. Code Ann. § 32.003(a)(4) ("hospital, medical, or surgical treatment" related to pregnancy). **Virginia:** Va. Code Ann. § 54.1-2969(E)(2) ("[m]edical or health services required in case of birth control, pregnancy or family planning").

[35] *See* Guttmacher Inst., *An Overview of Consent to Reproductive Health Services by Young People* (last updated Mar. 1, 2023) ("All states and DC allow young people to consent to STI services."); *see, e.g.*, **Alabama:** Ala. Code § 22-8-6 (care related to "venereal disease"). **District of Columbia:** D.C. Mun. Regs. tit. 22, § 600.7(c) ("prevention, diagnosis, or treatment of" "sexually transmitted disease"). **Indiana:** Ind. Code § 16-36-1-3(d) (care related to venereal disease). **Maryland:** Md. Code Ann., Health-Gen. § 20-102(c)(3) (treatment for or advice about venereal disease). **Minnesota:** Minn. Stat. § 144.343(1) (care related to venereal disease). **New York:** N.Y. Pub. Health Law § 2305(2) (treatment for infection with or exposure to sexually transmissible diseases). **Texas:** *Compare* Tex. Fam. Code Ann. § 32.003(a)(4) ("diagnosis and treatment of an infectious, contagious, or communicable disease," including STIs), *with* Tex. Health & Hum. Servs., Responsibilities for Treatment of Minors within the Family Planning Program and Healthy Texas Women Program 3 (n.d.) ("Parental consent is **not** required for a medical provider to provide . . . HIV testing, STD testing, or treatment for an STD to a minor.").

Indeed, the common law in many States long allowed certain minors to consent to their own medical treatment. The common law thus did not broadly or categorically give parents a right to control the medical treatment of all minor children, as the district court erroneously concluded. (*See* ROA 752.) For example, most States recognized that minors who had married or who lived independently could consent to medical care in the same manner as adults.[36] Today, most States, including many of the amici States, have codified expanded versions of these "status-based" consent laws, enabling minors to make their own medical decisions if they have, among other things, been pregnant or become parents, are active military, or have graduated from high school.[37] Separately, the common law of multiple States has for decades

---

[36] *See* Michelle Oberman, *Turning Girls into Women: Re-Evaluating Modern Statutory Rape Law*, 85 J. Crim. L. & Criminology 15, 47 (1994).

[37] As of 2019, "over forty states expressly authorize[d] emancipated or married minors to consent for their own healthcare treatment." Restatement of Children and the Law § 19.01 reporters' notes cmt. b (Am. L. Inst. Tentative Draft No. 2, 2019) (Westlaw). *See, e.g.*, **Illinois:** 410 Ill. Comp. Stat. 210/1(1) (minors who are married, are parents, or are pregnant). **Indiana:** Ind. Code § 16-36-1-3(a)(2) (minors who are emancipated; are at least fourteen years of age and independent from their parents; are or have been married; or are in the military). **Maryland:** Md. Code Ann., Health-Gen. § 20-102(a) (minors who are

(*continued on the next page*)

recognized that "mature" minors, such as older adolescents, are often just as capable as adults of providing informed consent to medical treatment.[38]

---

married, are parents, or are living independently and self-supporting). **Massachusetts:** Mass. Gen. Laws ch. 112 § 12F (minors who are married, widowed, divorced; who are parents; who are members of the armed forces; who are pregnant; or who are living separate and apart from their parent(s) or guardian(s) and are self-supporting). **Minnesota:** Minn. Stat. §§ 144.341 (minors living apart from parents and managing personal financial affairs), 144.342 (minors who have been married or have borne children). **Montana:** Mont. Code Ann. § 41-1-402(2)(a)-(b) (minors who are married, have had a child, or have graduated from high school, and minors who are separated from their parents and self-supporting). **New York:** N.Y. Pub. Health Law §§ 2504(1) (minor who is a parent or who has married), 2994-a(8) (minor who is a parent or who is sixteen or older and living independently). **Pennsylvania:** 35 Pa. Stat. § 10101 (minor who has graduated from high school, has married, or has been pregnant). **Rhode Island:** R.I. Gen. Laws § 23-4.6-1(a) (minors who are married). **Texas:** Tex. Fam. Code § 32.003(a)(1)-(2) (minors who are on active military duty or are sixteen years of age or older, residing separately and apart from parents or legal guardians, and are financially self-sufficient).

