No. 23-10159

# In the United States Court of Appeals for the Fifth Circuit

———————

ALEXANDER R. DEANDA, ON BEHALF OF HIMSELF AND OTHERS
SIMILARLY SITUATED,

*Plaintiff-Appellee*,

v.

XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
HEALTH AND HUMAN SERVICES; JESSICA SWAFFORD MARCELLA, IN
HER OFFICIAL CAPACITY AS DEPUTY ASSISTANT SECRETARY FOR
POPULATION AFFAIRS; UNITED STATES OF AMERICA,

*Defendants-Appellants.*

———————

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division
Case No. 2:20-CV-00092-Z

———————

## BRIEF FOR PLAINTIFF-APPELLEE ALEXANDER R. DEANDA

———————

GENE P. HAMILTON
Vice-President and General Counsel
America First Legal Foundation
611 Pennsylvania Avenue SE, #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF INTERESTED PERSONS

Counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiff | Plaintiff's Counsel |
|---|---|
| • Aleander R. Deanda | Jonathan F. Mitchell<br>MITCHELL LAW PLLC<br><br>Gene P. Hamilton<br>AMERICA FIRST LEGAL FOUNDATION |

| Defendants | Defendants' Counsel |
|---|---|
| • Xavier Becerra<br>• Jessica Swafford Marcella<br>• United States of America | Abby C. Wright<br>Courtney L. Dixon<br>Amber Richer<br>UNITED STATES DEPARTMENT OF JUSTICE |

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiff-Appellee*

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Deanda agrees with the appellants that oral argument is appropriate and would assist the Court in its consideration of this appeal.

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................. i

Statement Regarding Oral Argument ...................................................... ii

Table of Contents ................................................................................... iii

Table of Authorities .................................................................................v

Statement Of Jurisdiction .......................................................................1

statement of the issues ............................................................................1

Statement Of The Case ...........................................................................1

Summary of argument ............................................................................ 2

Standard of review ................................................................................. 4

Argument .................................................................................................5

 I. The District Court Correctly Held That Mr. Deanda Has Article III Standing .......................................................................5

  A. Mr. Deanda And Is Suffering Article III Injury From The Loss Of His Statutory Rights Under Section 151.001(6) of the Texas Family Code ................................................5

  B. The Defendants Are Inflicting Immediate, Present-Day Injury On Mr. Deanda By Subverting His Authority As A Parent ...................................................................................12

  C. The Defendants Are Inflicting Immediate, Present-Day Injury On Mr. Deanda By Depriving Him Of The Assurance That His Children Will Be Unable To Access Family-Planning Services .......................................................15

  D. The Defendants Are Inflicting Immediate, Present-Day Injury On Mr. Deanda By Subjecting Him To An Increased Risk That His Children Might Access Birth Control Without His Knowledge Or Consent...........................16

 II. The District Court Correctly Held That The Title X Statute Does Not Preempt State Parental-Consent Laws ..............................23

A.    The Appellants' Obstacle-Preemption Argument Is Meritless ........................................................................ 25

B.    Mr. Deanda Is Not Contending That Federal Law Requires Title X Participants To Comply With State Parental-Consent Requirements ............................. 28

C.    None Of The Court Decisions Holding That 42 U.S.C. § 300(a) Preempts State Parental-Notification Laws Have Provided Persuasive Reasons For That Conclusion ....... 31

D.    42 C.F.R. § 59.10(b) Does Not Preempt Texas's Parental-Consent Laws, And The Secretary Had No Authority To Issue This Regulation In Any Event ................. 34

III.  The District Court Correctly Held That The Defendants Are Violating Mr. Deanda's Constitutional Right To Direct The Upbringing Of His Children ............................................. 37

IV.   The District Court Correctly Vacated The Second Sentence Of 42 C.F.R. § 59.10(b) ...................................................... 40

Conclusion ........................................................................... 44

Certificate of service ........................................................... 45

Certificate of Compliance .................................................... 46

Certificate of Electronic Compliance ................................... 47

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021)........................................ 11

*Allen v. Milligan*, --- S. Ct. ----, 2023 WL 3872517 (2023) ........................................9

*Anspach v. Philadelphia*, 503 F.3d 256 (3d Cir. 2007) ...............................................39

*Arizona v. United States*, 567 U.S. 387 (2012)..........................................................25

*Baker v. Carr*, 369 U.S. 186 (1962) ..........................................................................9

Board of Governors v. Dimension Financial Corp.. 474 U.S. 361 (1986) ...............27

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ...................................................33

*Braidwood Management, Inc. v. EEOC*, No. 22-10145, 2023 WL
    4073826 (5th Cir. June 20, 2023)...................................................................12

*Building and Construction Trades Council of the Metropolitan District v.
    Associated Builders and Contractors of Massachusetts/Rhode Island,
    Inc.*, 507 U.S. 218 (1993) ..............................................................................24

*Camreta v. Greene*, 563 U.S. 692 (2011)...................................................................31

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ......................................................10

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) ................................. 22

*County of St. Charles v. Missouri Family Health Council*, 107 F.3d 682,
    684 (8th Cir. 1997) .................................................................................. 32, 33

*Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) ......................................... 20

*Data Marketing Partnership, LP v. United States Dep't of Labor*, 45
    F.4th 846 (5th Cir. 2022) ...............................................................................43

*Diamond v. Charles*, 476 U.S. 54 (1986) ...................................................................7

*Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022) ........... 38, 41

*Doe v. Irwin*, 615 F.2d 1162 (6th Cir. 1980)..............................................................39

*Doe v. Pickett*, 480 F. Supp. 1218 (S.D. W. Va. 1979)..............................................32

*Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S.
    59 (1978) ................................................................................................19, 20

v

*Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ....................................33

*Escambia County v. McMillan*, 466 U.S. 48 (1984) (*per curiam*) ...............37

*Farrakhan v. Washington*, 338 F.3d 1009, 1016 (9th Cir. 2003) ................. 11

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)............35

*FMC Corp. v. Boesky*, 852 F.2d 981 (7th Cir. 1988) ......................................9

*Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368 (5th Cir. 2022) ............43

*Friends Of Marolt Park v. U.S. Dep't of Transportation*, 382 F.3d 1088
    (10th Cir. 2004) ..........................................................................................17

*Griswold v. Connecticut*, 381 U.S. 479 (1965) .............................................38

*Harris v. McRae*, 448 U.S. 297 (1980) .........................................................37

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...........................2, 7

*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79 (2017) .................27

*In re Horizon Healthcare Services Inc. Data Breach Litigation*, 846 F.3d
    625 (3d Cir. 2017) ....................................................................................... 8

*In re Louisiana Crawfish Producers*, 852 F.3d 456 (5th Cir. 2017) .............5

*Johnson v. Allsteel, Inc.*, 259 F. 3d 885 (7th Cir. 2001) ............................. 17

*Kansas v. Garcia*, 140 S. Ct. 791 (2020) ................................. 24, 25, 26, 33

*Lawrence v. Texas*, 539 U.S. 558 (2003) ......................................................38

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................5, 8

*Magwood v. Patterson*, 561 U.S. 320 (2010).................................................33

*Maryland v. Louisiana*, 451 U.S. 725 (1981)...............................................24

*Massachusetts v. EPA*, 549 U.S. 497 (2007).................................... 3, 16, 20

*Milner v. Department of the Navy*, 562 U.S. 562 (2011) ............................ 31

*Missouri Coalition for Environment v. FERC*, 544 F.3d 955 (8th Cir.
    2008) ............................................................................................................17

*Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228 (D.C. Cir.
    1996) ............................................................................................................16

*Natural Resources Defense Council v. EPA*, 464 F.3d 1 (D.C. Cir. 2006) ...................17

*New York v. Heckler*, 719 F.2d 1191 (2d Cir. 1983) .................................... 29

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ............................................... 38

*Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005) ........................................................................................................ 17

*Parents United For Better Schools, Inc. v. School District of Philadelphia Board of Education*, 148 F.3d 260 (3d Cir. 1998) ................................... 14

*Parents United For Better Schools, Inc. v. School District of Philadelphia Board of Education*, 646 A.2d 689 (Pa. Cmwlth. 1994) .................. 14, 16

*Parker v. County of Los Angeles*, 338 U.S. 327 (1949) .............................. 38

*Planned Parenthood Ass'n of Utah v. Matheson*, 582 F. Supp. 1001 (D. Utah 1983) ............................................................................................. 32

*Planned Parenthood Federation of America, Inc. v. Heckler*, 712 F.2d 650 (D.C. Cir. 1983) .............................................................................. 29, 31, 32

*Planned Parenthood of Houston & Southeast Texas v. Sanchez*, 403 F.3d 324 (5th Cir. 2005) ................................................................................. 31

