No. 23-10159

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

ALEXANDER R. DEANDA, on Behalf of Himself and Others Similarly Situated,

Plaintiff-Appellee,

v.

XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services;
JESSICA SWAFFORD MARCELLA, in her official capacity as Deputy Assistant
Secretary for Population Affairs; UNITED STATES OF AMERICA,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas

REPLY BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

ABBY C. WRIGHT
COURTNEY L. DIXON
*Attorneys, Appellate Staff
Civil Division, Room 7246
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-8189*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ...................................................................1

ARGUMENT .......................................................................................................1

I.     Plaintiff Lacks Article III Standing .......................................................1

II.    State Parental-Consent Laws Do Not Limit Title X Federal
       Family-Planning Services .....................................................................10

III.   The District Court Erred in Recognizing an Abstract
       and Unqualified Constitutional Right of Parents to Insist
       that Contraception Not Be Provided to Minors....................................19

IV.    Even Assuming It Were Correct on the Merits, the District
       Court Abused Its Discretion in Vacating HHS's Regulation ...............22

CONCLUSION ..................................................................................................24

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                   **Page(s)**

*Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health,*
    503 F.3d 256 (3d Cir. 2007) ......................................................................... 20, 21

*Arizona v. United States,*
    567 U.S. 387 (2012) .................................................................................. 14, 15

*Cantrell v. City of Long Beach,*
    241 F.3d 674 (9th Cir. 2001) ............................................................................ 7

*Central & S.W. Servs., Inc. v. U.S. EPA,*
    220 F.3d 683 (5th Cir. 2000) .......................................................................... 23

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ............................................................................................ 8

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...................................................................................... 4, 5

*County of St. Charles v. Missouri Family Health Council,*
    107 F.3d 682 (8th Cir. 1997) .......................................................................... 15

*Data Mktg. P'ship LP v. U.S. Dep't of Labor,*
    45 F.4th 846 (5th Cir. 2022) ........................................................................... 23

*Doe v. Irwin,*
    615 F.2d 1162 (6th Cir. 1980) ........................................................................ 20

*E.T. v. Paxton,*
    41 F.4th 709 (5th Cir. 2022) .......................................................................... 3, 4

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,*
    458 U.S. 141 (1982) ........................................................................................ 18

*Geier v. American Honda Motor Co.,*
    529 U.S. 861 (2000) ........................................................................... 11, 14, 17

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) .................................................................................... 23

*Hines v. Davidowitz,*
    312 U.S. 52 (1941).......................................................................................... 11

*L.W. ex rel. Williams v. Skrmetti,*
  2023 WL 4232308 (M.D. Tenn. June 28, 2023), *stay granted by*
  2023 WL 4410576 (6th Cir. July 8, 2023) ...................................................... 21

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .................................................................................................. 7

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ................................................................................................ 23

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) .................................................................................................. 5

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) .................................................................................................. 5

*Mountain States Legal Found. v. Glickman,*
  92 F.3d 1228 (D.C. Cir. 1996) ............................................................................... 6

*Parents United for Better Sch., Inc. v. School Dist. of Phila. Bd. of Educ.:*
  646 A.2d 689 (Pa. Commw. Ct. 1994) ............................................................... 10
  148 F.3d 260 (3d Cir. 1998) .................................................................................. 10

*Planned Parenthood Fed'n of Am., Inc. v. Heckler,*
  712 F.2d 650 (D.C. Cir. 1983) ....................................................... 11, 13, 15, 17

*Planned Parenthood of Hous. & Se. Tex. v. Sanchez,*
  403 F.3d 324 (5th Cir. 2005) ....................................................................... 15, 16

*Public Citizen, Inc. v. National Highway Traffic Safety Admin.,*
  489 F.3d 1279 (D.C. Cir. 2007) ................................................................ 3, 4, 6

*Shrimpers & Fishermen of the RGV v. Texas Comm'n on Envt'l Quality,*
  968 F.3d 419 (5th Cir. 2020) ........................................................................ 2, 3, 4

*State of New York v. Heckler,*
  719 F.2d 1191 (2d Cir. 1983) ....................................................................... 13, 19

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) .................................................................................................. 2

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .................................................................................................. 8

*Sutton v. St. Jude Med. S.C., Inc.,*
  419 F.3d 568 (6th Cir. 2005) ................................................................................. 6

*Telescope Media Grp. v. Lucero,*
  936 F.3d 740 (8th Cir. 2019) ................................................................. 7, 8

*303 Creative LLC v. Elenis,*
  143 S. Ct. 2298 (2023) ........................................................................... 7, 8

*TransUnion LLC v. Ramirez,*
  141 S. Ct. 2190 (2021) ...................................................................... 4, 5, 7

*United States v. Texas,*
  143 S. Ct. 1964 (2023) .............................................................................. 23

*Village of Elk Grove Vill. v. Evans,*
  997 F.2d 328 (7th Cir. 1993) ...................................................................... 6

*Wisconsin Cent. Ltd. v. United States,*
  138 S. Ct. 2067 (2018) .............................................................................. 13

