# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 12, 2024

Lyle W. Cayce
Clerk

No. 23-10159

———

ALEXANDER R. DEANDA, *on Behalf of Himself and Others Similarly Situated*,

*Plaintiff—Appellee*,

*versus*

XAVIER BECERRA, *in his official capacity as Secretary of Health and Human Services*; JESSICA SWAFFORD MARCELLA, *in her official capacity as Deputy Assistant Secretary for Population Affairs*; UNITED STATES OF AMERICA,

*Defendants—Appellants*.

———

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:20-CV-92

———

Before RICHMAN, *Chief Judge*, and HAYNES and DUNCAN, *Circuit Judges*.

STUART KYLE DUNCAN, *Circuit Judge*:

## INTRODUCTION

Since 1970, the federal Title X program has given clinics hundreds of millions of dollars in grants to distribute contraceptives and other family planning services. By statute, Title X grantees must serve "adolescents"

No. 23-10159

while also "[t]o the extent practical . . . encourag[ing] family participation." 42 U.S.C. § 300(a). The question before us is whether Title X preempts a Texas law giving parents the right to consent to their teenagers' obtaining contraceptives. *See* TEX. FAM. CODE § 151.001(a)(6).

We hold that Title X does not preempt Texas's law. A grantee can comply with both. Moreover, Title X's goal (encouraging family participation in teens' receiving family planning services) is not undermined by Texas's goal (empowering parents to consent to their teen's receiving contraceptives). To the contrary, the two laws reinforce each other. We therefore affirm the district court's judgment declaring that Title X does not preempt Texas's parental consent law.

In doing so, we agree with the district court that the plaintiff, Alexander Deanda, has standing. If Title X preempts Texas's law, as the government maintains, it would nullify Deanda's right to consent to his children's medical care. That invasion of Deanda's state-created right alone creates Article III injury. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016); *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

Because we agree on preemption, we need not reach the district court's holding that Title X violates Deanda's constitutional right to direct his children's upbringing.

We depart from the district court on one point, however. Its final judgment partially vacated a regulation, 42 C.F.R. § 59.10(b), which forbids Title X grantees from notifying parents or obtaining their consent. The regulation, promulgated after Deanda filed suit, was not challenged by Deanda under the Administrative Procedure Act ("APA") or otherwise. Nor did the summary judgment order address the regulation's validity or preemptive force. We therefore conclude that the court erred by vacating the regulation under 5 U.S.C. § 706(2) of the APA.

No. 23-10159

Accordingly, we AFFIRM in part, REVERSE in part, and RENDER.

## I. Background

### A.

In 1970, Congress enacted Title X of the Public Health Service Act to "mak[e] comprehensive voluntary family planning services readily available to all persons desiring such services." Pub. L. No. 91-573, § 2(1), 84 Stat. 1504, 1504 (1970) (codified as amended at 42 U.S.C. § 300 *et seq*.). The law authorizes the Secretary of the Department of Health and Human Services ("HHS") "to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). Grants "shall be made in accordance with such regulations as the Secretary may promulgate." *Id.* § 300a-4(a).

"Title X grantees have served the teenage population from the inception of the program." *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 652 (D.C. Cir. 1983). A 1978 amendment made this explicit, requiring grantees to include "services for adolescents." Pub. L. No. 95-613, § 1(a)(1), 92 Stat. 3093, 3093 (1978); *see also Heckler*, 712 F.2d at 652 (noting the 1978 amendment "simply codified accepted past practice" with respect to providing services to "sexually active adolescents") (quoting S. Rep. No. 822, 95th Cong., 2d Sess. 24 (1978)).

In 1981 Congress amended Title X to require that, "[t]o the extent practical," grantees "shall encourage family participation in projects assisted under this subsection." Pub. L. No. 97-35, § 931(b)(1), 95 Stat. 357, 570 (1981). In 1983, the Secretary promulgated regulations requiring grantees to notify parents before prescribing contraceptives to minors and to comply

No. 23-10159

with state parental notification and consent laws. *See* 48 Fed. Reg. 3600 (Jan. 26, 1983). Those regulations never went into effect, however, because the D.C. and Second Circuits ruled them unlawful. *See Heckler*, 712 F.2d at 663–64; *New York v. Heckler*, 719 F.2d 1191, 1196 (2d Cir. 1983). The courts reasoned that Congress had declined to add such requirements to Title X and that, in any event, the regulations would "undermine" a "primary purpose" of the program—making "family planning services readily available to teenagers." *Heckler*, 712 F.2d at 660, 663.

As a result, the Secretary's "longstanding guidance" to Title X grantees has been that they cannot require parental consent or even notify parents. *See, e.g.*, 86 Fed. Reg. 56,144, 56,166 (Oct. 7, 2021) ("Specifically with respect to adolescents, courts have for decades recognized minors' rights to receive confidential services under the Title X program.") (citing *Heckler*, 712 F.2d 650)). The Secretary formalized this policy by promulgating a final rule in October 2021. *See id.* at 56,144. While reiterating that "[t]o the extent practical, Title X projects shall encourage family participation," the rule forbids grantees from requiring parental consent or notifying parents before or after a minor receives family planning services. 42 C.F.R. § 59.10(b).

## B.

In 2020, Alexander Deanda filed a federal lawsuit challenging the Secretary's administration of the Title X program. He alleged that he is the father of three minor daughters[1]; that he is raising his daughters according to his Christian beliefs to abstain from pre-marital sex; and that he wants to be

---

[1] Following oral argument, the Secretary filed a suggestion of mootness claiming interrogatory responses revealed that Deanda's daughters were now all adults. Deanda's response, accompanied by his affidavit, stated that one of his daughters remains a minor. Accordingly, we decline the Secretary's request to declare the case moot.

informed if any of his children access or try to access contraceptives. He further alleged that Texas law gives him a right to consent before his children obtain contraceptives. *See* Tex. Fam. Code § 151.001(a)(6); § 102.003(a)(1). Finally, he alleged that the Secretary administers Title X unlawfully by funding grantees who provide contraceptives to minors without notifying parents or obtaining parental consent. Accordingly, Deanda sought declaratory and injunctive relief on behalf of himself and a putative class, claiming that the Title X program violates (and does not preempt) Texas law and that it violates his constitutional right to direct his children's upbringing as well as his rights under the Religious Freedom Restoration Act ("RFRA").[2] After the district court declined to certify a class, Deanda moved for summary judgment on his own behalf, which the district court granted.