[38] *See, e.g.*, **Illinois:** *In re E.G.*, 133 Ill. 2d 98, 109 (1989) (holding that "mature minors may possess and exercise rights regarding medical care that are rooted in this State's common law"). **Kansas:** *Younts v. St. Francis Hosp. & Sch. of Nursing, Inc.*, 205 Kan. 292, 301 (1970) ("[E]xceptions generally recognized by the courts are . . . when the child is close to maturity and knowingly gives an informed consent."). **Massachusetts:** *Baird v. Attorney General*, 371 Mass. 741, 754 (1977) ("[T]he mature minor rule applies in this Commonwealth."). **Tennessee:** *Cardwell v. Bechtol*, 724 S.W.2d 739, 755 (Tenn. 1987) ("[A]doption of the mature minor exception . . . is consistent with the evolution of the common

*(continued on the next page)*

Many amici States also protect the confidentiality of healthcare services provided to adolescents by designating as confidential the records of treatment to which minors can lawfully consent and by prohibiting the unauthorized disclosure of treatment records to parents or guardians.[39] And some amici States authorize all individuals who can lawfully consent to medical procedures to request that private health insurers protect

---

law . . . in this State"). **West Virginia:** *Belcher v. Charleston Area Med. Ctr.*, 188 W. Va. 105, 115 (1992) ("[W]e believe that the mature minor exception is part of the common law rule of parental consent of this state.").

[39] *See, e.g.*, **California:** Cal. Health & Safety Code §§ 123110(a), 123115(a)(1), (3) (providing that a parent or guardian may not access minor's records of procedures for which minor is otherwise authorized to consent or which relate to sensitive treatment); Cal. Civ. Code §§ 56.10, 56.11(c)(2) (providing that minors must execute authorizations for release of same medical records). **Minnesota:** Minn. Stat. § 144.291(2)(g) (providing that a parent or guardian may not access a minor's sensitive treatment records without the minor's authorization). **New Mexico:** N.M. Stat. Ann. § 32A-6A-24(A) (generally prohibiting disclosure of confidential mental health records without the authorization of a child fourteen years of age or older). **Washington:** Wash. Rev. Code §§ 70.02.130(1) (protecting the confidential health information of minors for treatment to which the minor lawfully consented under federal and state law), 70.02.220(2)(a) (for minors fourteen years of age or older, preventing disclosure of STI-related information to parents or legal guardians).

their insurance records, such as explanations of benefits, from being disclosed to the primary insured—typically a parent or guardian.[40]

As both amici States' experience and independent research demonstrates, adolescent confidentiality is compatible with parental involvement. For example, studies show that parents want their children to receive health care from Title X clinics, knowing that their children's confidentiality will be protected therein. In one study, sixty percent of minors reported that a parent or guardian knew that they were accessing sexual health services at a clinic.[41] Almost all teenagers in this situation either had voluntarily told their parents or were at the clinic at the suggestion of a parent or guardian.[42] Studies also indicate that parents understand the importance of confidentiality in the clinical relationship. Indeed, one study found that a majority of parents *wanted* their adolescent children to have time to consult privately with their doctor

---

[40] *See, e.g.*, **Oregon:** Or. Rev. Stat. § 743B.555(2).

[41] Rachel Jones et al., *Adolescents' Reports of Parental Knowledge of Adolescents' Use of Sexual Health Services and Their Reactions to Mandated Parental Notification for Prescription Contraception*, 293 JAMA 340 (2005).

[42] *Id.*

during visits.[43] At the same time, both federal guidelines for Title X providers and the recommendations of major professional organizations encourage communication between adolescents and their parents about sexual and reproductive health.[44]

Moreover, adolescents who choose *not* to disclose their receipt of reproductive healthcare services are often those at greatest risk from violence, family conflict, and other dangers.[45] Not all minors have "capable parents."[46] And one study found that one-third of minors who choose not to inform their parents about their reproductive healthcare decisions

---

[43] Amanda F. Dempsey et al., *Adolescent Preventive Health Care: What Do Parents Want?*, 155 J. of Pediatrics 689 (2009) (abstract).

[44] Gavin et al., *supra*, at 13; Off. of Population Affs., U.S. Dep't of Health & Hum. Servs., *Title X Program Handbook* 19 (2022).