*Roark & Hardee LP v. City of Austin*, 522 F.3d 533 (5th Cir. 2008) ......................... 4

*Rodriguez v. United States*, 480 U.S. 522 (1987) ...................................... 27

*Sapp v. Renfroe*, 511 F.2d 172 (5th Cir. 1975) ......................................... 41

*Shepherd v. Trevino*, 575 F.2d 1110 (5th Cir. 1978) ................................. 11

*Shrimpers & Fishermen of RGV v. Texas Commssion on Environmental Quality*, 968 F.3d 419 (5th Cir. 2020) ............................................. 18, 19

*Shrimpers*, 968 F.3d at 424 ..................................................................... 20

*Spokeo, Inc. v. Robins,* 136 S. Ct. 1540 (2016) .......................................... 7

*Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) ................................ 8

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ............................................ 10

*Stewart v. Blackwell*, 444 F.3d 843 (6th Cir. 2006) .................................. 18

*Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019) ..................................... 10

*Sutton v. St. Jude Medical S.C., Inc.*, 419 F. 3d 568, 570–75 (6th Cir. 2005) ........................................................................................................ 17

*Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019) ................................. 11

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ............................................8, 9

*Troxel v. Granville*, 530 U.S. 57 (2000) .......................................................38

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669 (1973) ..................................................... 20

*Utah ex rel. Div. of Forestry, Fire & State Lands v. United States*, 528 F.3d 712 (10th Cir. 2008) .....................................................................2, 8

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) .........................................21

*Village of Elk Grove Village v. Evans*, 997 F.2d 328 (7th Cir. 1993) ...........................17

*Warth v. Seldin*, 422 U.S. 490 (1975) ..........................................................7

*Washington v. Glucksberg,* 521 U.S. 702 (1997) ..................................................................38

*West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83 (1991)........................27

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022)................................................35

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ..................................41

*Williams v. Taylor*, 677 F.2d 510 (5th Cir. 1982) .............................................11

*Wyeth v. Levine*, 555 U.S. 555 (2009)........................................................25

**Statutes**

28 U.S.C. § 1291.................................................................................1

28 U.S.C. § 1331 ...............................................................................1

42 U.S.C. § 300(a) .....................................................................passim

5 U.S.C. § 706(2)(A).......................................................................36, 42

Tex. Family Code § 151.001(6) .........................................................2, 5, 29

**Rules**

42 C.F.R. § 59.10(b).....................................................................passim

**Other Authorities**

Gerald Gunther, *The Subtle Vices of the Passive Virtues—A Comment on Principle and Expediency in Judicial Review*, 64 Colum. L. Rev. 1 (1964) ........................................................................................... 22

Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163 (1992)...................................8, 22

## STATEMENT OF JURISDICTION

The district court's jurisdiction rests on 28 U.S.C. § 1331. The appellate jurisdiction of this Court rests on 28 U.S.C. § 1291, as the defendants are appealing a final judgment. ROA.793-794. The district court entered judgment on December 20, 2022, and the defendants filed their notice of appeal on February 16, 2023. ROA.826.

## STATEMENT OF THE ISSUES

1.    Whether Mr. Deanda has Article III standing to challenge the defendants' administration of the Title X program.

2.    Whether the district court correctly held that the Title X statute, 42 U.S.C. § 300(a), does not preempt state parental-consent laws.

3.    Whether the district court correctly held that the defendants are violating Mr. Deanda's constitutional right to direct the upbringing of his children.

4.    Whether the district court correctly vacated the second sentence of 42 C.F.R. § 59.10(b) under section 706 of the APA.

## STATEMENT OF THE CASE

The appellants' discussion of the facts and procedural history of this case is complete and correct. Although we have a minor disagreement with their characterization of one of the cases that cite in their statement of the case,[1] we have no disputes with their statements regarding the facts and procedural history, and we have nothing to add to their thorough discussion.

---

1.    *See* note 11, *infra*.

## SUMMARY OF ARGUMENT

The district court correctly held that Mr. Deanda has Article III standing to sue the defendants over their administration of the Title X program. First, the law of Texas gives Mr. Deanda a statutory right to consent to his children's medical and dental care, and psychiatric, psychological, and surgical treatment. *See* Tex. Family Code § 151.001(6). The defendants have taken away this statutory right by insisting that Title X "preempts" section 151.001(6), and by administering a federal program that refuses to honor the state-law rights that Texas confers on parents. The federal government's removal of these state-law rights and protections—standing alone—is sufficient to establish injury in fact for Mr. Deanda, and for any other parent in Texas who would otherwise be entitled to consent to their child's medical treatment under section 151.001(6). *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) ("[T]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." (citation and internal quotation marks omitted)); *Utah ex rel. Div. of Forestry, Fire & State Lands v. United States*, 528 F.3d 712, 721 (10th Cir. 2008) ("Although Article III standing is a question of federal law, state law may create the asserted legal interest.").

Second, the defendants' implementation of the Title X program inflicts immediate, present-day injury on Mr. Deanda by subverting his authority as a parent. The mere fact that the federal government is administering a program that offers contraception to minors without parental knowledge or consent

undermines the authority of parents who want to prevent their children from accessing birth control and family-planning services. And it renders Mr. Deanda unable to prevent his children from accessing contraception or other family-planning services behind his back. This erosion of parental authority and control inflicts present-day injury in fact — regardless of whether Mr. Deanda's children are actually obtaining birth control from Title X participants.

Third, Mr. Deanda is suffering present-day injury in fact from the loss of assurance that his children will be unable to access prescription contraception or other family-planning services, because the Title X program is offering these services to all minors in Texas without any requirement of parental notification or consent.

Fourth, the defendants' actions are inflicting present-day injury on Mr. Deanda by increasing the risk that his children might access birth control without their knowledge and consent. *See Massachusetts v. EPA*, 549 U.S. 497, 525 n.23 (2007) ("[E]ven a small probability of injury is sufficient to create a case or controversy — to take a suit out of the category of the hypothetical — provided of course that the relief sought would, if granted, reduce the probability" (citation and internal quotation marks omitted)). It is not necessary for a plaintiff to allege or prove that his children actually *will* seek or obtain family-planning services from a Title X participant, as the appellants argue, and it has long been established that an act that increases the risk of a future

harm imposes present-day injury on those who are subjected to the increased risk.

The district court also correctly held that 42 U.S.C. § 300(a) does not preempt state parental-consent statutes such as section 151.001(6). 42 U.S.C. § 300(a) merely requires Title X participants to "encourage family participation" "to the extent practical." It establishes a *floor* for Title X funding recipients, not a ceiling that prevents them from going beyond the minimum parental involvement required by statute. The courts that have held that 42 U.S.C. § 300(a) preempts state parental-involvement laws have ignored the statutory text and rested their preemption analysis on legislative history and judicially perceived statutory "purposes." The district court was right to reject those non-binding court decisions, and it correctly held that Title X projects, no less than anyone else, must comply with the parental-consent laws of Texas.

Finally, the district court was correct to reject the Secretary's efforts to preempt Texas's parental-consent laws by issuing 42 C.F.R. § 59.10(b) after Mr. Deanda filed his lawsuit, and it did not abuse its discretion by vacating this unlawful and unauthorized regulation.

## STANDARD OF REVIEW

Each of the issues on this appeal presents questions of law subject to de novo review. *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008) ("[W]e review all justiciability issues, including standing and ripeness, de novo."); *In re Louisiana Crawfish Producers*, 852 F.3d 456, 462

(5th Cir. 2017) ("We review grants of summary judgment *de novo*, applying the same standard as the district court.").

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT MR. DEANDA HAS ARTICLE III STANDING

To establish Article III standing, a plaintiff needs to show: (1) an injury in fact, which is (2) fairly traceable to the challenged conduct of the defendants, and is (3) likely to be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The defendants' implementation of the Title X program is injuring Mr. Deanda in four separate and distinct ways.

### A. Mr. Deanda And Is Suffering Article III Injury From The Loss Of His Statutory Rights Under Section 151.001(6) of the Texas Family Code

The law of Texas gives Mr. Deanda a statutory right to consent to his children's medical treatment. *See* Tex. Family Code § 151.001(6). The defendants have taken away this statutory right from Mr. Deanda by insisting that Title X "preempts" section 151.001(6), and by establishing a federal program that refuses to honor the state-law rights that Texas confers on parents. The removal of these state-law rights and protections inflicts injury in fact, regardless of whether Mr. Deanda can allege or prove that his children are using the Title X program to obtain birth control behind his back.