**Statutes:**

Pub. L. No. 91-572, § 2(1), 84 Stat. 1504, 1504 (1970) ....................................12

Pub. L. No. 95-613, § 1(a)(1), 92 Stat. 3093, 3093 (1978) ...............................12

Pub. L. No. 97-35, 95 Stat. 357 (1981)
  (codified as amended at 42 U.S.C. § 300(a)):
    § 931(b)(1), 95 Stat. at 570.............................................................................12
    § 955(a), 95 Stat. at 587 ................................................................................13

42 U.S.C. § 300(a) ........................................ 12, 13, 14, 15, 17, 20

42 U.S.C. § 300a-4(a) ........................................................................ 18

Tex. Fam. Code § 32.003(a)(3) ............................................................. 9

Tex. Fam. Code § 151.001(a)(6) ........................................................... 9

**Regulation:**

42 C.F.R. § 59.10(b) .......................................................................... 16, 18

**Other Authorities:**

*Encourage*, Merriam-Webster, https://perma.cc/75JU-WZZW ................................... 12

*Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56,144 (Oct. 7, 2021) ...................................... 16, 17, 18

Tex. Dep't of State Health Servs., *Adolescent Health* (Aug. 2016), https://perma.cc/83Z3-WMA5 ...................................................................... 11, 19, 20

## INTRODUCTION AND SUMMARY

Plaintiff's response confirms that HHS has not violated his rights to direct the upbringing of his children.  Plaintiff does not even attempt to establish that there is a likelihood that his minor children will obtain services from a Title X provider before they turn 18.  Instead, plaintiff contends that it is sufficient for Article III standing that he is a parent of minor children in Texas.  That is flatly contrary to Article III and this Court's precedent.  Plaintiff's merits arguments fare no better.  Plaintiff fails to rebut the government's showing that the Title X statute and regulations preempt state laws that require parental consent for minors to receive family-planning services.  And plaintiff fails to robustly defend the district court's constitutional holding—with good reason.  The district court plainly erred in recognizing a fundamental constitutional right of parents to stop Title X providers from offering voluntary contraception services to adolescents without consideration of any countervailing interests.

## ARGUMENT

### I.    Plaintiff Lacks Article III Standing

Nowhere in plaintiff's response brief does he claim that his children have ever sought family-planning services from a Title X provider (or any other provider) or that there is a likelihood that any of his children still under the age of 18 might do so.  Instead, plaintiff primarily asserts that because he is a parent of daughters under the age of 18, he need not demonstrate any such likelihood.  *See, e.g.*, Br. 2-3, 13, 18.

Plaintiff's standing arguments run headlong into established precedent and should be rejected.

**A. 1.** Plaintiff does not appear to embrace the district court's holding that plaintiff has established a "probabilistic injury in fact" based on general statistics (which the court misinterpreted) concerning the availability of Title X services in the greater region. *See* ROA.739. As our opening brief explained, *see* Opening Br. 20-22, that reasoning is squarely foreclosed by this Court's precedent, which does "not recognize the concept of 'probabilistic standing' based on a non-particularized 'increased risk'—that is, an increased risk that equally affects the general public." *Shrimpers & Fishermen of the RGV v. Texas Comm'n on Envt'l Quality*, 968 F.3d 419, 424 (5th Cir. 2020) (per curiam); *accord Summers v. Earth Island Inst.*, 555 U.S. 488, 497-98 (2009) (rejecting standing theory based on a "statistical probability that some of [an organization's] members are threatened with concrete injury").

Plaintiff insists that he is facing a particularized increased risk of harm, but, like the district court, plaintiff appears to mean only that he is a parent who lives in a State where Title X grantees operate. *See* Br. 18-20. That is precisely the type of "non-particularized 'increased risk'" this Court has held insufficient to support standing. *See Shrimpers*, 968 F.3d at 424 (finding organization with members living and working within 14-miles of proposed facility failed to establish their standing to challenge the grant of an air-quality permit to the facility where the organization provided only

general modeling of an elevated risk of harm within 14 miles of the facility but no "concrete evidence" "that their members will suffer imminent injuries").

Plaintiff's defense of his "increased-risk injury" theory as limited to "only" all "parents in Texas with minor-age daughters of child-bearing years," Br. 19, confirms his errors. Plaintiff has not alleged the ages of his own children, and thus has not set forth particular facts even to demonstrate that he is a parent of minor children "of child-bearing years." *Id.*; *see* ROA.14; ROA.627 (stating only that plaintiff is the "father of three daughters under the age of 18"). Nor does plaintiff explain why his "increased-risk injury" would be limited to Texas parents, as opposed to parents in any State where Title X grantees operate or where services could be accessed. And even accepting plaintiff's purported limitations, his theory remains entirely removed from the circumstances of any individual parent and how likely it is that his or her own children would obtain Title X services. *See* Br. 18-19.