The district court first ruled that Deanda had standing because the Secretary's administration of Title X threatens his right under Texas law "to consent to his children's medical care" and also "increas[es] the risk that [his] children might access birth control without his knowledge or consent." On the merits, the court concluded that Title X does not preempt Texas's parental consent law and also that the Secretary's administration of Title X violates Deanda's constitutional right to direct the upbringing of his children.

The court then ordered the parties to file proposed final judgments. Deanda's proposed judgment argued that under the APA, 5 U.S.C. § 706(2), he was entitled to vacatur of the October 2021 HHS regulation, 42 C.F.R. § 59.10, prohibiting parental notice or consent. (That regulation was promulgated after Deanda sued and after the parties initially cross-moved for summary judgment.) The Secretary objected, arguing

---

[2] Deanda later withdrew his RFRA claim.

No. 23-10159

Deanda had brought no APA claim nor sought vacatur of any regulations, and moved to strike that part of Deanda's proposed judgment.

The final judgment declared that the Secretary's administration of Title X violated Deanda's rights under Texas law and his constitutional right to direct his children's upbringing. Notwithstanding the Secretary's motion to strike, the judgment also vacated the second sentence of 42 C.F.R. § 59.10 under APA § 706(2). The district court then requested supplemental briefing on that latter issue but ultimately denied the Secretary's motion to strike. The court reasoned that partial vacatur of the regulation "follow[ed] necessarily" from the court's substantive holdings.

The Secretary timely appealed.

## II. Standard of Review

We review standing and preemption *de novo. See Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 432 (5th Cir. 2023) (citations omitted). We also review summary judgments *de novo. See Students for Fair Admissions, Inc. v. Univ. of Tex.*, 37 F.4th 1078, 1083 (5th Cir. 2022); Fed. R. Civ. P. 56(a). We review the vacatur of a regulation under the APA for abuse of discretion. *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 855 (5th Cir. 2022).

## III. Standing

First, we address standing. As noted, the district court ruled Deanda had standing because the Secretary's administration of Title X (1) seeks to undermine Deanda's state right to consent to his children's medical care, and (2) increases the risk that his children will obtain contraceptives without his knowledge or consent. On appeal, the Secretary contests both conclusions. We conclude that Deanda has standing under the first theory, so we need not address the second.

No. 23-10159

## A.

To have standing to sue in federal court, a plaintiff must show he has suffered an injury traceable to the defendant which the court's judgment would likely redress. *Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 272 (5th Cir. 2021) (citing *Spokeo*, 578 U.S. at 338). One kind of injury occurs when a defendant invades a statutorily-created right that protects the plaintiff. "The actual or threatened injury requirement of Article III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Wendt v. 24-Hour Fitness USA, Inc.*, 821 F.3d 547, 552 (5th Cir. 2016) (quoting *Warth*, 422 U.S. at 500) (cleaned up).[3] In such a case, the statute must "grant[] persons in the plaintiff's position a right to judicial relief." *Ibid.* (quoting *Warth*, 422 U.S. at 500). Violating the statute, however, does not "automatically" guarantee standing: "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341. So, a "bare procedural violation, divorced from any concrete harm" would not "satisfy the injury-in-fact requirement."

---

[3] *See also Diamond v. Charles*, 476 U.S. 54, 65 n.17 (1986) ("The Illinois Legislature, of course, has the power to create new interests, the invasion of which may confer standing.") (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 n.22 (1976)); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (recognizing Article III injury may exist "solely" due to invasion of plaintiff's statutory rights) (citing *Warth*, 422 U.S. at 500)); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973) (recognizing "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute") (citing *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 212 (1972) (White, J., concurring)); *Hardin v. Ky. Util. Co.*, 390 U.S. 1, 6 (1968)); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 635 (3d Cir. 2017) ("That the violation of a statute can cause an injury in fact and grant Article III standing is not a new doctrine.") (and collecting cases); *Utah ex rel. Div. of Forestry, Fire & State Lands v. United States*, 528 F.3d 712, 721 (10th Cir. 2008) ("Although Article III standing is a question of federal law, state law may create the asserted legal interest."); *Cantrell v. City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001) ("[S]tate law can create interests that support standing in federal courts.").

*Ibid.* (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). But sometimes violating the statute is enough: "[T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact," and "a plaintiff in such a case need not allege any *additional* harm beyond the one [the statute] has identified." *Id.* at 342 (citations omitted).

Under those principles, Deanda has standing based on the Secretary's attempt to undermine his state right to consent to his daughters' obtaining contraceptives. It is undisputed that Texas affords Deanda a right to consent to his minor children's medical care, including whether they receive contraceptives and other family planning services. *See* Tex. Fam. Code § 151.001(a)(6) (providing "[a] parent of a child has . . . the right to consent to the child's . . . medical and dental care"). It is also undisputed that Deanda may sue to enforce that right. *See id.* § 102.003(a)(1) (allowing "a parent of the child" to file suit). Nor can it be doubted that the Secretary's policy is to "inva[de]" the right Texas confers on Deanda. *Warth*, 422 U.S. at 500. The Secretary distributes millions of dollars in grants annually to Texas clinics on the express condition that they provide contraceptive services to minors without notifying their parents or seeking parental consent. *See* 42 C.F.R. § 59.10(b).[4] And, in the Secretary's view, this policy trumps the notice-and-consent rights of Texas parents like Deanda. *See Ensuring Access*

---

[4] In 2022, for instance, the Secretary granted $26,520,156 to clinics in "Region VI" alone, which includes Texas and four other states. Office of Population Affairs, Title X Family Planning Annual Report, 2022 National Summary 75 (October 2023), *available at* opa.hhs.gov/sites/default/files/2023-10/2022-FPAR-National-Summary.pdf. Using those Title X funds, Region VI clinics provided contraceptives to 21,972 children under eighteen, almost ninety percent female. *Id.* at 27. Nationwide, the Secretary provided $248,666,814 to Title X clinics in 2022. *Id.* at 75. Those clinics, in turn, provided contraceptives to 205,108 children under eighteen—including 47,909 under fifteen. *Id.* at 27.