[45] *Cf.* Am. Acad. of Pediatrics, Comm. on Adolescence, *Policy Statement, The Adolescent's Right to Confidential Care When Considering Abortion*, 139 Pediatrics e20163861, at 4 (2017); Lee A. Hasselbacher et al., *Factors Influencing Parental Involvement Among Minors Seeking an Abortion: A Qualitative Study*, 104 Am. J. Pub. Health 2207, 2209 (2014); J. Shoshanna Ehrlich, *Grounded in the Reality of Their Lives: Listening to Teens Who Make the Abortion Decision Without Involving Their Parents*, 18 Berkeley Women's L.J. 61, 94 (2003).

[46] Margaret Moon, *Adolescents' Right to Consent to Reproductive Medical Care: Balancing Respect for Families with Public Health Goals*, 12 Am. Med. Ass'n J. of Ethics 805, 806 (2012).

"already have experienced family violence and fear it will recur."[47] As the American Academy of Pediatrics' position statement explains, "risks of violence, abuse, coercion, unresolved conflict, and rejection are significant in unsupportive or dysfunctional families when parents are informed of a pregnancy against the adolescent's considered judgment."[48] According to another study, adolescents who reported avoiding healthcare in the last year due to confidentiality concerns reported having "elevated depressive symptom levels, suicidal ideation, suicide attempt, sexual activity, birth control nonuse at last sex, STI history, [or] alcohol use."[49] Title X thus provides confidentiality protections to vulnerable minors who may be in danger of harm absent such confidentiality, while requiring Title X grantees to encourage family involvement for those minors who can safely do so. *See* 42 U.S.C. § 300(a).

---

[47] Am. Acad. of Pediatrics, Comm. on Adolescence, *The Adolescent's Right to Confidential Care When Considering Abortion*, *supra*, at 4.

[48] *Id.*

[49] Jocelyn A. Lehrer et al., *Forgone Health Care Among U.S. Adolescents: Associations Between Risk Characteristics and Confidentiality Concern*, 40 J. of Adolescent Health 218, 222 (2007).

The Title X program's assurance of confidentiality is essential to delivering necessary healthcare to minors safely. The Court should reverse the district court's grant of summary judgment.

## CONCLUSION

This Court should reverse the judgment of the district court.

Dated:  New York, New York
        May 1, 2023

                                    Respectfully submitted,

ROB BONTA                           LETITIA JAMES
  *Attorney General*                  *Attorney General*
  *State of California*               *State of New York*
KATHLEEN BOERGERS                   BARBARA D. UNDERWOOD
  *Supervising Deputy*                *Solicitor General*
    *Attorney General*              JUDITH N. VALE
ANNA RICH                             *Deputy Solicitor General*
KETAKEE KANE
  *Deputy Attorneys General*    By:   */s/ Elizabeth A. Brody*
  *Healthcare Rights &*               ELIZABETH A. BRODY
    *Access Section*                  Assistant Solicitor General

1515 Clay Street                    28 Liberty Street
Oakland, CA 94612                   New York, NY 10005
(510) 879-1519                      (212) 416-6167


*(Counsel list continues on the next page.)*

25

KRIS MAYES
  *Attorney General*
  *State of Arizona*
2005 N. Central Ave
Phoenix, AZ 85004

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 West Randolph Street
Chicago, IL 60601

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
25 Market Street
Trenton, NJ 08625

RAÚL TORREZ
  *Attorney General*
  *State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87504

JOSHUA H. STEIN
  *Attorney General*
  *State of North Carolina*
114 W. Edenton Street
Raleigh, NC 27603

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street N.E.
Salem, OR 97301

MICHELLE A. HENRY
  *Attorney General*
  *Commonwealth of Pennsylvania*
Strawberry Square
Harrisburg, PA 17120

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSHUA L. KAUL
  *Attorney General*
  *State of Wisconsin*
17 West Main Street
Madison, WI 53703

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Ester Murdukhayeva, an attorney in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 5,285 words and complies with the typeface requirements and length limits of Rules 27, 29, and 32(a)(5)-(7) and the corresponding local rules.

*/s/ Elizabeth A. Brody*

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically with the Court's CM/ECF system on May 1, 2023. Service will be effectuated by the Court's electronic notification system upon all parties and counsel of record.

Dated:  New York, New York
        May 1, 2023

                                    _/s/ Elizabeth A. Brody_