The district court correctly held that the loss of the right to consent to a child's medical treatment inflicts injury in fact *per se*, and that there is no

need to establish additional harms beyond that lost prerogative. ROA.294 ("Plaintiff has suffered a per se statutory injury in fact."). Imagine a divorce decree that gives one of the spouses the authority to consent to a child's access to birth control without notifying or obtaining consent from the other spouse. The spouse who has been denied the prerogative to consent would surely have standing to appeal a divorce decree of this sort, even if there is no way to know whether the child will ever seek to obtain family-planning services. The loss of the parental right to consent to treatment *is* injury in fact. And when a parent is told that his state-law right to consent to his child medical treatment has been taken away or transferred to someone else, he will have standing to sue to reclaim that right—and he need not wait for an actual medical situation to arise before suing to recover his right to consent.

So too here. Mr. Deanda's state-law right to consent before his child obtains prescription contraception has been taken away and transferred to the federal government and the participants in its Title X program. The loss of that state-law prerogative inflicts Article III injury, and Mr. Deanda may sue to reclaim that state-law right. He need not wait until one of his daughters attempts to access prescription contraception through the Title X program; indeed, Mr. Deanda is unlikely to know whether this is happening because the Title X program flouts the Texas laws that require parental notification and consent before dispensing prescription contraception to minors. Mr. Deanda's injury comes the removal of his state-law right to consent to his daugh-

ters' medical treatment, and that is the injury that Mr. Deanda is seeking to redress in this litigation.

The Supreme Court has long held that Congress and the states may create legally cognizable rights in their statutes, and the deprivation of these statutory rights can inflict Article III injury without any additional showing of harm. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) ("[T]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." (citation and internal quotation marks omitted));[2] *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (same); *Diamond v. Charles*, 476 U.S. 54, 65 n.17 (1986) ("The Illinois Legislature, of course, has the power to create new interests, the invasion of which may confer standing. In such a case, the requirements of Art. III may be met."); *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1549 (2016) ("[T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in

---

2.   The district court's order of September 24, 2020, claims that *Havens Realty* concerns only "whether prudential considerations could deprive a plaintiff of standing vis-a-vis a fair housing claim even though plaintiff satisfied the constitutional minimum requirement of injury-in-fact." ROA.292 n.13. We respectfully disagree. The district court is certainly correct to observe that *Havens Realty* rejected any attempt to impose prudential-standing obstacles to the plaintiffs' lawsuit in that case, *see* 455 U.S. at 372–73, but the opinion in *Havens Realty* goes on to consider whether the plaintiffs could satisfy Article III standing by alleging a violation of their statutory right to obtain truthful and accurate information—and it held unequivocally that a violation of this statutory right suffices to inflict Article III injury. *See Havens Realty*, 455 U.S. at 373–74.

such a case need not allege any *additional* harm beyond the one Congress has identified." (citations omitted)); *see also In re Horizon Healthcare Services Inc. Data Breach Litigation*, 846 F.3d 625, 635 (3d Cir. 2017) ("[I]n some circumstances, that the breach of a statute is enough to cause a cognizable injury — even without economic or other tangible harm."); *Utah ex rel. Div. of Forestry, Fire & State Lands v. United States*, 528 F.3d 712, 721 (10th Cir. 2008) ("Although Article III standing is a question of federal law, state law may create the asserted legal interest."). The statutory rights established in section 151.001(6) give Mr. Deanda and the class members the prerogative to consent before their children obtain prescription contraception. The federal government's decision to strip Mr. Deanda and the putative class of the parental prerogatives conferred by section 151.001(6) inflicts injury in fact, without any need to show additional harm beyond the loss of their state-law statutory rights.

The appellants' brief does nothing to refute the existence of this indisputable Article III injury. The appellants correctly observe that Congress cannot create Article III standing merely by creating a cause of action that authorizes plaintiffs to sue. *See* Appellants' Br. at 23 (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 222–23 (1992) (criticizing *Lujan*). But Mr. Deanda is not asserting standing by relying on a congressionally created cause of action; he is alleging injury from the loss of

his *state-law* right to consent to his minor children's medical treatment. And the loss of that right constitutes injury in fact regardless of whether Mr. Deanda can allege or prove that his children are using the Title X program to obtain birth control. *See FMC Corp. v. Boesky*, 852 F.2d 981, 993 (7th Cir. 1988) ("Properly pleaded violations of state-created legal rights, therefore, must suffice to satisfy Article III's injury requirement . . . even in the absence of a specific finding that FMC was injured."); *id.* (holding that "the invasion of a recognized state-law right in itself satisf[ies] Article III's injury requirement, even though an injury separate and apart from the actual invasion is difficult to identify"). *TransUnion* (and *Lujan*) have nothing to say about standing to sue over the loss of a state-law legal entitlement; they merely limit the power of Congress to invent new types of "injuries" that bear no relationship to the types of harm "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2200.

The appellants also claim that the district court's theory of standing would empower "any parent (or potential parent) in Texas" to sue HHS over its administration of the Title X program. *See* Appellants' Br. at 23. But there is nothing unusual about government-inflicted injuries that affect a large number of people—and that enable those individuals to sue. Think of redistricting litigation, where any voter in a gerrymandered or malapportioned district can assert "injury in fact" and sue over the dilution of their voting power. *See Allen v. Milligan*, --- S. Ct. ----, 2023 WL 3872517 (2023); *Baker v. Carr*, 369 U.S. 186, 207–208 (1962). And a widespread injury does not con-

vert a plaintiff's claim into a generalized grievance. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 n.7 (2016) ("The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance."). The appellants also overstate the scope of permissible plaintiffs; the district court's holding would not empower "any parent (or potential parent) in Texas" to sue, but only parents of minor children, and only those parents who wish to preserve (rather than relinquish) their state-law right to consent in the Title X program.

The appellants' citation of *Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019), is inapposite, because the problem in *Stringer* was that plaintiffs had shown only a past injury rather than a continuing or threatened future injury, which is insufficient to confer standing for prospective relief. *See id.* at 720 ("Because injunctive and declaratory relief cannot conceivably remedy any past wrong, plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." (citation and internal quotation marks omitted)); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983). Mr. Deanda, by contrast has alleged (and shown) an ongoing loss of his state-law right to consent to his children's medical treatment, so the appellants must explain how the loss of this state-law entitlement fails to inflict "injury in fact" under Article III.

Finally, the appellants claim that Mr. Deanda cannot establish Article III injury unless and until a Title X project actually dispenses birth control to

one of his children in violation of the Texas laws that protect his right to consent. *See* Appellants' Br. at 22–23. But the mere *loss* of Mr. Deanda's state-law right to consent to enough to establish Article III injury; he does not need to wait until an actual *violation* of that state-law right occurs. Imagine a state law that disenfranchises convicted felons. A felon who has been stripped of his voting rights under this law can sue immediately; he does not need to wait until he is banned from voting in an actual election to show "injury in fact." *See Williams v. Taylor*, 677 F.2d 510 (5th Cir. 1982); *Shepherd v. Trevino*, 575 F.2d 1110 (5th Cir. 1978); *Farrakhan v. Washington*, 338 F.3d 1009, 1016 (9th Cir. 2003), *overruled in part by Farrakhan v. Gregoire*, 623 F.3d 990 (9th Cir. 2010).

Or consider a state law that strips Christian wedding vendors of their right to decide whether they will participate in same-se marriage ceremonies. A wedding vendor who has lost that prerogative may sue to recover that right, and he does not need to wait for the state (or a customer) to *violate* that right by forcing the vendor to participate in a same-sex wedding. *See Telescope Media Group v. Lucero*, 936 F.3d 740, 749–50 (8th Cir. 2019) (holding that a videographer has standing to sue over an anti-discrimination statute that prohibits wedding vendors from withholding services for same-sex weddings—even though Telescope Media had not yet entered the wedding-video business and even though it was not facing any impending or threatened enforcement action); *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1070–76 (10th Cir. 2021), *cert. granted in part*, 142 S. Ct. 1106 (2022) (holding that website

designer has standing to sue over an anti-discrimination statute that prohibits it from denying services to those seeking a website that celebrates or promotes same-sex weddings, even though the designer was not yet offering wedding-related services and had not been threatened or compelled to create an objectionable website); *Braidwood Management, Inc. v. EEOC*, No. 22-10145, 2023 WL 4073826, at *7–10 & n.17, n.23 (5th Cir. June 20, 2023) (citing *Telescope Media* and *303 Creative* with approval).

And imagine if a state official had terminated Mr. Deanda's right to consent to his children's medical treatment under section 151.001(6) and transferred that prerogative someone else. The loss of that state-law right would inflict immediate Article III injury, and Mr. Deanda would have standing to sue the state official without waiting for an actual medical situation to arise. (Do the appellees want to contend otherwise?) The *loss* of the state-law right to consent confers standing, and Mr. Deanda need not wait for a *violation* of that right before seeking judicial relief.