In all events, "even where increased-risk claims *are* particularized, they generally cannot satisfy the actual or imminent requirement." *E.T. v. Paxton*, 41 F.4th 709, 715 (5th Cir. 2022) (quotation marks omitted). "[T]he mere increased risk of some event occurring is utterly abstract—not concrete, direct, real, and palpable." *Public Citizen, Inc. v. National Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297-98 (D.C. Cir. 2007); *see Shrimpers*, 968 F.3d at 424 (relying on "then-Judge Kavanaugh['s]" decision in *Public Citizen*).

3

Thus, even assuming plaintiff's purported increase in risk is particularized in some sense, he is incorrect to assert that he can demonstrate standing based on a mere increase in risk alone, regardless of how speculative or remote the risk of actual injury is. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401, 410 (2013) (rejecting as "too speculative to satisfy" Article III a standing theory based on an "objectively reasonable likelihood" of harm "at some point in the future"); *Public Citizen*, 489 F.3d at 1297-98 (recognizing that it would "end-run the Supreme Court's standing precedents" to find Article III standing based on remote and "speculative increased risks" of injury (quotation marks omitted)). The mere fact that plaintiff is a father who lives in a State where Title X grantees offer voluntary services to the public does not establish that it is "certainly impending" that his own minor children will obtain those services without his knowledge or consent. *See Shrimpers*, 968 F.3d at 424-25; *see also E.T.*, 41 F.4th at 715-16 (finding plaintiffs lacked Article III injury where "the odds of any particular plaintiff" becoming injured was "speculative, and the time (if ever) when any such [injury] would occur is entirely uncertain" (quotation marks omitted)).

Plaintiff attacks a strawman in arguing that he need not wait "unless and until a Title X project actually dispenses birth control to one of his children." Br. 10-11. That is not the government's argument. "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021). But a plaintiff must show

that "the risk of harm is sufficiently imminent and substantial," *id.*, and plaintiff has made no such showing here.

The Supreme Court cases cited by plaintiff (Br. 19) only further underscore the speculative and unsupported nature of his purported increased-risk injury. Plaintiff cites, for example, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010), but in that case "declarations in the record" established "a significant risk of contamination to respondents' crops" from nearby-planted genetically modified crops as a result of naturally occurring phenomenon. *Id.* at 153 n.3, 153-54; *see Clapper*, 568 U.S. at 414 n.5, 420 (distinguishing the "concrete evidence" of harm presented in *Monsanto* from "mere conjecture" about possible future harm). Plaintiff also relies on *Massachusetts v. EPA*, 549 U.S. 497 (2007), but as our opening brief explained, the State in *Massachusetts* presented "unchallenged affidavits" establishing that rising sea levels had affected its costal land, and the Supreme Court repeatedly emphasized the State's "quasi-sovereign" interests. *Id.* at 520, 522-23; *see* Opening Br. 24. Plaintiff relies on a parenthetical citation in a footnote of that decision, *see* Br. 3, 18 (citing *Massachusetts*, 549 U.S. at 525 n.23), but places far more weight on that parenthetical than it can bear. Indeed, the Supreme Court was discussing redressability in that portion of its opinion—not injury-in-fact—and in the special context of the State's asserted "procedural right," which is also not at issue here. *See Massachusetts*, 549 U.S. at 525 & n.23; *id.* at 489, 520.

The out-of-Circuit cases cited by plaintiff (Br. 16-18) are similarly distinguishable. The harms asserted in those cases are meaningfully different from plaintiff's unsubstantiated risk of harm here, even assuming the courts of appeals in those cases correctly applied Article III principles. *E.g.*, *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234-35 (D.C. Cir. 1996) (finding environmental plaintiff had standing to challenge governmental action contributing to wildfire risk where plaintiff presented evidence establishing that risk and that he recreated in "precisely the area affected"); *but see Public Citizen*, 489 F.3d at 1294-96 (questioning whether *Mountain States* is consistent with Article III and construing it in any event as requiring a "*substantially* increased risk of harm" and "a *substantial* probability of [actual] harm with that increase taken into account").[1]

2. Perhaps recognizing the weakness of a standing theory based on an increased risk that his children will access family-planning services, plaintiff asserts that this Court "need not" address that aspect of the district court's holding because plaintiff is injured from "the loss of his state-law right to consent to his children's medical treatment." Br. 21. As explained, however, this theory is also premised on

---

[1] *See also, e.g.*, *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 570-75 (6th Cir. 2005) (finding plaintiffs who had been surgically "implanted" with allegedly defective medical device had standing to bring tort suit for "medical monitoring costs"); *Village of Elk Grove Vill. v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993) (finding village had standing to challenge grant of construction permit for tower on floodplain near village where village provided affidavit establishing its flood risk and explaining how the construction of the tower would increase that known risk).

plaintiff's minor children receiving family-planning services: without some showing that his children will imminently receive these services, there is nothing to which plaintiff can even theoretically consent. *See* Opening Br. 22-23.