No. 23-10159

*to Equitable, Affordable, Client-Centered, Quality Family Planning Services*, 86 Fed. Reg. 56,144, 56,166 (Oct. 7, 2021) (explaining that 42 C.F.R. § 59.10(b) protects "adolescent confidentiality" and that family "involvement" is unnecessary). So, the Secretary's policy would not merely "inva[de]" Deanda's state-conferred parental rights. *Warth*, 422 U.S. at 500. It would obliterate them.

This is not a case where Deanda has alleged a "bare procedural violation, divorced from any concrete harm." *Spokeo*, 578 U.S. at 341; *see also Summers*, 555 U.S. at 496 ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing."). Those situations are unlike this one, as a review of the leading Supreme Court cases shows. Start with *Spokeo*. The plaintiff sued an internet search company for violating the Fair Credit Reporting Act ("FCRA") by disseminating "incorrect" information about him. 578 U.S. at 333. As the Court explained, not all FCRA violations inflict Article III injury: "It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." *Id.* at 342. Or take *Spokeo*'s sequel, *TransUnion*. The Court held procedural FCRA violations would not cause injury-in-fact where a misleading credit report was never even disseminated. *See TransUnion L.L.C. v. Ramirez*, 594 U.S. 413, 434 (2021) ("The mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm."). Finally, take *Summers*. Plaintiffs challenged Forest Service regulations exempting a timber project (Burnt Ridge) from notice-and-comment, allegedly in violation of federal law. 555 U.S. at 490–91. The Court held any procedural violation did not concretely injure plaintiffs because litigation over Burnt Ridge had settled. *See id.* at 496 (explaining "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing").

No. 23-10159

Merely describing these "bare procedural right" cases shows why they do not apply here. To begin with, none involves a federal program that, by design, seeks to preempt a state-conferred right. Furthermore, Deanda does not complain that the Secretary is violating some technical component of federal or state law with no real-world consequences to him. *Cf. TransUnion*, 594 U.S. at 434; *Spokeo*, 578 U.S. at 342; *Summers*, 555 U.S. at 496. He complains, rather, that the Secretary's policy purports to obliterate the parental rights he now enjoys under Texas law. In other words, if the Secretary's view prevails, Deanda's existing right to consent to his children's receiving contraceptives from Title X providers will disappear. That is the "concrete interest[]," *Summers*, 555 U.S. at 496, which Texas law protects and which the Secretary's policy would vaporize.

Finally, the Supreme Court has told us to consider whether Deanda's claimed injuries bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425 (citing *Spokeo*, 578 U.S. at 340–41). To be sure, his alleged harms are "intangible," but that does not prevent them from also being "concrete" for Article III purposes. *See ibid.* ("Various intangible harms can also be concrete."); *Spokeo*, 578 U.S. at 340 ("Although tangible injuries are perhaps easier to recognize, . . . intangible injuries can nevertheless be concrete."). Deanda's injuries plainly qualify as harms long recognized by our courts.

As the district court correctly reasoned, Deanda alleges injuries to his religious exercise and parental rights that have perennially been honored by American courts. For example, he claims the Secretary's policy burdens his right to exercise his Christian belief that his minor children should abstain from pre-marital sex. Such rights are, as the Supreme Court has explained, part of our "enduring American tradition." *See Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246, 2261 (2020) ("Drawing on 'enduring American tradition,' we have long recognized the rights of parents to direct 'the

No. 23-10159

religious upbringing' of their children.") (citing *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972)).[5] He also claims interference with his parental rights under the Fourteenth Amendment—rights our courts have traditionally protected. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the righ[t] . . . to direct the education and upbringing of one's children.").[6] True, parental rights over their children's medical treatment are not unlimited. *See, e.g.*, *L.W. by and through Williams v. Skrmetti*, 83 F.4th 460, 475 (6th Cir. 2023) ("This country does not have a custom of permitting parents to obtain banned medical treatments for their children and to override contrary legislative policy judgments."). But "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v.*

---

[5] *See also Yoder*, 406 U.S. at 214 (observing "the values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society") (citing *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925); *Ginsberg v. New York*, 390 U.S. 629 (1968); *Meyer v. Nebraska*, 262 U.S. 390 (1923)).

[6] *See also, e.g.*, *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Parham v. J. R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course."); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("Choices about . . . the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society.'") (quoting *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971)); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 256–57 (2022) (discussing "the right to make decisions about the education of one's children") (citing *Pierce*, 268 U.S. at 510)).

No. 23-10159

*Granville*, 530 U.S. 57, 66 (2000) (plurality op.). The injuries Deanda asserts fall within this "enduring American tradition." *Espinoza*, 140 S. Ct. 2261.

**B.**

The Secretary raises two objections to standing. First, Deanda has not alleged that his minor daughters have obtained or tried to obtain (or are likely to obtain) contraceptives from a Title X provider. Second, Deanda effectively raises a generalized grievance to Title X. We disagree with both points.