## B.   The Defendants Are Inflicting Immediate, Present-Day Injury On Mr. Deanda By Subverting His Authority As A Parent

The defendants' implementation of the Title X program also inflicts immediate, present-day injury on Mr. Deanda by subverting his authority as a parent. *See* Deanda Decl., at ¶ 9(b) (ROA.420). The mere fact that the federal government is administering a program that offers contraception to minors without parental knowledge or consent undermines the authority of parents

who want to prevent their children from accessing birth control and family-planning services. And it renders parents such as Mr. Deanda unable to prevent their children from accessing contraception or other family-planning services behind their backs. *See id.* This erosion of parental authority and control inflicts present-day injury in fact—regardless of whether Mr. Deanda's children are actually obtaining birth control from Title X participants.

The defendants try to avoid this conclusion by insisting that Mr. Deanda is asserting a speculative, future injury that depends on the conduct of third parties such as Mr. Deanda's children and Title X participants. *See* Appellants' Br. at 19 ("Plaintiff's abstract interest in consenting to his children obtaining family-planning services from some unknown Title X provider at some hypothetical, 'indefinite future time' does not establish any ''actual or imminent' injury' from HHS." (quoting *Lujan*, 504 U.S. at 564 & n.2)). But that mischaracterizes the injury that Mr. Deanda is asserting. He is not claiming injury by asserting that his daughters *will* obtain birth control and family-planning services from Title X participants; he is instead claiming injury from the subversion of his parental authority, which is an immediate, present-day injury rather than a contingent or hypothetical future harm. And this injury does not in any way depend on whether one's children are actually obtaining (or trying to obtain) birth control from Title X participants. It is no different from a public school that decides to distribute condoms without parental notification or consent. A parent whose children attend that school would have standing from the mere fact that condoms have been made avail-

able; he would not need to allege or show that his children would actually obtain (or try to obtain) the prophylactics. *See Parents United For Better Schools, Inc. v. School District of Philadelphia Board of Education*, 148 F.3d 260 (3d Cir. 1998) (allowing parents to challenge condom-distribution program in the Philadelphia public schools on the ground that it subverts their authority as parents, while rejecting the parents' challenge to the program on the merits); *Parents United For Better Schools, Inc. v. School District of Philadelphia Board of Education*, 646 A.2d 689, 691 (Pa. Cmwlth. 1994) (holding that parents have standing to challenge condom-distribution program in the Philadelphia public schools, even though the program allowed parents to opt their children out of the program by mailing in a "veto form," because parents suffered injury from the loss of their prerogative to "consent . . . before medical treatment [is] provided"). The appellants try to distinguish the condom-distribution cases by pointing to the absence of evidence that Mr. Deanda's children have ever "sought" or been "offered" birth-control devices,[3] but the injury to parental authority does not depend on whether one's children actually seek or obtain the disputed birth-control devices. The mere fact that Title X program makes family-planning services to minors without parental knowledge or consent subverts Mr. Deanda's authority as a parent. And the appellants are wrong to claim that Mr. Deanda's children are not being "offered" birth-control devices, as the Title X program is offering birth control

---

3.    *See* Appellants' Br. at 24.

devices to *all* women and adolescents of child-bearing age, including Mr. Deanda's children. *See* Family Planning Services and Population Research Act of 1970, Pub. L. No. 91-572, § 2(1), 84 Stat. 1504, 1504 (1970) ("It is the purpose of this Act . . . to assist in making comprehensive voluntary family planning services readily available to all persons desiring such services.").

### C.    The Defendants Are Inflicting Immediate, Present-Day Injury On Mr. Deanda By Depriving Him Of The Assurance That His Children Will Be Unable To Access Family-Planning Services

Mr. Deanda is also suffering present-day injury in fact from the loss of assurance that his children will be unable to access prescription contraception or other family-planning services, because the Title X program is offering these services to all minors in Texas without any requirement of parental notification or consent. *See* Deanda Decl., at ¶ 9(c) (ROA.420). The law of Texas provided this assurance in section 151.001(6) of the Texas Family Code, which outlaws the distribution of prescription contraception to minors without parental consent. The defendants' conduct removes the assurance that the law of Texas would otherwise provide. Now Mr. Deanda can only wonder whether his children are obtaining prescription contraception and other birth control behind their back. *See id.*

This injury—like the subversion-of-parental-authority injury—is an immediate, present-day injury rather than a speculative or contingent future harm. Yet the appellants' brief continues to insist that Mr. Deanda's alleged injuries are merely "conjectural" or describe "future injury." Appellants' Br.

at 18, 23 (quoting *Lujan*, 504 U.S. at 560, 564 n.2). An injury of this sort would sustain a parental challenge to a school district's condom-distribution program. *See Parents United*, 646 A.2d 689. No different result should obtain when the condoms and birth control are distributed by the federal government.

> **D.** **The Defendants Are Inflicting Immediate, Present-Day Injury On Mr. Deanda By Subjecting Him To An Increased Risk That His Children Might Access Birth Control Without His Knowledge Or Consent**

The defendants' actions are also inflicting present-day injury on Mr. Deanda by increasing the risk that his children might access birth control without his knowledge and consent. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 525 n.23 (2007) ("[E]ven a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of the hypothetical—provided of course that the relief sought would, if granted, reduce the probability" (citation and internal quotation marks omitted)); ROA.299-300; ROA.738-739.

It has long been established that an act that increases the risk of a future harm imposes present-day injury on those who are subjected to the increased risk—even if the actual risk of the future harm occurring is small. *See Massachusetts*, 549 U.S. at 525 n.23; *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228, 1234–35 (D.C. Cir. 1996) (plaintiff established standing to challenge the government's decision to limit timber harvesting by alleging an increased risk of wildfires); *Natural Resources Defense Council v. EPA*, 464 F.3d

1, 7 (D.C. Cir. 2006) (plaintiffs established standing to challenge government decision deregulating methyl bromide by alleging an increased lifetime risk of developing skin cancer); *Sutton v. St. Jude Medical S.C., Inc.*, 419 F.3d 568, 570–75 (6th Cir. 2005) (standing based on increased risk of harm caused by implantation of defective medical device); *Johnson v. Allsteel, Inc.*, 259 F.3d 885, 888–91 (7th Cir. 2001) (standing based on increased risk that Employee Retirement Income Security Act beneficiary will not be covered due to increased amount of discretion given to ERISA administrator); *id.* at 888 ("The increased risk the participant faces as a result is an injury-in-fact."); *Village of Elk Grove Village v. Evans,* 997 F.2d 328, 329 (7th Cir. 1993) (finding standing because "[t]he Village is in the path of a potential flood" and "even a small probability of injury is sufficient to create a case or controversy."); *Missouri Coalition for Environment v. FERC*, 544 F.3d 955, 957 (8th Cir. 2008) (holding that "a potentially increased risk of environmental harm" is sufficient to confer Article III standing); *Friends Of Marolt Park v. U.S. Dep't of Transportation*, 382 F.3d 1088, 1095 (10th Cir. 2004) (plaintiff established Article III standing by alleging "an increased risk of harm" to a park that its members use for recreational purposes); *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 860 (9th Cir. 2005) (plaintiff established Article III standing to challenge an oil tanker dock expansion by alleging an "increase in the risk of an oil spill"); *id.* ("[T]he alleged injury is not conjectural or hypothetical, as 'an increased risk of harm can itself be injury in fact for standing'" (quoting *Ecological Rights Found. v. Pac. Lumber Co.,* 230 F.3d

1141, 1149 (9th Cir. 2000)); *Constellation Energy Commodities Group, Inc. v. FERC*, 457 F.3d 14, 20 (D.C. Cir. 2006) ("We agree with Edison that the increased risk of non-recovery inherent in the reduction of collateral securing a debt of uncertain amount is sufficient to support its standing."); *Stewart v. Blackwell*, 444 F.3d 843, 855 (6th Cir. 2006), vacated and superseded on other grounds, 473 F.3d 692 (6th Cir. 2007) ("The plaintiffs here have alleged an injury in fact sufficient to confer Article III standing. The increased probability that their votes will be improperly counted based on punch-card and central-count optical scan technology is neither speculative nor remote.").

There defendants' implementation of the Title X program increases the risk that the children of Mr. Deanda will obtain birth control against his wishes, because it instructs Title X participants to flout a Texas statute that *requires* parental consent before dispensing prescription contraception to minors. That alone suffices to establish standing under *Massachusetts* and the cases cited above, so long as the requested relief will "reduce" this risk. The imposition of this increased risk imposes a certain, present-day injury on Mr. Deanda, and the existence of that injury does not depend on speculation or conjecture about what might happen in the future.