Plaintiff misses the relevant point in asserting that "states may create legally cognizable rights in their statutes." Br. 7. Even if state law may "create interests that support standing in federal courts," that is a separate question from whether plaintiff has alleged any injury to his state-law right that "suffice[s] under Article III." *See Cantrell v. City of Long Beach*, 241 F.3d 674, 683-84 (9th Cir. 2001). Where plaintiff has not provided any facts to suggest his children are likely to seek or obtain Title X services, he has not shown that HHS has caused any injury to his state-law right to consent that is "concrete," "particularized," and "actual or imminent." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks omitted). To the extent plaintiff argues that the mere existence of a state law protecting his interests is alone sufficient, *see* Br. 8-9, that is plainly incorrect. Article III is a constitutional limitation on the power of federal courts; the mere existence of a state-law right cannot alone suffice to establish standing any more than the mere existence of a federal right. *See Lujan*, 504 U.S. at 576-77; *TransUnion*, 141 S. Ct. at 2205.

Plaintiff's reliance on *303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023) and *Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019), fails. Those cases did not recognize an abstract loss of a "right to decide" as a basis for Article III standing. Br. 11. They involved First Amendment pre-enforcement challenges brought by

businesses that courts held established "a credible threat" of prosecution under the challenged laws. *303 Creative*, 143 S. Ct. at 2308-10 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014)); *see Telescope*, 936 F.3d at 749-50.

Plaintiff's "divorce" analogy (Br. 6) is even further afield. HHS has not "transferred" plaintiff's parental rights to anyone else or taken any action comparable to a court-entered "divorce decree" determining parental rights vis-à-vis former spouses. *Id.* HHS funds voluntary family-planning projects without a requirement that Title X providers affirmatively seek parental consent for those federal services, and plaintiff has not alleged that his minor children have ever sought or are likely to seek Title X services. Plaintiff does not have standing to sue HHS for its administration of a federal program he does not allege his minor children are likely to encounter. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 108-09 (1983) ("If [plaintiff] has made no showing that he is realistically threatened by [the challenged practice], then he has not met the requirements for seeking an injunction in a federal court.").

Just as he failed to do with respect to his increased-risk theory, plaintiff makes no serious attempt to cabin the remarkable reach of his "state-law legal entitlement" theory. Br. 9. Plaintiff acknowledges that, under his argument, every parent of a "minor child" in Texas has standing to challenge Title X. Br. 10. Thus, the parent of a three-year-old would have standing to sue HHS for its administration of the Title X program. As our opening brief explained, accepting plaintiff's theory would distort Article III beyond recognition. Opening Br. 23. In response, plaintiff suggests that

"only those parents who wish to" contest Title X's preemption of Texas law would sue. Br. 10. But that is merely a recognition of the common-sense fact that potential plaintiffs are, in general, individuals that disagree with the program they seek to challenge—it is not a meaningful limitation on plaintiff's state-law theory of injury, and a desire to sue cannot create standing.

**B.** Although plaintiff purports to advance two additional standing theories that the district court did not adopt, those theories merely repackage the same arguments discussed above and should be rejected for the same reasons.

Plaintiff asserts that he is injured from the "loss of assurance" that his children will not obtain contraception without his consent, which plaintiff claims was "provided" by Texas law. Br. 15 (citing Tex. Fam. Code § 151.001(a)(6)). But that is simply a rephrasing of his "state-law legal entitlement" theory, Br. 9, and it fails for the reasons already explained. Plaintiff overstates, moreover, the Texas provision on which he relies. That provision does not "outlaw[] the distribution of prescription contraception to minors without parental consent," Br. 15, but rather provides Texas parents a right to consent to certain "medical and dental care" for a minor child, subject to exceptions, Tex. Fam. Code § 151.001(a)(6); *id.* § 32.003(a)(3). And, again, plaintiff has not provided any facts to suggest his minor children are likely to obtain medical care from a Title X provider.

Plaintiff's repackaging of the same argument as HHS "subverting his authority as a parent," Br. 12, fares no better. This theory, too, is premised on plaintiff's

assertions that HHS is "administering a program" available to all on a voluntary basis that plaintiff fears his minor children might hypothetically access at some unknown future time.  Br. 12-13.  Plaintiff's reliance on *Parents United for Better Schools, Inc. v. School District of Philadelphia Board of Education (PUBS)*, 646 A.2d 689 (Pa. Commw. Ct. 1994), fails for the reasons explained in our opening brief.  *See* Opening Br. 24.  Even assuming that state-court case was correctly decided, it involved a condom-distribution program administered in public schools that public-school children were required to participate in as a default.  *PUBS*, 646 A.2d at 690-91.[2]  Title X, by contrast, is a voluntary federal program providing family-planning services to the public through Title X providers, none of whom plaintiff identifies or alleges his minor children are likely to visit.

## II.    State Parental-Consent Laws Do Not Limit Title X Federal Family-Planning Services

Plaintiff's attempts to defend the district court's decision on the merits are no more successful than his attempts to demonstrate standing.