The Secretary first argues that Deanda must do more than allege the nullification of his right to consent to his children's medical care. Deanda must also allege his children "have . . . obtained or sought to obtain family-planning services from a Title X provider" or "are likely to do so in the near future." That is a puzzling argument. A key goal of the Secretary's policy is to get contraceptives into children's hands *without their parents knowing. See* 42 C.F.R. § 59.10(b) (forbidding "any Title X project staff [from] notify[ing] a parent or guardian before or after a minor has requested and/or received Title X family planning services"). So, imagine two dads. One dad's daughter gets the Pill from a Title X clinic, and the dad never finds out. According to the Secretary, he has no standing to sue. The other dad finds out. According to the Secretary, he can sue. That makes little sense. Parents' standing to sue should not depend on whether the Secretary has successfully kept them in the dark about their children's sex lives. *See Heckler*, 712 F.2d at 353 (Bork, J., concurring in part and dissenting in part) ("It would be no small matter to decide, as proponents of the rule would put it, that the federal government will assist teenagers in conducting active sexual lives but that their parents may not be told.").

In any event, the Secretary misunderstands the claimed injury. Deanda asserts injury to his state-secured parental rights to notice and consent. Contrary to the Secretary's argument, that injury is not "premised

No. 23-10159

on [his] minor children's receiving family-planning services." It is premised on the Secretary's express goal of overriding Deanda's parental rights under Texas law. The attempted erasure of those rights is "sufficient . . . to constitute [an] injury in fact," without Deanda's needing to "allege any *additional* harm beyond the one [Texas] has identified." *Spokeo*, 578 U.S. at 342 (citations omitted); *see also Warth*, 422 U.S. at 500 ("The actual or threatened injury required by Art[icle] III may exist *solely* by virtue of 'statutes creating legal rights, the invasion of which creates standing[.]'") (emphasis added) (citations omitted)). To be sure, if one of Deanda's daughters did get contraceptives from a Title X provider without his knowing, that would also injure Deanda. But it would mean Deanda had been injured not once but *twice*—once by the Secretary's nullifying his parental rights and a second time by the Secretary's succeeding in delivering birth control to Deanda's daughter behind his back.

The Secretary next argues that, if Deanda has standing, then "any parent (or potential parent) in Texas would presumably have standing to sue HHS for its administration of the Title X program." We disagree. This case does not concern all "parents or potential parents." It concerns only a parent with particular religious beliefs about raising his children. And even if that category includes many other parents, "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo*, 578 U.S. at 339 n.7; *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) ("[W]here a harm is concrete, though widely shared, the Court has found 'injury in fact.'") (citations omitted)). The Secretary's policy is to spend millions to get contraceptives to minors without telling their parents. It should not come as a shock that there could be a correspondingly large number of parents who can challenge it in court.

No. 23-10159

In any event, Deanda's injury is not a "generalized grievance." That is a case where "the impact on [plaintiff] is plainly undifferentiated and 'common to all members of the public.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 575 (1992) (quoting *United States v. Richardson*, 418 U.S. 166, 176–77 (1974)). Deanda's injury is personal. He sues as a father who, for religious reasons, wishes to exercise his state-conferred right to keep his children from accessing birth control without his knowledge or consent—not as an "undifferentiated" member of the general public. *See, e.g., United States v. Texas*, 599 U.S. 670, 703–04 (2023) (Gorsuch, J., concurring) ("Standing doctrine . . . preserves a forum for plaintiffs seeking relief for concrete and personal harms while filtering out those with generalized grievances that belong to a legislature to address.").

## C.

In sum, Deanda has shown an Article III injury because the Secretary seeks to preempt his state-conferred right to consent to his children's obtaining contraceptives.[7] Deanda easily satisfies the other standing components. The injury to Deanda's parental rights flows directly from the Secretary's administration of Title X. *See, e.g. Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 468–69 (5th Cir. 2024). That injury would be redressed if we declared that the Secretary's policy did not preempt Texas law or was otherwise unlawful. *See ibid.*

## IV. Preemption

We turn to the question whether Title X preempts Texas's parental consent law. The district court held there was no preemption because a Title

---

[7] We therefore need not consider Deanda's alternate argument that the Secretary injures him by increasing the risk that his children will obtain contraceptives from a Title X provider.

No. 23-10159

X grantee could comply with the Texas law while also complying with Title X's statutory directive that grantees "[t]o the extent practical . . . shall encourage family participation" in family planning projects. 42 U.S.C. § 300(a). The Secretary contends this was error for several reasons. After setting out the principles guiding our inquiry, we consider each argument in turn.

## A.

Federal preemption of state law flows from the Supremacy Clause:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. Art. VI, cl. 2; *see Kansas v. Garcia*, 140 S. Ct. 791, 800 (2020) ("The [Supremacy] Clause provides 'a rule of decision' for determining whether federal or state law applies in a particular situation.") (citation omitted)). State law is preempted when (1) a federal statute expressly preempts state law ("express preemption"); (2) federal legislation pervasively occupies a regulatory field ("field preemption"); or (3) a federal statute conflicts with state law ("conflict preemption"). *See generally Arizona v. United States*, 567 U.S. 387, 398–400 (2012).

Preemption analysis begins "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). This "presumption against preemption is applicable to 'areas of law traditionally reserved to the states[.]'" *Franks Inv. Co. L.L.C. v. Union Pac. R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (en banc) (quoting *In*

*re Davis*, 170 F.3d 475, 481 (5th Cir. 1999) (en banc)); *see also Arizona*, 567 U.S. at 400 ("In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'") (quoting *Rice*, 331 U.S. at 230)). Accordingly, "[t]here is . . . a presumption against preemption of state laws governing domestic relations, and family and family-property law must do major damage to clear and substantial federal interests before the Supremacy Clause will demand that state law will be overridden." *Hillman v. Maretta*, 569 U.S. 483, 490–91 (2013) (quoting *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001); *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581 (1979) (cleaned up)).