The defendants do not deny that their conduct increases the risk that Mr. Deanda's children might access birth-control devices without his knowledge or consent. Instead, they claim that Mr. Deanda's "increased risk" theory of Article III injury is incompatible with *Shrimpers & Fishermen of RGV v. Texas Commssion on Environmental Quality*, 968 F.3d 419 (5th Cir. 2020). But

18

*Shrimpers* does not categorically reject the notion of "increased risk" injury under Article III, and it could not do so without contradicting the Supreme Court's holdings in *Massachusetts* and other cases. *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010) (conventional alfalfa farmers had standing to seek injunctive relief because the agency's decision to deregulate a variety of genetically engineered alfalfa gave rise to a "significant risk of gene flow to non-genetically-engineered varieties of alfalfa."); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 74 (1978) (allowing plaintiffs to challenge to constitutionality of the Price-Anderson Act, which limits the liability of nuclear power plants, based on "our generalized concern about exposure to radiation and the apprehension flowing from the uncertainty about the health and genetic consequences of even small emissions."). Instead, *Shrimpers* holds only that a plaintiff cannot rely on an "increased risk" that "equally affects the general public":

> We do not recognize the concept of "probabilistic standing" based on a non-particularized "increased risk"—that is, an increased risk that equally affects the general public.

*Shrimpers*, 968 F.3d at 424. Mr. Deanda's increased-risk injury, however, is *not* an injury that "equally affects the general public"; it is an injury that affects only parents in Texas with minor-age daughters of child-bearing years, and only those parents who wish to preserve their state-law right to consent before their children's obtain family-planning services from Title X provid-

ers. So Mr. Deanda is not asserting a "non-particularized" increased risk, and he encounters no obstacle from the holding in *Shrimpers*.

The *Shrimpers* opinion goes on to question the propriety of "increased-risk" standing,[4] but this discussion is dictum, and (more importantly) it cannot override the decisions of the Supreme Court that confer standing on plaintiffs who assert Article III injury from an increased risk of harm. *See Massachusetts*, 549 U.S. at 525 n.23 (2007); *Monsanto*, 561 U.S. at 15; *Duke Power*, 438 U.S. at 74. *Shrimpers* also suggests that plaintiffs asserting increased-risk injury must produce evidence of the "extent" of the increased risk,[5] but that stance is incompatible with the Supreme Court's refrain that an "identifiable trifle"[6] is all that is needed to establish Article III injury—and an "identifiable trifle" need not be quantified or measured. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing

---

4.  *See Shrimpers*, 968 F.3d at 424 ("As then-Judge Kavanaugh once wrote for the D.C. Circuit, there is 'a powerful argument that "increased-risk-of-harm" claims . . . fail to meet the constitutional requirement that a plaintiff demonstrate harm that is "actual or imminent, not conjectural or hypothetical."'" (quoting *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Administration*, 489 F.3d 1279, 1294 (D.C. Cir. 2007)).

5.  *See Shrimpers*, 968 F.3d at 425 ("[T]here is no evidence of the *extent* to which those risks would be increased for those members by the expected emissions." (emphasis added)); *id.* ("[T]here is again no evidence concerning the *extent* to which the expected omissions would increase any such risks for Petitioners' members." (emphasis added)).

6.  *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) ("[A]n identifiable trifle is enough for standing" (citation and internal quotation marks omitted)).

purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 139 S. Ct. 361, 368 n.1 (2018) ("[T]he decrease in the market value of Weyerhaeuser's land as a result of the designation is a sufficiently concrete injury for Article III purposes."). Article III serves to distinguish injured litigants from those asserting nothing more than an ideological grievance,[7] and the extent of an admittedly increased risk of harm has no bearing on that question.

Finally, it is important to note that this Court need not resolve whether an increased-risk injury can support Article III standing when Mr. Deanda has already established Article III injury from the loss of his state-law right to consent to his children's medical treatment, as well as immediate, present-day injury from the loss of parental authority and reduced assurance that his children will not be accessing family-planning services without his knowledge or consent. *See* Sections I.A–I.C, *supra*. The appellants train most of their fire on this aspect of the district court's standing analysis—and for understandable reasons. The Supreme Court's pronouncements in this area have not been a paragon of consistency, and one needs only to read the competing opinions in *Clapper* to see that judges have leeway in deciding whether to characterize an injury as imposing the "immediate harm" of increased risk or

---

7.   *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485–86 (1982) (holding that "the psychological consequence . . . produced by observation of conduct with which one disagrees" is "not an injury sufficient to confer standing under Art. III")

the "conjectural" harm of a possible future injury. *Compare Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013) (majority opinion) ("[W]e have repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient." (citation omitted)); *with id.* at 435 (Breyer, J., dissenting) ("[C]ourts have often found probabilistic injuries sufficient to support standing." (citing authorities)); *see also* Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 203–05 (1992) (noting how courts have latitude in their "characterization of the injury"). It is also dangerous for courts to wield jurisdictional doctrines that can be deployed in an arbitrary fashion. *See* Gerald Gunther, *The Subtle Vices of the Passive Virtues—A Comment on Principle and Expediency in Judicial Review*, 64 Colum. L. Rev. 1 (1964). So if the Court concludes that Mr. Deanda has standing on other grounds, it does not have to resolve this particular theory of Article III standing—although we respectfully ask the Court to rule on each of Mr. Deanda's standing arguments regardless because it is possible that further review will be sought in the en banc court of appeals or in the Supreme Court.

## II. The District Court Correctly Held That The Title X Statute Does Not Preempt State Parental-Consent Laws

There is no conceivable conflict between the text of 42 U.S.C. § 300(a) and the parental-consent requirement of section 151.001(6). The full text of 42 U.S.C. § 300(a) provides:

> The Secretary is authorized to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents). To the extent practical, *entities which receive grants or contracts under this subsection shall encourage family participation in projects assisted under this subsection.*

42 U.S.C. § 300(a) (emphasis added). This statutory language establishes a *floor* for Title X funding recipients: Every recipient of a Title X grant or contract must, "to the extent practical . . . encourage family participation" in Title X projects. An entity that fails to "encourage family participation" in Title X projects is categorically eligible to receive a Title X grant or contract, and the Secretary violates the Title X statute if he provides grants or contracts to such an entity.

But nothing in this statutory language prohibits Title X funding recipients from going beyond a mere policy of "encouraging family participation." A Title X participant, for example, would not violate federal law if it decided to establish a categorical policy of notifying or seeking consent from parents before dispensing prescription contraception or other family-planning ser-

vices to minors. And if there is nothing that prohibits a Title X participant from establishing and enforcing a policy of this sort, then there is nothing that prevents a state from imposing this policy on Title X participants. *See Kansas v. Garcia*, 140 S. Ct. 791, 806 (2020) ("We ... see no ground for holding that the Kansas statutes at issue conflict with federal law. It is certainly possible to comply with both IRCA and the Kansas statutes").

More importantly, there is nothing in 42 U.S.C. § 300(a) that purports to preempt or override state or federal laws that require more extensive parental involvement, and there is nothing in 42 U.S.C. § 300(a) that purports to exempt Title X projects from those laws. This statutory language comes nowhere close to overcoming the presumption against preemption that applies to federal legislation. *See Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) ("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law."); *Building and Construction Trades Council of the Metropolitan District v. Associated Builders and Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 224 (1993) ("We are reluctant to infer pre-emption.").

The defendants have never attempted to explain how section 151.001(6) could possibly contradict a federal statute that merely requires Title X recipients to "encourage family participation." 42 U.S.C. § 300(a) does nothing more than establish the *minimum* requirement for Title X participants on the issue of family involvement. There is nothing in 42 U.S.C. § 300(a) that prevents a Title X recipient from going beyond this mandatory minimum, and

there is nothing in 42 U.S.C. § 300(a) that purports to exempt Title X entities from state laws that require additional parental involvement. A state law would be preempted by 42 U.S.C. § 300(a) if it *prohibited* Title X recipients from "encouraging family participation," but section 151.001(6) does nothing of the sort.

The appellants nonetheless insist that 42 U.S.C. § 300(a) preempts Texas's parental-consent laws, but none of their arguments have merit.