For approximately four decades, courts have recognized that state parental-consent requirements cannot constrain the provision of Title X federal family-

---

[2] Plaintiff also cites the Third Circuit's decision in *Parents United for Better Schools, Inc. v. School District of Philadelphia Board of Education*, 148 F.3d 260 (3d Cir. 1998).  The Third Circuit's decision does not discuss Article III standing, and in any event, that case involved the same condom-distribution program being administered in Philadelphia public schools, *see id.* at 264, and is therefore distinguishable for the same reasons.

planning services. *See, e.g., Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 663-64 (D.C. Cir. 1983). The State of Texas has itself recognized that "[u]nder federal law, minors may give their own consent and receive confidential family planning services on request" from the "Title X Family Planning Program." Tex. Dep't of State Health Servs., *Adolescent Health* 13 (Aug. 2016), https://perma.cc/83Z3-WMA5.[3] Plaintiff nonetheless insists that Title X does not preempt Texas's parental-consent requirements and that adolescents' access to Title X federal services may therefore be conditioned on a state-law requirement of parental consent. *See* Br. 23. That argument, like the district court's holding, fails to heed the language of Title X and ignores the extent such a requirement would interfere with adolescents' access to important federal family-planning services.

**A.** Our opening brief established, *see* Opening Br. 25-35, that to the extent Texas law requires parental consent for minors to obtain family-planning services, that law cannot validly restrain Title X federal services because it would stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" under the Title X program. *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

---

[3] For this reason, plaintiff errs in referring in his brief to "*Texas* . . . insisting that Title X participants comply with" a parental-consent requirement. *See* Br. 31 (emphasis added). The State of Texas is not a party to this suit and, as explained, has recognized that adolescents in Texas may receive confidential services under the Title X program.

In urging to the contrary, plaintiff asserts "that there is no evidence or reason to believe" that Congress intended for adolescents to receive Title X services without their parents' consent. *See* Br. 26. That argument ignores Title X's text and context. Title X was designed to make family-planning services "readily available to all persons desiring such services," Pub. L. No. 91-572, § 2(1), 84 Stat. 1504, 1504 (1970), and Congress expressly included "services for adolescents" among the family-planning services that Title X must provide, Pub. L. No. 95-613, § 1(a)(1), 92 Stat. 3093, 3093 (1978). Congress considered the issue of family participation in the Title X program, and Congress amended the statute to direct only that grantees "encourage family participation" "[t]o the extent practical." Pub. L. No. 97-35, § 931(b)(1), 95 Stat. 357, 570 (1981) (codified as amended at 42 U.S.C. § 300(a)).

As our opening brief explained, Congress's choice of the statutory language "encourage family participation" "[t]o the extent practical," 42 U.S.C. § 300(a), demonstrates that Congress did not intend to condition adolescents' receipt of Title X family-planning services on the consent or notification of their parents. *See* Opening Br. 26-29. Plaintiff does not meaningfully dispute the government's showing that Congress's use of the phrase "*encourage* family participation," 42 U.S.C. § 300(a) (emphasis added), indicates that Congress intended only to direct grantees to communicate with those seeking services to motivate and advise them to include their family in their decision-making. *See* Opening Br. 26-27; *see also Encourage*, Merriam-Webster, https://perma.cc/75JU-WZZW (defining "encourage" as "to inspire with

12

courage, spirit, or hope"; "to spur on"). And even then, Congress was not categorical: it specified "[t]o the extent practical," 42 U.S.C. § 300(a), an important "qualifier" indicating that Congress understood that even the "goal of encouraging family participation may well have to give way to other," competing considerations, *see Planned Parenthood Fed'n of Am. v. Heckler*, 712 F.2d at 656. It thus cannot be the case that, as plaintiff urges, every Title X provider in Texas must instead demand parental consent before providing federally funded services.

Plaintiff also acknowledges (Br. 30) that Congress used materially different language in Title XX—a separate grant program under the Public Health Service Act related to adolescent pregnancy and sexual health. Congress expressly provided under Title XX that grantees must "notify the parents or guardians of any unemancipated minor requesting services" and, with limited exceptions, "obtain the permission of such parents or guardians with respect to the provision of such services." Pub. L. No. 97-35, § 955(a), 95 Stat. at 587; *see State of New York v. Heckler*, 719 F.2d 1191, 1197 (2d Cir. 1983) (emphasizing Congress's different language in Title X and XX and noting that Congress "[o]bviously" "knew how to require parental notice and consent when that was its intention"); *accord Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071-72 (2018) (recognizing that courts generally "presume differences in language like this convey differences in meaning" that are to be "respect[ed], not disregard[ed]").