With that background in mind, we turn to the Secretary's arguments that the Title X program preempts Texas's parental consent law.

## B.

The Secretary argues that the text of 42 U.S.C. § 300(a) conflicts with, and thus preempts, Texas's parental consent law. To be precise, the Secretary does not contend that complying with both provisions is "a physical impossibility." *Arizona*, 567 U.S. at 399 (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)). Rather, the Secretary argues that Texas's law "stands as an obstacle" to accomplishing Title X's "full purposes and objectives." *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). This kind of preemption claim must clear a "high threshold." *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011)). "Courts may not conduct 'a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives [because] such an endeavor would undercut

No. 23-10159

the principle that it is Congress rather than the courts that pre-empts state law.'" *Ibid.* (quoting *Whiting*, 563 U.S. at 607).[8]

### 1.

The Secretary properly begins with § 300(a)'s text, which provides:

> The Secretary is authorized to make grants and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents). *To the extent practical, entities which receive grants or contracts under this subjection shall encourage family participation in projects assisted under this subsection.*

42 U.S.C. § 300(a) (emphasis added). The Secretary targets the italicized sentence, specifically the requirement that grantees "[t]o the extent practical . . . shall encourage family participation" in Title X projects. According to the Secretary, this language conveys that Congress "did not intend to require parental consent as a condition for adolescents to receive Title X services," thus bringing Title X's goals into conflict with Texas's parental consent law. We disagree.

A straightforward reading of § 300(a) reveals no conflict between Title X's objectives and Texas's. The federal text plainly conveys the

---

[8] Two Justices have criticized "purposes and objectives" preemption as contrary to the Supremacy Clause. *See Kansas*, 140 S. Ct. at 808 (Thomas, J., concurring, joined by Gorsuch, J.) ("The doctrine of 'purposes and objectives' pre-emption impermissibly rests on judicial guesswork about 'broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained with the text of federal law.'") (citation omitted)). Until the Supreme Court discards the doctrine, however, we must apply it. *See, e.g.*, *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 314 (5th Cir. 2023) (applying the doctrine); *Barrosse*, 70 F.4th at 321–23 (same).

No. 23-10159

overarching goal of encouraging family participation in adolescents' family planning decisions. The Texas law pursues the same goal through more specific means: requiring parental consent before minors obtain contraceptives. Those objectives reinforce each other. As Deanda argues, Title X establishes a "floor" for grantees' participation (encouraging family participation), and Texas law establishes a specific means of achieving that goal (obtaining parents' consent). So, far from undermining Title X's purposes, Texas law concretely furthers them.[9]

To reach the opposite conclusion—*i.e.*, that § 300(a) implicitly *forbids* requiring parental consent—the Secretary must distort the text. He contends the "plain meaning of the verb 'encourage' suggests" Congress only wanted grantees to "motivate and advise" minors "to include their family in their decision-making." The Secretary offers scant support for that reading beyond quoting dictionary definitions of "encourage," such as "to inspire with courage, spirit, or hope" or "to spur on."[10] That begs the question. *How* did Congress want grantees to "inspire" or "spur on" family participation? Section 300(a)'s broad language does not specify, and we cannot accept the Secretary's invitation to read restrictions into it. *See, e.g., P.R. Dep't of*

---

[9] For that reason, we are unpersuaded by the Secretary's reliance on *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324 (5th Cir. 2005). *Sanchez* addressed a Texas law blocking Title X funds from entities that perform abortions. *Id.* at 328. We suggested the law would be preempted if it conflicted with Title X eligibility requirements (but we did not decide that question, given that the Texas law possibly allowed grantees to keep receiving funds if they created separate affiliates). *Id.* at 338–43. *Sanchez* is inapposite. Unlike the law in *Sanchez*, Texas's parental consent law does not purport to add requirements to Title X eligibility. Rather, it is a generally applicable state law. Furthermore, as explained, Texas's parental consent law does not conflict with Title X's mandate that grantees encourage family participation. By contrast, the Texas law in *Sanchez* potentially excluded grantees that Congress had deemed eligible. *Id.* at 338.

[10] *See Encourage*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/encourage (last visited March 7, 2024).

No. 23-10159

*Consumer Aff. v. Isla Petrol. Corp.*, 485 U.S. 495, 501 (1988) [*Isla Petrol.*] (preemption cannot depend on "congressional intent in a vacuum, unrelated to the giving of meaning to an enacted statutory text"). If we did, we would commit the kind of forbidden "freewheeling judicial inquiry" into "federal objectives." *Whiting*, 563 U.S. at 607.[11]

**2.**

Moreover, the Secretary ignores the presumption against preempting state family law. *See, e.g.*, *Egelhoff*, 532 U.S. at 151 ("There is indeed a presumption against pre-emption in areas of traditional state regulation such as family law.") (citation omitted)). To defeat that presumption, Congress must "ma[k]e clear its desire for pre-emption." *Ibid.*; *see also Isla Petrol.*, 485 U.S. at 500 ("As we have repeatedly stated, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the *clear and manifest purpose of Congress.*'") (emphasis added) (citation omitted)).

In § 300(a), however, we see no such preemptive desire, clear or otherwise. If anything, we see the opposite. After all, in 1981 Congress did not add language to § 300(a) requiring grantees to "discourage" or "restrict" family participation in family planning. It added language requiring grantees to *encourage* family participation. That would be a bizarre way of announcing Congress's intent to nullify state requirements that parents consent to their teenagers' getting the Pill.

---

[11] In a similar vein, the Secretary also argues the "[t]o the extent practical" language in § 300(a) "indicat[es] that Congress understood that even the goal of encouraging family participation may well have to give way to other, competing considerations" (citation and internal quotation marks omitted). Maybe so. But the point is that this vague language does not mandate the Secretary's reading of § 300(a) to categorically forbid grantees from contacting parents.