### A.    The Appellants' Obstacle-Preemption Argument Is Meritless

The appellants do not appear to be claiming that Title X participants would violate 42 U.S.C. § 300(a) by complying with section 151.001(6)'s parental-consent requirement, and they do not claim that it is impossible for Title X participants in Texas to comply with both section 151.001(6) and 42 U.S.C. § 300(a). So the appellants are not (as far as we can tell) relying on the doctrine of "conflict" or "impossibility" preemption,[8] and they are not relying on field preemption either.[9] Instead, the appellants' preemption argument rests on the notion of "obstacle preemption," a controversial doctrine

---

8. *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

9. *See Kansas v. Garcia*, 140 S. Ct. 791, 804 (2020) ("In rare cases, the Court has found that Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation'" (citation omitted)); *Arizona v. United States*, 567 U.S. 387, 401 (2012) ("Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards.").

in which state legislation is displaced by the court-perceived purposes of a statute rather its enacted language. *See Kansas v. Garcia*, 140 S. Ct. 791, 807–08 (2020) (Thomas, J., joined by Gorsuch, J.) (calling for the abandonment of "purposes and obstacles" preemption). But the appellants' obstacle-preemption argument is unavailing even if one accepts the legitimacy of obstacle-preemption doctrine.

The problem for the appellants is that there is no evidence or reason to believe that a "purpose" of the Title X statute is to empower minor children to obtain birth control or family-planning services against the wishes of their parents or in violation of state parental-consent laws. The evidence that the government cites shows only that congressional supporters of Title X wanted to make family-planning services available to "adolescents" and "sexually active teenagers." Appellants' Br. at 26 (citations and internal quotation marks omitted). That does not mean that Title X's supporters wanted to accomplish this purpose at all costs and in disregard of other competing interests—and it does not indicate that Title X's supporters wanted to override parental-consent rights secured by state law. No statute pursues a single goal the maximum possible extent, and obstacle-preemption analysis does not allow judges to choose a perceived "purpose" from a statutory enactment and declare that any state law in contravention of that preferred purpose must give way. As the Supreme Court has explained:

> No legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achieve-

> ment of a particular objective is the very essence of legislative
> choice — and it frustrates rather than effectuates legislative in-
> tent simplistically to assume that *whatever* furthers the statute's
> primary objective must be the law.

*Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987); *see also Board of Governors v. Dimension Financial Corp.*, 474 U.S. 361, 374 (1986) ("Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise . . . ."). In fact, the Title X statute tempers the pursuit of access to birth control by requiring Title X participants to "encourage family participation" "to the extent practical"—even when state law imposes no such requirement. 42 U.S.C. § 300(a). Just how far Congress decided to go in promoting access to family-planning is determined by the enacted language of 42 U.S.C. § 300(a), not by choosing one of the many competing statutory purposes and pushing aside every state law that might interfere with that preferred statutory objective. *See West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 98 (1991) ("The best evidence of that purpose is the statutory text adopted by both Houses of Congress and submitted to the President."); *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) ("[W]e will not presume with petitioners that any result consistent with their account of the statute's overarching goal must be the law but will presume more mod-

estly instead 'that [the] legislature says . . . what it means and means . . . what it says.' *Dodd v. United States,* 545 U.S. 353, 357 (2005) (internal quotation marks omitted; brackets in original).").

And the "purposes" of 42 U.S.C. § 300(a) are what appear in the enacted text: To empower the Secretary of HHS to make grants and enter into contracts with entities that provide family-planning methods and services, but *only* with entities that "encourage family participation" "to the extent practical." By excluding entities that fail to "encourage family participation" from Title X grants and contracts, the statute establishes nothing more than a baseline minimum requirement for Title X participants. It does not restrict their ability of Title X participants to require additional parental involvement, either on their own initiative or in response to state parental-consent laws such as section 151.001(6).

### B.    Mr. Deanda Is Not Contending That Federal Law Requires Title X Participants To Comply With State Parental-Consent Requirements

The appellants also spend much of their brief insisting that 42 U.S.C. § 300(a) does not require Title X participants to obtain parental consent or comply with state parental-consent laws. *See* Appellants' Br. at 27–29. They also note that the Reagan Administration was rebuffed by federal courts when it interpreted 42 U.S.C. § 300(a) to require that Title X projects comply with state parental-involvement laws, and notify a parent or guardian before dispensing family-planning services to unemancipated minors regardless

of whether state law imposed such a requirement.[10] *See New York v. Heckler*, 719 F.2d 1191 (2d Cir. 1983); *Planned Parenthood Federation of America, Inc. v. Heckler*, 712 F.2d 650 (D.C. Cir. 1983).[11] But Mr. Deanda is not arguing that federal law requires parental consent—nor is he arguing that federal law requires Title X participants to comply with a state's parental-consent laws.[12] The requirement to provide parental consent comes entirely from the law of Texas,[13] and this requirement is not incorporated by reference into 42 U.S.C. § 300(a) or any other source of federal law.

---

10.  *See Parental Notification Requirements Applicable to Projects for Family Planning Services*, 48 Fed. Reg. 3600 (Jan. 26, 1983).

11.  The Second Circuit refused to rule on the provision in the Reagan Administration's rule requiring Title X participants to comply with state parental-consent or notification laws. *See New York*, 719 F.2d at 1196 ("We reach a contrary conclusion regarding the standing of plaintiffs to contest the regulation requiring grantee compliance with state law on parental notice or consent. . . . [W]e do not see how any of the plaintiffs face injury from this regulation since neither New York nor any bordering state has such a law. . . . We therefore find it necessary to reverse that portion of the judgment that enjoins the operation of this regulation."). The appellants' brief incorrectly claims that the Second Circuit held that this requirement was "prohibited by the Title X statute." Appellants' Br. at 5.

12.  The district court's order of September 24, 2020, suggests that Mr. Deanda is arguing that 42 U.S.C. § 300(a) should be interpreted to "require[] Title X grantees to encourage family participation in minors' contraception decisions to the greatest extent practical—given each state's law." ROA.304. Mr. Deanda is not making such an argument, and he not argued this at any point in the litigation.

13.  *See* Tex. Family Code § 151.001(6).

The issue in this case is not whether the text of 42 U.S.C. § 300(a) can or should be interpreted to *require* Title X participants to obtain parental consent before dispensing birth control or prescription contraception to minors. Nor the issue whether 42 U.S.C. § 300(a) imposes a federal-law obligation on Title X participants to comply with state parental-involvement laws. The issue is only whether 42 U.S.C. § 300(a) *preempts* a *state-law* parental-consent requirement; it is not about whether 42 U.S.C. § 300(a) independently imposes such a requirement. The appellants' insistence that 42 U.S.C. § 300(a) does not require parental consent as a matter of federal law is non-responsive to Mr. Deanda's argument. We agree with the appellants that there is no federal legal requirement that Title X participants obtain parental consent (or notify a parent) before dispensing birth control to an unemancipated minor. But the absence of a federal-law requirement does not establish preemption of a similar requirement imposed by state law.

The appellants also observe that Congress enacted another federal statute, Title XX, which explicitly mandates parental notification and consent, and they argue that the absence of such explicit language in the Title X statute implies that no such parental-consent requirement is mandated for Title X participants. *See* Appellants' Br. at 28. This argument does nothing to help the appellants because Mr. Deanda is not arguing that the Title X statute requires parental consent—and he is not arguing that the Title X statute (or any provision of federal law) should be construed to impose such a requirement. His claim is only that 42 U.S.C. § 300(a) *does not preempt* state laws

that require more extensive parental involvement than the bare minimum re-quired by the Title X statute. The defendants' citation of *Planned Parenthood of Houston & Southeast Texas v. Sanchez*, 403 F.3d 324 (5th Cir. 2005),[14] is equally unavailing because Texas is not imposing conditions on the receipt of federal funds; it is simply insisting that Title X participants comply with the state's generally applicable laws—in the same way that Title X recipients must obey and remain subject to the state's laws prohibiting robbery and murder.

**C.    None Of The Court Decisions Holding That 42 U.S.C. § 300(a) Preempts State Parental-Notification Laws Have Provided Persuasive Reasons For That Conclusion**

The appellants are certainly correct to observe that other courts have held that Title X preempts state parental-notification and consent laws. *See* Appellants' Br. at 25 (citing *Planned Parenthood Federation of America, Inc. v. Heckler*, 712 F.2d 650, 663–64 (D.C. Cir. 1983)); *id.* at 29 (citing authorities)). But none of those cases are binding authority, and they may not be followed unless this Court, in its independent judgment, finds them persuasive. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011); *Milner v. Department of the Navy*, 562 U.S. 562, 576 (2011) ("[W]e have no warrant to ignore clear statu-tory language on the ground that other courts have done so."). And none of these court rulings have explained *how* the language of 42 U.S.C. § 300(a) can possibly preempt parental-consent laws such as section 151.001(6). As we

---

14.   See Appellants' Br. at 30.

have explained, the text of 42 U.S.C. § 300(a) establishes a *floor* and not a ceiling for parental involvement. *See* 42 U.S.C. § 300(a) ("To the extent practical, entities which receive grants or contracts under this subsection *shall encourage family participation in projects assisted under this subsection*." (emphasis added)). None of the court decisions that find "preemption" acknowledge this inconvenient fact.[15] Instead, the opinions ruminate about Congress's "purpose" and "intent"[16] and rely on legislative history,[17] which is not law of

---

15. The Eighth Circuit, for example, falsely claimed that 42 U.S.C. § 300(a) requires family participation "*only* to the extent practical," replacing the enacted statutory language with a statute of its own creation. *See County of St. Charles v. Missouri Family Health Council*, 107 F.3d 682, 684 (8th Cir. 1997) (emphasis added) (internal quotation marks omitted).