Against all of this, plaintiff asserts that Congress's considered choice not to require parental consent for Title X services is irrelevant to whether *state law* may

13

impose a parental-consent requirement on those federal services. *See* Br. 31-32. But the Supreme Court's obstacle-preemption precedent establishes otherwise. *See, e.g., Arizona v. United States*, 567 U.S. 387, 405-07 (2012) (recognizing that where Congress made "deliberate choice" not to impose certain criminal penalties on noncitizens, "[i]t follow[ed]" under obstacle-preemption principles that a State law nonetheless imposing such penalties was preempted); *see also, e.g., Geier*, 529 U.S. at 878-82 (finding that where federal-safety standard reflected agency's "deliberate[]" decision to allow a variety of safety devices instead of an "all airbag" approach, a state-tort duty imposing airbag requirement was "obstacle" to federal scheme). Thus, where Congress directly considered the question of adolescent participation and parental involvement in Title X services and made the deliberate choice only to direct grantees to "encourage family participation," "[t]o the extent practical," not to require parental consent, 42 U.S.C. § 300(a), a parental-consent requirement cannot nonetheless be imposed on Title X services under state law. *See Arizona*, 567 U.S. at 405-07. To do so would not only impose a requirement on Title X services that Congress itself chose not to require but would also deter and prevent adolescents from receiving those services Congress intended Title X to provide. *See* Opening Br. 29-30, 32-33; *see also* American Acad. of Pediatrics Amicus Br. 10-14.

Plaintiff thus mischaracterizes the government's preemption argument as asking this Court to inquire into "the court-perceived purposes of" Title X and determine for itself how those purposes should be balanced. *See* Br. 25-26. To the

contrary, the statutory text and context of Title X establish that *Congress* considered the issue, and the approach Congress chose was to direct grantees to "encourage family participation," "[t]o the extent practical," 42 U.S.C. § 300(a), not to require parental consent—a different approach that would have carried different costs. *See* Opening Br. 29-30, 33-34. Plaintiff's argument, like the district court's holding, fails to give appropriate weight to Congress's "considered judgment." *See Arizona*, 567 U.S. at 405.

Plaintiff makes a similar error (Br. 32) in dismissing the decisions of other courts of appeals. *See, e.g., County of St. Charles v. Missouri Family Health Council*, 107 F.3d 682, 684-85 (8th Cir. 1997) (recognizing that "[a]ll the circuits which have considered the validity of parental consent requirements for adolescents to receive Title X federal services have found them prohibited by statute, regardless of whether they are based on state law"); Opening Br. 29 (collecting cases). Those decisions did not, as plaintiff asserts, simply "ruminate about Congress's 'purpose' and 'intent,'" Br. 32, but rather interpreted the "[s]tatutory language" of 42 U.S.C. § 300(a) in its context, including Congress's choice to explicitly require parental consent and notification under Title XX. *See, e.g., Planned Parenthood Fed'n of Am.*, 712 F.2d at 656 & nn.29-30.

Plaintiff's effort to dodge this Court's decision in *Planned Parenthood of Houston & Southeast Texas v. Sanchez*, 403 F.3d 324 (5th Cir. 2005), likewise fails. This Court recognized in *Sanchez* that under the Supremacy Clause, a State cannot "impose

15

regulations that restrict the scope of" the Title X program and disqualify entities from participating in Title X that Congress and HHS determined to be eligible. *Id.* at 340-41, 338-41, 341 n.84. Plaintiff suggests that *Sanchez* involved a condition placed directly on "the receipt of federal funds" rather than a "generally applicable" state law. Br. 31. But plaintiff does not develop that argument or explain why the nature of the state law affects whether it "would seriously undermine and obstruct Congress's" objectives if permitted to apply to Title X federal services. *Sanchez*, 403 F.3d at 341. Unlike the "generally applicable" state criminal laws that plaintiff references, Br. 31, a state parental-consent requirement would impose conditions on Title X federal services that Congress chose not to require and that would interfere with adolescents' ability to access those services. *See* Opening Br. 29-30; *supra* p. 13.

**B.** HHS's October 2021 regulation, which has "no less preemptive effect than [a] federal statute[]," *Sanchez*, 403 F.3d at 336, removes any doubt that Texas's parental-consent requirement cannot constrain the provision of Title X federal services. That regulation "add[s] specific language" to 42 C.F.R. § 59.10(b) providing that Title X grantees must "encourage family participation" "[t]o the extent practical," but explaining that grantees may not require parental consent or notify parents that an adolescent has sought or obtained Title X services. *See Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56,144, 56,166-67 (Oct. 7, 2021); *see* 42 C.F.R. § 59.10(b).

Plaintiff asserts that HHS's regulation does not preempt state law because it does not specifically mention preemption or state-law requirements. *See* Br. 35. But HHS was not required to provide "a formal agency statement of pre-emptive intent" or a "specific, formal agency statement identifying conflict" with state laws in order for its regulation to have preemptive effect. *See Geier*, 529 U.S. at 884-85. HHS's regulation makes explicit the agency's "longstanding" understanding of the "legal requirements" of the Title X statute. *See* 86 Fed. Reg. at 56,166. In particular, the agency explained in its rulemaking that Congress in Title X did not "mandat[e]" parental participation but instead directed grantees to "encourage family participation" "to the extent practical." *Id.* (quoting 42 U.S.C. § 300(a)). And HHS explained that courts for "decades" have interpreted the Title X statute to protect adolescents' "rights to receive confidential services under the Title X program" without a requirement of parental notification or consent. *See id.* (citing 42 U.S.C. § 300(a) and *Planned Parenthood Fed'n of Am.*, 712 F.2d 650).