No. 23-10159

### 3.

The Secretary next points out that, also in 1981, Congress amended a different provision—one relating to adolescent pregnancy demonstration grants under Title XX—to require parental notice and consent. *See* Pub. L. No. 97-35, § 955(a), 95 Stat. at 587 (Aug. 13, 1981) (requiring grantees to "notify the parents and guardians of any unemancipated minor requesting services" and generally to "obtain the [parent's] permission"); *see* 42 U.S.C. § 300z-5(22)(A). According to the Secretary, because § 300(a) lacks such explicit language, by implication it does not require parental notice or consent.

That misses the point. Deanda does not argue that Title X *itself* requires parental consent—in fact, he concedes it does not. He argues only that Title X's silence on the matter does not preempt a state parental-consent law, like Texas's, that may "require more extensive parental involvement than the bare minimum required by the Title X statute." So, the 1981 Title XX amendments are immaterial to the preemption question before us.

### 4.

The Secretary then turns to legislative history. He relies on two items: (1) a failed pre-1981 proposal to require Title X grantees to notify parents, *see Heckler*, 712 F.2d at 660 & n.43; and (2) a conference committee report suggesting grantees would not contact parents directly but would instead encourage minors to involve their parents. *See id.* at 657 (quoting H.R. Cong. Rec. No. 97-208, at 799 (1981)). We are unpersuaded for several reasons.

First, legislative history, generally of dubious value in statutory interpretation,[12] is especially unhelpful in interpreting § 300(a). Speculating

---

[12] *See, e.g., Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004) ("We should prefer the plain meaning since that approach respects the words of Congress. In this manner we avoid

No. 23-10159

why legislators rejected language in one bill (the pre-1981 proposed amendment to § 300(a)) and accepted the language in another (the present § 300(a)) is "not the best of guides to legislative intent." *State of Ala. ex rel. Graddick v. Tenn. Valley Auth.*, 636 F.2d 1061, 1068 n.12 (5th Cir. 1981) (quoting *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 381 n.11 (1969)). Even worse is the Secretary's invitation to rely on the conference committee report, which would effectively *amend* § 300(a). That is, the Secretary would use the report to alter the text from

> To the extent practical, entities which receive grants or contracts under this subjection shall encourage family participation in projects assisted under this subsection.

to

> To the extent practical, entities which receive grants or contracts under this subjection shall *not contact parents directly but shall only* encourage ~~family participation~~ *adolescents to contact their parents* in projects assisted under this subsection.

Congress could have adopted the committee's views by enacting them into law, but it did not. And, for our part, we cannot end-run Congress by using a committee report to amend the statute. *See, e.g.*, *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) ("[L]egislative history is not the law."); *United States*

---

the pitfalls that plague too quick a turn to the more controversial realm of legislative history."); *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) (explaining that "legislative history is not the law"); *Wooden v. United States*, 595 U.S. 360, 381 (2022) (Barrett, J., concurring) (noting that "the problems with legislative history are well rehearsed"); *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) (explaining that we "may look to legislative history" only "in very rare cases"); A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 46 (2012) ("In the interpretation of legislation, we aspire to be 'a nation of laws, not of men.' This means (1) giving effect to the text that lawmakers have adopted and that the people are entitled to rely on, and (2) giving *no* effect to lawmakers' unenacted desires.").

No. 23-10159

*v. Safehouse*, 985 F.3d 225, 239 (3d Cir. 2021) ("The words on the page, not the intent of any legislator, go through bicameralism and presentment and become law."); SCALIA & GARNER, *supra*, at 310 ("Even if the members of each house wish to do so, they cannot assign responsibility for making law—or the details of law—to one of their number, *or to one of their committees*.") (emphasis added)).

Second, even if we considered the legislative history cited here, it speaks only to whether Title X itself requires parental consent. Once again, that issue is not before us. The issue, instead, is whether Title X preempts state parental consent laws. *See, e.g.*, *Heckler*, 712 F.2d at 668 (Bork, J., concurring in part and dissenting in part) ("Congress might forbid HHS from requiring parental notification yet, in recognition of states' traditional role in this area, defer to states that have such a requirement.").

Third, and most importantly, in areas of traditional state regulation like family law, Congress must overcome the presumption-against-preemption by "clear[ly] and manifest[ly]" showing its intent to preempt. *See Arizona*, 567 U.S. at 400; *Altria Grp.*, 555 U.S. at 77; *Isla Petrol.*, 485 U.S. at 500. Yet, in urging preemption here, the Secretary must paper over the statute's silence with legislative history. That is a flashing red sign that no "clear and manifest" intent to preempt is shown in § 300(a). *See, e.g.*, *Isla Petrol.*, 485 U.S. at 501 (no preemption where "[t]here is no text . . . to which expressions of pre-emptive intent in legislative history might attach"); *cf. United States v. Nordic Vill., Inc.*, 503 U.S. 30, 37 (1992) (if the "clarity" necessary to abrogate sovereign immunity "does not exist [in the statute], it cannot be supplied by a committee report").

## 5.

Finally, the Secretary relies on out-of-circuit cases, principally the D.C. Circuit's 2-1 decision in *Planned Parenthood Federation of America, Inc.*

No. 23-10159

*v. Heckler*, 712 F.2d 650 (D.C. Cir. 1983) [*Heckler*]; *but see id.* at 665–67 (Bork, J., concurring in part and dissenting in part). *Heckler* invalidated the Secretary's 1982 regulations requiring Title X grantees to notify parents and comply with state parental notice-and-consent laws. *Id.* at 665.[13] We disagree with the Secretary, however, that *Heckler* provides helpful guidance on the preemption question before us.