16. *See Planned Parenthood Federation of America, Inc. v. Heckler*, 712 F.2d 650, 651 (D.C. Cir. 1983) ("[T]he regulations are fundamentally inconsistent with Congress' intent and purpose in enacting Title X"); *Planned Parenthood Ass'n of Utah v. Matheson*, 582 F. Supp. 1001 (D. Utah 1983) ("Congressional intent in enacting Title X is relevant to determining whether the state law does major damage to substantial federal interests. As did the District of Columbia and the Second Circuits, this court concludes that the provision of family planning services to minors on a confidential basis was critically significant to Congress when it enacted and amended Title X. Consequently, the court finds that H.B. 343 would do major damage to the federal interests created by Title X by preventing Title X grantees from providing confidential services to eligible minors on request. In these circumstances, the Supremacy Clause dictates that the federal law prevail over H.B. 343."); *Doe v. Pickett*, 480 F. Supp. 1218, 1221 (S.D. W. Va. 1979) ("The requirement of parental consent as a condition to the provision of these family planning services to a minor clearly thwarts the Act's comprehensive goals"); *id.* ("[M]edical advice and other family planning services without parental involvement is essential if the purposes of the family planning title of the Public Health Service Act are to be achieved.").

any sort. *See Magwood v. Patterson*, 561 U.S. 320, 334 (2010) ("We cannot replace the actual text with speculation as to Congress' intent."); *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) ("[L]egislative history is not the law."). The enacted language of 42 U.S.C. § 300(a) is the *only* relevant consideration, and any argument for preemption must be grounded in what that statute actually says. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1737 (2020) ("Only the written word is the law"); *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) ("In all cases, the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress."); *id.* ("There is no federal preemption *in vacuo*, without a constitutional text, federal statute, or treaty made under the authority of the United States." (citation and internal quotation marks omitted)).

The appellants seem to think that the brute fact that other courts have found that 42 U.S.C. § 300(a) "preempts" state parental-consent laws is somehow a reason for this Court to do the same. But none of those cases present an argument based on the language of 42 U.S.C. § 300(a), and neither does the appellants' briefing. There is simply no conflict between a federal statute that requires Title X entities to "encourage family participation" and a state statute that requires those entities to obtain parental consent before

17. *See Planned Parenthood*, 712 F.2d at 656–61; *County of St. Charles* 107 F.3d at 684 ("[T]he legislative history indicates that Congress did not desire mandatory parental notification or parental consent for a minor to receive Title X services.").

dispensing prescription contraception to minors. And until the appellants can explain *how* the text of 42 U.S.C. § 300(a) contradicts the laws of Texas, its preemption argument cannot get off the ground.

> **D.     42 C.F.R. § 59.10(b) Does Not Preempt Texas's Parental-Consent Laws, And The Secretary Had No Authority To Issue This Regulation In Any Event**

After Mr. Deanda filed his lawsuit, Secretary Becerra issued 42 C.F.R. § 59.10(b), which purports to explicitly prohibit Title X projects from notifying parents or requiring parental consent before dispensing family-planning services to minors. 42 C.F.R. § 59.10(b) provides:

> To the extent practical, Title X projects shall encourage family participation. However, Title X projects may not require consent of parents or guardians for the provision of services to minors, nor can any Title X project staff notify a parent or guardian before or after a minor has requested and/or received Title X family planning services.

42 C.F.R. § 59.10(b). The appellants claim that this newly minted regulation preempts section 151.001(6) and requires this Court to dismiss Mr. Deanda's claims for relief. *See* Appellants' Br. at 31 ("Federal regulations have no less preemptive effect than federal statutes." (citation and internal quotation marks omitted)). It does nothing of the sort.[18]

---

18.    The appellants criticize the district court for "fail[ing] to fully consider HHS's regulation," Appellants' Br. at 34, yet they barely mentioned 42 C.F.R. § 59.10(b) in their district-court briefing and never presented any analysis or preemption argument based on the regulation. ROA.643; ROA.647; ROA.659; TOA.661; ROA.719; ROA.725. The district court can be forgiven failing to "fully consider" arguments that were never presented to it.

42 C.F.R. § 59.10(b) does not say anything about state parental-consent laws; it merely says that Title X projects may not require parental consent (or notify parents) before dispensing family-planning services to minors. That does not preempt the laws of Texas, and it does exempt Title X participants from those the requirements of those laws. If the laws of Texas require parental consent before distributing birth control to minors, and 42 C.F.R. § 59.10(b) says that Title X participants are forbidden to obtain parental consent when distributing birth control to minors, then the upshot is that no Title X projects can operate in Texas. It does not mean that Texas's parental-consent laws are "preempted" by 42 C.F.R. § 59.10(b).

The situation is no different from a regulation requiring Title X projects to behave in a manner that violates a state's abortion or medical-licensing laws. A regulation of that sort would not "preempt" the state's laws; it would simply make it impossible for a Title X project to lawfully operate in that state. The Secretary cannot preempt a state's parental-consent laws (or any other state law) by regulation unless Congress has authorized or empowered him to do so, and there is nothing in 42 U.S.C. § 300(a) that delegates preempting powers of that sort to the Secretary. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) ("[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress."); *West Virginia v. EPA*, 142 S. Ct. 2587, 2607–08 (2022) ("Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some

measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted." (citation and internal quotation marks omitted)). The Secretary has no more power to "preempt" a state's parental-consent laws by attaching conditions to the receipt of Title X funds than he has power to preempt a state's abortion or medical-licensing laws through this maneuver. And if the Secretary wants to impose conditions that make it impossible for a Title X project to lawfully operate in a state, then the consequence is that Title X projects cannot operate in that state— not that the state's laws are "preempted" by the conditions that the Secretary has chosen to impose on the receipt of Title X funds.

There is a more serious problem with the appellants' reliance on 42 C.F.R. § 59.10(b). Federal regulations can preempt state law only when the regulation is authorized by statute and "in accordance with law." *See* 5 U.S.C. § 706(2)(A). And 42 U.S.C. § 300(a) merely establishes a baseline minimum requirement for parental involvement, by requiring Title X projects to "encourage family participation" "to the extent practical." The statute does not in any way limit the ability of Title X projects to obtain parental consent or notify parents before dispensing family-planning services to minors, and it does not delegate powers to the Secretary to impose limitations of that sort on Title X participants. The Secretary has no statutory authority to prohibit Title X projects from requiring parental involvement that extends beyond the minimum requirements of 42 U.S.C. § 300(a), and he assuredly has no authority to preempt state laws requiring that additional involvement. Finally,

the regulation's categorical ban on *any* parental notification at *any* time—even when the minor consents to the notification—is incompatible with the statutory command that Title X participants "encourage family participation" "to the extent practical." How can a Title X project "encourage family participation" "to the extent practical" when it is forbidden under *any* circumstance to even notify a parent or guardian of a minor seeking services, even when the minor *wants* her parents to be notified? The appellants' brief makes no attempt to explain how that aspect of the regulation can co-exist with the mandatory family-participation requirements of 42 U.S.C. § 300(a).

## III. The District Court Correctly Held That The Defendants Are Violating Mr. Deanda's Constitutional Right To Direct The Upbringing Of His Children

There is no need for the Court to reach the constitutional question if it agrees with Mr. Deanda's anti-preemption arguments, as section 151.001(6) fully protects the constitutional interests that Mr. Deanda is asserting in this litigation. *See Escambia County v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam) ("[N]ormally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case"); *Harris v. McRae*, 448 U.S. 297, 306–07 (1980) ("It is well settled that if a case may be decided on either statutory or constitutional grounds, this Court, for sound jurisprudential reasons, will inquire first into the statutory question. This practice reflects the deeply rooted doctrine that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." (citation and

internal quotation marks omitted)); *Parker v. County of Los Angeles*, 338 U.S. 327, 333 (1949) ("The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity."). But if the Court chooses to resolve the issue, then it should affirm the district court's constitutional holding.