HHS's regulation thus reflects the agency's and Congress's decades-long judgment that confidentiality is critically important for Title X services and that adolescents' access to such services should not be conditioned on parental notification or a requirement of parental consent. *See* 86 Fed. Reg. at 56,166-67. A state-law requirement of parental consent for adolescents to access family planning services plainly conflicts with that judgment and cannot validly be applied to Title X federal family-planning services.

Plaintiff similarly errs in suggesting that Congress was required to explicitly "authorize" HHS to "preempt" state law in order for HHS's regulation to have preemptive effect. Br. 35. The Supreme Court has made clear that "[a] pre-emptive regulation's force does not depend on express congressional authorization to displace state law." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154-55 (1982). The relevant question is whether HHS acted "within the scope of [its] delegated authority" in promulgating its regulation, *see id.*, and HHS plainly did so here. Congress gave the Secretary express authority to promulgate regulations governing grants under the Title X program, 42 U.S.C. § 300a-4(a), and as explained, HHS's regulation is consistent with the text, structure, and purpose of Title X as well as over 40 years of judicial precedent interpreting the Title X statute. *See* 86 Fed. Reg. at 56,166; *see also* Opening Br. 26-32.

Plaintiff argues that HHS's regulation is inconsistent with the statute because the regulation would "forbid[]" parental notification "at *any* time" "even when the minor *wants* her parents to be notified." Br. 37. But if an adolescent *wants* to notify his or her parents that he or she is seeking services, the adolescent is free to do so: nothing in the regulation would prevent such communication between adolescents and their parents, and the regulation reaffirms that grantees must "encourage" such family participation. *See* 42 C.F.R. § 59.10(b). The regulation directs that Title X grantees should not themselves "notify a parent or guardian" that a minor has sought or requested services. *Id.* But that is fully consistent with Congress's direction in the

Title X statute that grantees are to encourage those seeking services to include their parents and guardians in their decision-making. *See* Opening Br. 27-29; *supra* pp. 12-13; *see also State of New York*, 719 F.2d at 1196 (recognizing that the "encouragement" Congress required "is clearly to be directed at minors to involve their parents or guardians" and it was not intended to be a direction that grantees themselves "directly involve parents or guardians").

## III. The District Court Erred in Recognizing an Abstract and Unqualified Constitutional Right of Parents to Insist that Contraception Not Be Provided to Minors

Plaintiff devotes less than four pages (Br. 37-40) to defending the district court's novel constitutional holding. Plaintiff begins by recognizing (Br. 37) that Texas's parental-consent laws would be sufficient to protect his interests and thus if Title X does not preempt Texas law, there is no need to reach the constitutional issue. And yet, the district court nonetheless proceeded to address that issue and held that irrespective of any state law, the Due Process Clause provides parents a fundamental right to "consent to [their children's] use of contraceptives," ROA.762, regardless of "the particular form of contraception or the environment in which the contraception is distributed," ROA.760. As we established, *see* Opening Br. 36-47, no precedent supports that sweeping constitutional rule—which recognizes a constitutional right of parents that seemingly extends beyond the rights provided even under Texas's own laws, *see* Tex. Dep't of State Health Servs., *Adolescent Health*, *supra*, at 13 (recognizing, for example, that nonprescription contraception is available to purchase without

19

parental consent and that minors may consent to prescription contraception in certain circumstances). And the Sixth and Third Circuits have correctly rejected such a rule. *Doe v. Irwin*, 615 F.2d 1162, 1166 (6th Cir. 1980); *see Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 266 (3d Cir. 2007).

Plaintiff's response fails to explain how HHS's administration of the Title X program has interfered with his fundamental liberty interests. Plaintiff does not dispute that Title X services are wholly "voluntary" and that his children are not required to visit a Title X provider. 42 U.S.C. § 300(a). He also does not dispute that he failed to allege that his children have ever visited a Title X provider or that they are likely to do so. Nor does he deny that he remains free as a parent to raise his children in accordance with his faith and to instruct his children never to visit a Title X provider or to obtain contraceptives (as he presumably has done with respect to non-prescription contraception available for adolescents to purchase in Texas). *See* Opening Br. 40-41; Texas Dep't of State Health Servs., *Adolescent Health*, *supra*, at 13. If plaintiff's children ever were, hypothetically, to nonetheless seek Title X services, they would be free to inform him and include him in their decision-making—indeed, they would be "encourage[d]" to do so. 42 U.S.C. § 300(a). The record is devoid of any facts to suggest that HHS has "injected itself into [plaintiff's] private familial sphere." *See Anspach*, 503 F.3d at 267.