First and foremost, *Heckler* addressed only the Secretary's authority to promulgate regulations and not whether Title X preempts state law. *See* 712 F.2d at 656–64. Preemption was not at issue. Moreover, the majority refused even to consider preemption principles as instructive on whether the Secretary's regulations were valid. The majority rejected as "misplaced" the Secretary's argument that avoiding preemption supported the regulations, *id.* at 664 n.57, instead treating the regulations as "an invalid delegation of authority to the states." *Id.* at 663. Dissenting on this point, Judge Bork argued that the Secretary's regulation as to state parental consent laws was supported by the goal of not preempting state family law. *Id.* at 668 (Bork, J., concurring in part and dissenting in part). So, with respect to the issue before us—whether Title X preempts state parental consent laws—the *Heckler* majority said next to nothing.

Furthermore, because the *Heckler* majority did not consider preemption, it necessarily did not read § 300(a) through the lens of the presumption-against-preemption. *See Egelhoff*, 532 U.S. at 151 (discussing the "presumption against pre-emption in areas of traditional state regulation

---

[13] Three circuits have since followed *Heckler*. *See State of N.Y. v. Heckler*, 719 F.2d 1191, 1196 (2d Cir. 1983) ("agree[ing]" with D.C. Circuit decision); *Jane Does v. Utah Dep't of Health*, 776 F.2d 253, 254–56 (10th Cir. 1985) (affirming trial court's adherence to D.C. Circuit and Second Circuit decisions); *Cnty. of St. Charles v. Mo. Fam. Health Council*, 107 F.3d 682, 684–85 (8th Cir. 1997) (relying on D.C., Second, and Tenth Circuits).

such as family law"). Judge Bork disagreed on this point, and so his opinion sheds more light on the issue before us. Even if Title X itself did not require parental notification, he explained, "yet, in recognition of states' traditional role in this area, [Congress might] defer to states that have such a requirement." *Id.* at 668 (Bork, J., concurring in part and dissenting in part). Judge Bork found support for that view in "the especially high standard that must be met when inferring preemption of state laws in areas such as family relations and medical ethics that are traditionally the exclusive or nearly exclusive province of state law." *Ibid.* (Bork, J., concurring in part and dissenting in part) (citing *Hisquierdo*, 439 U.S. at 581). "Where such policies are at stake," Judge Bork explained, "it is particularly important that we make sure Congress intended to oust state laws." *Ibid.*

Accordingly, we disagree with the Secretary that *Heckler* supports his position in this case.[14]

---

[14] We add that the *Heckler* majority's use of legislative history sits uneasily with our modern precedent. The majority spent two inconclusive paragraphs on the text, *see id.* at 656, but spent page after page exploring various kinds of legislative history. *See id.* at 656–58 (1981 conference committee report); *id.* at 659 (1975 and 1978 Senate reports); *id.* at 659–60 (1977 Senate, 1978 House, 1978 Senate reports); *id.* at 660 (1978 failed Volkmer amendment); *id.* at 662–63 (1981 and 1982 Senate reports); *id.* at 662 (committee chairman's statement). The majority even theorized that "despite ritualistic incantations of the 'plain meaning rule,' no occasion for statutory construction now exists when the [Supreme] Court will *not* look at the legislative history." *Id.* at 657 n.32 (citations omitted). This use of legislative history jars with modern cases, however. Since *Heckler* was decided in 1983, both the Supreme Court and our court have taken a more restrained approach to using legislative history. *See, e.g., Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("Even those of us who sometimes consult legislative history will never allow it to be used to 'muddy' the meaning of 'clear statutory language.'") (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011))); *ibid.* (observing "this Court has repeatedly refused to alter FOIA's plain terms on the strength only of arguments from legislative history") (citations omitted)); *United States v. Nazerzadeh*, 73 F.4th 341, 347 (5th Cir. 2023) (explaining, where text is unambiguous, "we are not permitted to look to the legislative history"); *Moore*, 71 F.4th at 395 (explaining legislative history is relevant only

No. 23-10159

\* \* \*

In sum, we agree with the district court that 42 U.S.C. § 300(a) does not preempt Texas's parental consent law.[15]

## C.

The Secretary next argues that Texas's parental consent law is independently preempted by a regulation, 42 C.F.R. § 59.10(b). As noted, the regulation provides:

> To the extent practical, Title X projects shall encourage family participation. However, Title X projects may not require consent of parents or guardians for the provision of services to minors, nor can any Title X project staff notify a parent or guardian before or after a minor has requires and/or received Title X family planning services.

42 C.F.R. § 59.10(b). HHS promulgated the regulation in October 2021, after Deanda filed suit and after the parties initially cross-moved for summary judgment. *See* 86 Fed. Reg. 56,144 (Oct. 7, 2021). We decline to reach this issue because the parties did not raise it in the district court and the district court's summary judgment order did not address it.

Valid agency regulations constitute federal law for preemption purposes. *See, e.g.*, *Butler v. Coast Elec. Power Ass'n*, 926 F.3d 190, 196 (5th Cir. 2019) (citing *City of New York v. F.C.C.*, 486 U.S. 57, 63 (1988); *Fid. Fed.*

---

"in very rare cases"); SCALIA & GARNER, *supra*, at 46. And, as noted, the Secretary's use of legislative history would add words to § 300(a) that were never enacted.

[15] We therefore need not and do not address Deanda's argument that Title X violates his constitutional right to direct his children's upbringing. *See, e.g.*, *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam) ("It is a well established principle governing the prudent exercise of [federal] jurisdiction that normally [we should] not decide a constitutional question if there is some other ground on which to dispose of the case.").

No. 23-10159

*Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) [*de la Cuesta*]; *O'Hara v. Gen. Motors Corp.*, 508 F.3d 753, 758 (5th Cir. 2007)); *see also La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368–69 (1986) (recognizing "a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation"). In such a case, "the correct focus is on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action." *City of New York*, 486 U.S. at 64. A regulation intended to preempt state law will be upheld unless the administrator "has exceeded his statutory authority or acted arbitrarily." *de la Cuesta*, 458 U.S. at 154 (citing *United States v. Shimer*, 367 U.S. 374, 381–82 (1961); *see also ibid.* (noting preemptive regulations "must not be 'unreasonable, unauthorized, or inconsistent with' the underlying statute") (quoting *Ridgway v. Ridgway*, 454 U.S. 46, 57 (1981))).