We acknowledge at the outset that the right of a parent to direct the upbringing of his children does not appear anywhere in the text of the Constitution. It is a court-created "substantive due process" right,[19] and its contours are defined by judicial precedent rather than by anything that the Constitution says. But the Supreme Court has told us that the test for a "fundamental" right turns on whether the asserted right is "deeply rooted in this Nation's history and tradition," and it requires courts to apply a "careful description" of the asserted fundamental liberty interest. *See Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997); *see also Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). The right of parents to consent to the medical treatment of their children—unlike the court-invented rights to contraception,[20] homosexual activities,[21] and same-sex marriage[22]—is assuredly an interest that is "deeply rooted in this Nation's history and tradition," and the time-honored substantive-due-process rights should receive at

---

19. *See Troxel v. Granville*, 530 U.S. 57, 91–92 (2000)*Pierce v. Society of Sisters*, 268 U.S. 510, 534 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923).

20. *See Griswold v. Connecticut*, 381 U.S. 479 (1965).

21. *See Lawrence v. Texas*, 539 U.S. 558 (2003).

22. *See Obergefell v. Hodges*, 576 U.S. 644 (2015).

least as much protection as the court-imposed substantive-due-process rights that became fashionable only after the sexual revolution. Any infringement on this right should therefore be subjected to strict scrutiny, which allows the government to override this fundamental right only when necessary to advance a compelling governmental interest.

The appellants argue for a looser, interest-balancing approach that would weigh the parent's interests against those of the child and the government—an approach similar to what was employed by the Sixth Circuit in *Doe v. Irwin*, 615 F.2d 1162, 1168 (6th Cir. 1980), and the Third Circuit in *Anspach v. Philadelphia*, 503 F.3d 256, 262 (3d Cir. 2007). *See* Appellant's Br. at 37–47. Tests of this sort are largely indeterminate, because there is no algorithm to determine when a competing interest should prevail over another, and arguments based on interest balancing are almost impossible to falsify. We certainly cannot quarrel with the appellants' claims that minors will occasionally have interests in obtaining birth control without their parents' knowledge, and the government may also have interests making birth control widely available in an effort to prevent unwanted pregnancies. Our claim is only that these interests are insufficient to prevail under the strict-scrutiny standard that typically applies to laws that implicate "fundamental" substantive-due-process rights. The government would certainly have a compelling governmental interest in overriding the wishes of parents who seek to deny life-saving medical treatment to their children, and it might have a compelling interest in requiring vaccinations over parental objections. But there is no

such "compelling" interest at stake when it comes to the provision of birth control. These are not matters of life or death, and parental authority cannot be subordinated to the views of federal officials or Title X entities who think they can make better decisions regarding a child's welfare.

## IV. THE DISTRICT COURT CORRECTLY VACATED THE SECOND SENTENCE OF 42 C.F.R. § 59.10(b)

We have already explained that the Secretary had no authority to issue the second sentence of 42 C.F.R. § 59.10(b) or impose that requirement on Title X recipients. *See* Section II.D, *supra*. If the Court disagrees with our argument, then it should reverse the district court's vacatur of the second sentence of 42 C.F.R. § 59.10(b). But the appellants are making a more ambitious claim: That the district abused its discretion in vacating the second sentence of 42 C.F.R. § 59.10(b) *even if* it was correct to conclude that the Secretary had no authority to issue that regulation. *See* Appellants' Br. at 48–51. The appellants' argument is untenable.

The appellants first claim that Mr. Deanda's request for vacatur of 42 C.F.R. § 59.10(b) come too late in the day because he did not "raise an APA claim in his complaint." Appellants' Br. at 48. But Mr. Deanda can be forgiven for omitting an APA claim from his complaint. 42 C.F.R. § 59.10(b) did not exist when Mr. Deanda filed his complaint, and neither Mr. Deanda nor his attorneys have powers of divination. And the deadline to amend the pleadings had long since passed when 42 C.F.R. § 59.10 become final on October 20, 2021. ROA.323 (scheduling order). In all events, it does not matter

whether Mr. Deanda raised an APA claim or requested vacatur of 42 C.F.R. § 59.10(b) in his pleadings, because Rule 54(c) requires this Court to "grant the relief to which each party is entitled, *even if the party has not demanded that relief in its pleadings*." Fed. R. Civ. P. 54(c) (emphasis added). And if that were not enough, the catch-all request for relief in Mr. Deanda's complaint was sufficient to preserve a request for vacatur of a future agency rule. ROA.21 (asking the court to "award all other relief that the Court deems just, proper, or equitable"); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016) (a request in the complaint to issue "such other and further relief as the Court may deem just, proper, and equitable" is sufficient to preserve claims that go unmentioned in the pleadings), overruled on other grounds in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2245 (2022); *Sapp v. Renfroe*, 511 F.2d 172, 176, n.3 (5th Cir. 1975) (allowing claim for damages raised for first time on appeal in light of Rule 54(c) and the catchall prayer for relief in plaintiff's complaint).

The defendants also make an estoppel argument by pointing out that Mr. Deanda explicitly disclaimed an intent to seek an APA remedy in his earlier briefing. *See* Appellants' Br. at 48. But Mr. Deanda first disclaimed an APA remedy in his summary-judgment brief of July 23, 2021, at a time when 42 C.F.R. § 59.10 did not exist. ROA.395-396 ("Mr. Deanda has not brought a 'facial challenge' (or any type of 'challenge') to an agency rule, and he is not asking this court to 'hold unlawful and set aside' any agency rule under section 706 of the APA.'). That statement does not preclude or estop Mr. Dean-

da from pursuing a vacatur remedy against a rule that did not exist at that time. This statement was, however, repeated verbatim in a subsequent filing of July 25, 2022,[23] which post-dates the enactment of 42 C.F.R. § 59.10(b). But the context of that statement was to rebut the defendants' statute-of-limitations defense by pointing out that limitations are relevant only when pursuing a remedy against past agency action that took place more than six years ago. The second sentence of 42 C.F.R. § 59.10(b) was enacted barely more than one year ago, and it is well within the six-year statute of limitations. Nothing in Mr. Deanda's argument on the limitations issue indicates or implies that a recently enacted rule such as 42 C.F.R. § 59.10(b) would be off-limits, and nothing Mr. Deanda said on the limitations issue is inconsistent with his current stance that 42 C.F.R. § 59.10 cannot survive the district court's interpretations of 42 U.S.C. § 300(a) and the Fourteenth Amendment.

The appellants also claim that the district court erred by vacating the regulation because it should have limited its relief to Mr. Deanda rather than issuing a universal remedy by vacating the agency rule across the board. *See* Appellants' Br. at 49. But the command of the APA is mandatory, not discretionary, and it says that a reviewing court "shall" (not "may") "hold unlawful and set aside" agency rules that are "not in accordance with law." 5 U.S.C. § 706(2)(A).And the precedent of this Court interprets the "set

_____

23. ROA.607.

aside" command to require universal vacatur of unlawful agency actions rather than a more limited remedy that "sets aside" the unlawful rule as applied only to the named plaintiff. *See Data Marketing Partnership, LP v. United States Dep't of Labor*, 45 F.4th 846, 859(5th Cir. 2022) ("The APA gives courts the power to 'hold unlawful and set aside agency action[s].' 5 U.S.C. § 706(2). Under prevailing precedent, § 706 'extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers courts to "set aside"—*i.e.*, formally nullify and revoke—an unlawful agency action.' (citations omitted)); *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."). If this Court agrees with Mr. Deanda that the second sentence of 42 C.F.R. § 59.10(b) is unlawful, then it cannot leave that regulation in place consistent with the APA's mandatory commands and the precedent of this Court.

# CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted.

 /s/ Jonathan F. Mitchell

GENE P. HAMILTON                    JONATHAN F. MITCHELL
Vice-President and General Counsel  Mitchell Law PLLC
America First Legal Foundation      111 Congress Avenue, Suite 400
611 Pennsylvania Avenue SE, #231    Austin, Texas 78701
Washington, DC 20003                (512) 686-3940 (phone)
(202) 964-3721                      (512) 686-3941 (fax)
gene.hamilton@aflegal.org           jonathan@mitchell.law

Dated: June 23, 2023                *Counsel for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I certify that on June 23, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Fifth Circuit and served through CM/ECF upon:

Abby C. Wright
Courtney L. Dixon
Appellate Staff Civil Division, Room 7246
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-8189
abby.wright@usdoj.gov
courtney.l.dixon@usdoj.gov

*Counsel for Defendants-Appellants*

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiff-Appellee*

# CERTIFICATE OF COMPLIANCE

with type-volume limitation, typeface requirements,
and type-style requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 11,789 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
Dated: June 23, 2023                                    *Counsel for Plaintiff-Appellee*

**CERTIFICATE OF ELECTRONIC COMPLIANCE**

Counsel also certifies that on June 23, 2023, this brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, through the court's CM/ECF document filing system, https://ecf.ca5.uscourts.gov/

Counsel further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.


/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiff-Appellee*