Although plaintiff does not develop his constitutional argument, he appears to assert that "strict scrutiny" must apply to any law that would allow his minor children

to voluntarily obtain contraceptives against his wishes. *See* Br. 38-39. Plaintiff does not cite any authority to support that novel constitutional rule, which would "stretch the parental liberty interest well beyond its previously defined borders." *Anspach*, 503 F.3d at 269; *see* Opening Br. 42-44. Nor does plaintiff even attempt to reconcile such a rule with the laws of States throughout the country that affirmatively protect adolescents' rights to access general medical care on their own behalf and the laws of States that protect adolescents' rights to access contraception, specifically. *See* Opening Br. 38-39, 45; *see also* States Amicus Br. 17-22.

In a letter providing supplemental authority, plaintiff suggests that his constitutional argument is supported by district court decisions that have addressed state prohibitions on gender-affirming care for minors. *See* Pl.'s 28(j) Letter (July 4, 2023) (citing *L.W. ex rel. Williams v. Skrmetti*, 2023 WL 4232308 (M.D. Tenn. June 28, 2023), *stay granted by* 2023 WL 4410576 (6th Cir. July 8, 2023)). But a state law *prohibiting* a parent, child, and medical doctor from accessing a chosen course of medical treatment for a child is distinct from a *voluntary* government program providing services to the general public that plaintiff remains free to direct his children never to access. *See Anspach*, 503 F.3d at 263-64 (distinguishing, for purposes of the due process clause, a government program involving "constraint or compulsion" from a program merely making voluntary services available). Such cases, like the inapposite cases relied upon by the district court, therefore provide scant support for plaintiff's argument that he has a fundamental liberty interest in objecting

to his minor children's voluntary receipt of contraceptives in all circumstances. *See* Opening Br. 40-41, 43-44.

## IV. Even Assuming It Were Correct on the Merits, the District Court Abused Its Discretion in Vacating HHS's Regulation

Plaintiff does not rebut the government's showing that even assuming the court was correct on the merits, it abused its discretion in invoking § 706(2) of the Administrative Procedure Act (APA) to vacate HHS's regulation. *See* Opening Br. 48-51.

Plaintiff acknowledges (Br. 41-42) that he did not raise an APA claim in his complaint and that he asserted as late as summary judgment—after HHS promulgated its rule in October 2021—that he was "not asking th[e] court to 'hold unlawful and set aside' any agency rule under section 706 of the APA." ROA.607; *see* ROA.607 ("Mr. Deanda is merely asking for a declaration of his rights . . . along with an injunction to ensure those rights are observed.").

Plaintiff also does not dispute that the declaratory remedy he actually sought— and was granted—fully remedied any injury to himself. *See* Opening Br. 49. The district court declared that HHS's administration of the Title X program is violating plaintiff's rights under Texas law and the Constitution, ROA.794, and HHS has instructed Title X providers not to provide Title X services to his minor children in a manner that is inconsistent with that declaration of rights. Plaintiff does not even attempt to explain how that declaratory relief is insufficient to remedy any

demonstrated harm to himself, and that alone is reason to reverse the district court's

grant of vacatur.  *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)

(recognizing equitable principles require that any relief "be no more burdensome to

the defendant than necessary to provide complete relief to the plaintiff" (quotation

marks omitted)); *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (Article III requires that

any remedy "must of course be limited to the inadequacy that produced the injury in

fact that the plaintiff has established" (quotation marks omitted)).

Plaintiff is thus left to assert that the APA remedy "require[s] universal vacatur"

of agency rules—regardless of whether or not plaintiff brought an APA claim, and

regardless of whether or not that relief is necessary to redress a demonstrated harm to

himself.  That is incorrect.  As our opening brief explained, *see* Opening Br. 50-51, the

government respectfully disagrees with this Court's conclusion that vacatur is an

available remedy in challenges to agency rules.  *See United States v. Texas*, 143 S. Ct.

1964, 1981-83 (2023) (Gorsuch, J., concurring).  But this Court has also described

vacatur as merely a "default" remedy, *Data Mktg. P'ship LP v. U.S. Dep't of Labor*, 45

F.4th 846, 859 (5th Cir. 2022), and has recognized that courts have discretion to

deviate from that remedy in appropriate circumstances even when an APA claim has

succeeded on the merits, *see, e.g., Central & S.W. Servs., Inc. v. U.S. EPA*, 220 F.3d 683,

692 (5th Cir. 2000).  Plaintiff is therefore incorrect that this Court's precedent

compels the conclusion that the APA displaces a court's equitable discretion even in

cases in which it applies, and for the reasons explained, Article III and equitable

principles forbid the vacatur remedy the district court provided.

## CONCLUSION

For the foregoing reasons, and those set forth in the government's opening

brief, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

ABBY C. WRIGHT
  *s/ Courtney L. Dixon*
COURTNEY L. DIXON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7246*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-8189*
  *courtney.l.dixon@usdoj.gov*

July 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2023, I electronically filed the foregoing brief

with the Clerk of the Court for the United States Court of Appeals for the Fifth

Circuit by using the appellate CM/ECF system.  Participants in the case are registered

CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


*s/ Courtney L. Dixon*
Courtney L. Dixon

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,049 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Courtney L. Dixon*
Courtney L. Dixon