On appeal, the parties briefly spar over whether the regulation independently preempts Texas's parental consent law. Yet, as both parties concede, the district court did not address this distinct issue. That is unsurprising. The regulation was promulgated only after the first round of summary judgment briefing was complete. Following the regulation's issuance, neither party presented any argument about its separate preemptive force, citing the regulation only as confirming the Secretary's longstanding policy of excluding parental notice and consent. The district court's summary judgment order—while citing the regulation in passing— did not address whether the regulation itself preempts state law. That is, the district court never addressed whether the regulation has independent preemptive force apart from Title X's text. Nor did the court address the antecedent question whether, in promulgating the regulation, the Secretary "exceeded his statutory authority or acted arbitrarily." *de la Cuesta*, 458 U.S. at 154 (citation omitted).

No. 23-10159

"As we have repeatedly observed, we are a court of review, not first view." *Rest. L. Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023) (citation omitted). We therefore decline to address in the first instance whether 42 C.F.R. § 59.10(b) independently preempts Texas's parental consent law.

## V. Partial Vacatur of 42 C.F.R. § 59.10(b)

Finally, the Secretary argues the district court erred by partially vacating 42 C.F.R. § 59.10(b). Following the summary judgment grant, Deanda argued for the first time that the district court should vacate the regulation's second sentence (that is, the sentence precluding parental notice and consent) under APA § 706(2). Over the Secretary's objection, the district court agreed. Accordingly, the final judgment "holds unlawful and sets aside" the second sentence under § 706(2). We agree with the Secretary that this was an abuse of discretion.

It is true that the "[t]he APA gives courts the power to 'hold unlawful and set aside agency action[s].'" *Data Mktg. P'ship*, 45 F.4th at 859 (quoting 5 U.S.C. § 706(2)). Indeed, "[t]he ordinary practice [under the APA] is to vacate unlawful agency action." *Id.* at 859–60 (quoting *United States v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). The problem is that Deanda never challenged the regulation, under the APA or otherwise. We know of no authority—and Deanda cites none—authorizing a court to vacate a regulation under § 706(2) in the absence of an APA claim. *Cf. Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy *for a successful APA challenge to a regulation*.") (citing 5 U.S.C. 706(2)(A)) (emphasis added)). We take Deanda's point that the regulation was issued only after summary judgment briefing was underway. Yet that does not change the fact that Deanda has not challenged the regulation under the APA.

Deanda responds that the absence of an APA claim does not matter because Federal Rule of Civil Procedure 54 requires a court to "grant the relief to which each party is entitled, *even if the party has not demanded that relief in its pleadings*." Fed. R. Civ. P. 54(c) (emphasis added). We disagree. Rule 54(c)'s remedial latitude is not unlimited. Although the rule authorizes relief beyond what a complaint specifically requests, the relief granted "must be based on what is alleged in the pleadings and justified by plaintiff's proof, which the opposing party has had an opportunity to challenge." *Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335, 340 n.4 (5th Cir. 2015) (quoting 10 Charles Alan Wright, Arthur Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2662 (4th ed. 2014), at 165); *see also* 10 Moore's Fed. Prac., Civil § 54.72 (2024) (relief under Rule 54(c) "may not be granted . . . on an issue not properly presented to the court for resolution"). In other words, "[t]he discretion afforded by Rule 54(c) . . . assumes that a plaintiff's entitlement to relief not specifically pled has been tested adversarially, tried by consent, or at least developed with meaningful notice to the defendant." *Peterson*, 806 F.3d at 340.

Those conditions for applying Rule 54(c) were unmet here. As noted, Deanda brought no APA claim and his pleadings do not request vacatur of, or otherwise challenge, any regulation. *See, e.g.*, *Portillo v. Cunningham*, 872 F.3d 728, 735 (5th Cir. 2017) ("Where this court has found relief improper under Rule 54(c), the relief has generally been of a substantially different character from that requested."). It was only Deanda's proposed final judgment that first mentioned vacating 42 C.F.R. § 59.10(b). *Cf. ibid.* ("Rule 54(c) does not permit unrequested relief when it 'operate[s] to the prejudice of the opposing party,' such as when 'relief is finally sought at a [] late[] stage of the proceedings.'") (quoting *Peterson*, 806 F.3d at 340). Nor did the court's summary judgment order independently address the regulation's validity. True, in overruling the Secretary's objections, the district court

No. 23-10159

suggested its substantive rulings were incompatible with the regulation's lawfulness. Be that as it may, that is not the same as adjudicating an APA challenge to the regulation. *Cf. Portillo*, 872 F.3d at 735 (explaining there is no prejudice in awarding unpled Rule 54(c) relief "when all of the elements justifying such relief were *fully established before the district court*") (quoting *Peterson*, 806 F.3d at 340) (emphasis added).

Accordingly, we reverse the district court's final judgment to the extent it vacates the second sentence of 42 C.F.R. § 59.10(b) under 5 U.S.C. § 706(2).

## Conclusion

We AFFIRM the district court's final judgment declaring that the Secretary's administration of Title X violates Deanda's rights under section 151.001(a)(6) of the Texas Family Code and that "there is nothing in 42 U.S.C. § 300(a) that purports to preempt state laws requiring parental consent or notification before distributing contraceptive drugs or devices to minors."[16] We REVERSE the district court's final judgment to the extent it holds unlawful and sets aside the second sentence of 42 C.F.R. § 59.10(b) under § 706(2) of the APA.

AFFIRMED in part, REVERSED in part, and RENDERED.

---

[16] As noted, we need not and do not reach the district court's holding that the Secretary's administration of Title X violates Deanda's constitutional right to direct his children's upbringing.